No. 14-1111

# United States Court of Appeals
# for the Federal Circuit

---

KIM LAUBE & COMPANY, INC., a California corporation,
and KIM LAUBE, an individual,

*Plaintiffs – Appellants,*

*v.*

WAHL CLIPPER CORPORATION, an Illinois corporation,

*Defendant – Appellee,*

DOES 1-10, 1 to 10, Inclusive,

*Defendant.*

---

*Appeal from the United States District Court for the Central District of
California in Case No. 2:09-cv-00914-JAK-JC, Judge John A. Kronstadt*

---

## CORRECTED BRIEF FOR PLAINTIFFS-APPELLANTS

KENT A. ROWALD, ESQ.
LAW OFFICES OF KENT A. ROWALD, P.C.
2000 Bering Drive, Suite 700
Houston, TX 77057
(281) 516-3844
krowald@patentlawyers.com
*Counsel for Appellants*

April 11, 2014



UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**KIM LAUBE AND CO., INC AND KIM LAUBE v. WAHL CLIPPER CORPORATION**

**14-1111**

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellants certifies the following pursuant to Federal Circuit Rule 47.4:

1.      The full name of every party represented by me is:

      a.      Kim Laube & Co., Inc.
      b.      Kim Edward Laube

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
      a.      Kim Laube & Co., Inc.
      b.      Kim Edward Laube

3.      There are no publicly held affiliates of any corporate party represented by me.

4.      The names of all law firms and the partners or associates that appeared for the Appellants now represented by me in the trial court, or are expected to appear in this court are:

**Kent A. Rowald, Esq.     LAW OFFICES OF KENT A. ROWALD, P.C.**
                                 2000 Bering Drive, Suite 700
                                 Houston, TX  77057
                                 (281) 516-3844
                                 (832) 814-6871
                                 KRowald@PatentLawyers.com

| | |
|---|---|
| **Daniel J Kessler, Esq.** | **Burkhalter Kessler Clement & George LLP**<br>2020 Main Street Suite 600<br>Irvine, CA 92614<br>T: 949-975-7500<br>F: 949-975-7501<br>dkessler@bkcglaw.com |
| **David A Berstein** | **Myers Lin LLP**<br>7545 Irvine Center Drive Suite 200<br>Irvine, CA 92618<br>949-623-8750<br>Fax: 949-623-8759<br>david.berstein@myerslin.com |
| **Eric J Goodman** | **Burkhalter Kessler Goodman and George LLP**<br>2020 Main Street Suite 600<br>Irvine, CA 92614<br>949-975-7500<br>Fax: 949 975 7501<br>egoodman@bkgglaw.com |

<u>Mar 26, 2014</u>
Date

/s/Kent A. Rowald/s/
Kent A. Rowald
Texas Bar No.:  09602581
CAFC:  *admitted*
Law Offices Of Kent A. Rowald, P.C.
2000 Bering Drive, Suite 700
Houston, TX  77057
(281) 516-3844
(832) 814-6871
KRowald@PatentLawyers.com
Counsel for Appellants

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST .................................................................... i

TABLE OF CONTENTS............................................................................. iii

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)(C)............. iv

TABLE OF AUTHORITIES ........................................................................ v

REQUEST FOR ORAL ARGUMENT ..................................................... viii

STATEMENT OF RELATED CASES ......................................................... 1

STATEMENT OF JURISDICTION ............................................................. 2

STATEMENT OF THE ISSUES ................................................................. 4

STATEMENT OF THE CASE ..................................................................... 6

STATEMENT OF THE FACTS ................................................................. 12

SUMMARY OF THE ARGUMENT .......................................................... 16

ARGUMENT AND AUTHORITY: ISSUES I, II, III, IV, V and VIII ....... 22

   Standard of Review.............................................................................. 22

   1. The Court's Rulings relating to Claims 1-5 must be vacated. .............. 24

   2. The Court's Rulings relating to Claims 6-7 must also be vacated ........ 26

      a) The Reexamination Bars Wahl from asserting invalidity............. 26

      b) The Surviving Claims 6-7 Are Further Subject to A Covenant
         Not to Sue ................................................................................. 30

ARGUMENT AND AUTHORITY: ISSUES VI and VII .......................... 33

   Standard of Review.............................................................................. 33

ARGUMENT AND AUTHORITY: ISSUE X ............................................. 39

   Standard of Review...................................................................... 39

     1.  Laube's Variable Speed Technology Properly Qualifies As a
         Trade Secret ...................................................................... 40

     2.  The Uniform Trade Secret Act.......................................... 43

     3.  Laube's Technology Constitutes Trade Secrets Under USTA ........ 45

        a) Independent Economic Value from Not Being
           Generally Know. ........................................................... 45

        b) Reasonable Efforts to Maintain Secrecy ..................... 45

ARGUMENT AND AUTHORITY: ISSUE XI ......................................... 46

   Standard of Review...................................................................... 46

ARGUMENT AND AUTHORITY: ISSUE XII......................................... 52

   Standard of Review...................................................................... 52

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .................... 54

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)(C)

iv

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Amana Refrigeration, Inc. v. Quadlux, Inc.,*
  172 F. 3d 852 (Fed. Cir. 1999)...................................... 32, 33

*Avocent Huntsville Corp. v. ClearCube Technology, Inc.,*
  443 F.Supp.2d 1284 (N.D. Ala 2006) ........................................ 36

*Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,*
  15 F.3d 1573 (Fed. Cir. 1993)...................................... 40, 47, 52

*Cybertek Computer Products, Inc. v. Whitfield*
  (1977) 1977 Cal. App. LEXIS 2140 ........................................ 54

*Cybor Corp. v. FAS Technologies, Inc.,*
  46 U.S.P.Q.2d 1169 (Fed. Cir. 1998)...................................... 22, 34

*Engelhard Indus., Inc. v. Research Instrumental Corp.,*
  (9th Cir. 1963) 324 F.2d 347 ........................................ 43

*Fresenius USA, Inc. v. Baxter Int'l, Inc.,*
  721 F.3d 1330 (Fed. Cir. 2013)........................................ 25

*Futurecraft Corp. v. Clary Corp.,*
  (1962) 205 Cal. App. 2d 279, 23 Cal. Rptr. 198 ...................................... 43

*General Electric Co. v. Joiner,*
  522 U.S. 136 (1997) ........................................ 47

*Hoffmann– La Roche, Inc. v. Promega Corp.,*
  323 F.3d 1354 (Fed.Cir.2003) ........................................ 37

*In re Portola Packaging Inc.,*
  110 F.3d 786 (Fed. Cir. 1997)........................................ 26

*In re Swanson, et al.,*
  Fed. Cir. Dkt. No. 2007-1534 (Fed. Cir 2008)........................................ 26

v

*In re: Kim Laube and In re: Kim Laube & Co.*, Inc,
pending in the U.S. Bankruptcy Court,  C.D.Ca – San Fernando Valley
Division, Case Nos 1:13-bk-17331 VK and 1:13-bk-17332 VK ............... 1

*Intellectual Property Development, Inc., v. TCI Cablevision of Cal., Inc.*,
248 F.3d 1333 (Fed. Cir. 2001) ........................................................... 31, 32

*Kim Laube & Company, Inc. and Kim Laube v. Wahl Clipper Corp.*, Case
No. CV-09-914 JAK (JCx) .......................................................................... 1

*Kingsdown Medical Consultants, Ltd v. Hollister, Inc.*,
863 F.2d 867 (Federal Circuit 1988) ........................................................ 38

*Koon v. United States*,
518 U.S. 81 (1996) .................................................................................... 48

*Laube v. Rea*, Court of Appeals for the Federal Circuit,
Case No. 2013-1048 .................................................................................... 1

*Lauf v. E. G. Shinner & Co.*,
303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938) .................................... 33

*Panduit v. Dennison Mfg. Co.*,
810 F. 2d 1561 (Fed. Cir.),
*cert denied*,  481 U.S. 1052 (1987) ..................................................... 23, 34

*Preiser v. Newkirk*,
422 U.S. 395 (1975) .................................................................................. 31

*Pullman-Standard v. Swint*,
456 U.S. 273, 102 S.Ct. 1781 (1982) ........................................... 40, 47, 52

*Rigging Int'l Maint. Co. v. Gwin*,
(1982) 128 Cal. App. 3d 594, 180 Cal. Rptr. 451 .................................... 42

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*,
528 F.3d 1365 (Fed.Cir.2008) .................................................................. 38

*Star Scientific, Inc., v. R.J. Reynolds Tobacco Co.,*
   537 F.3d 1357 (Fed.Cir.2008) ................................................................ 37

*Super Sack Mfg. Corp. v. Chase Packaging Corp.,*
   57 F.3d 1054 (Fed. Cir. 1995) ........................................................... 32, 33

*Therasense Inc. v. Becton, Dickinson and Co.,*
   649 F.3d 1276, 99 U.S.P.Q.2d 1065 (Fed. Cir. 2011) (en banc) ........ 29, 36

**Statutes**

28 USC § 2201(a) ........................................................................................ 31

35 U.S.C. §315(c) ....................................................................................... 27

Cal. Civ. Code § 3246.1(d) ......................................................................... 45

Cal. Civ. Code § 3426.1(d) ......................................................................... 44

Cal. Civ. Code §§ 3426-3426.10 ................................................................ 43

**Other Authorities**

Park, *et al.*, EVIDENCE LAW § 12.01, at 540-41 (1998) .......................... 47

**Rules**

37 C.F.R. § 1.907 ........................................................................................ 27

# REQUEST FOR ORAL ARGUMENT

Plaintiffs are referred to as "Laube". Defendant is referred to as "Wahl". Laube respectfully requests oral argument on this appeal. This appeal concerns the denial of Laube's motion to dismiss the patent related claims, denial of Laube's for summary judgment of non-infringement and the granting of Wahl's summary judgment of invalidity and non-infringement, the findings after a bench trial of inequitable conduct based upon Claims 1-5 of the patent in suit (which subsequently were eliminated from the patent in an inter partes reexamination which is now final), the finding that the case is an exceptional case and the award of attorney's fees for the patent issues based upon the inequitable conduct findings premised on the non-existent (post reexamination) claims 1-5, the amount of the attorney's fees awarded and the denial of a motion to dismiss all patent related claims in light of a covenant not to sue issued on all claims in the patent, regardless of whether they survived reexamination. Additionally, this appeal concerns the granting of Wahl's motion for summary judgment relating to Laube's trade secrets relating to variable speed technology and the Court's refusal to allow certain evidence to be presented to the jury and the resulting erroneous jury verdict that Wahl did not misappropriate

Laube's trade secrets relating to Laube's lever mechanism's replaceable tip technology.

Finally, immediately prior to the filing of this corrected brief, a decision was be entered by the district court awarding additional attorneys' fees relating to the trade secrets claims. That decision will be appealed by Laube within a few days of the filing of this corrected brief and Laube respectfully suggests that matter should be consolidated with this matter.

Laube requests oral argument to provide clarity and assistance to the Court on the events that transpired and the merits of the appeal.

<u>Mar 26, 2014</u>
Date

<u>/s/Kent A. Rowald/s/</u>
Kent A. Rowald
Texas Bar No.: 09602581
CAFC: *admitted*
Law Offices Of Kent A. Rowald, P.C.
2000 Bering Drive, Suite 700
Houston, TX 77057
(281) 516-3844
(832) 814-6871
KRowald@PatentLawyers.com
Counsel for Appellants

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant provides as follows:

(a) There have been no previous appeals in this case.

(b) Appellant cites the district court case from which this appeal emanates in which a motion is still pending: *Kim Laube & Company, Inc. and Kim Laube v. Wahl Clipper Corp.*, Case No. CV-09-914 JAK (JCx), in the United States District Court, Central District of California.

(c) Appellant cites Laube v. Rea, Court of Appeals for the Federal Circuit, Case No. 2013-1048, now concluded and the related reexamination proceeding in which a certificate of reexamination has now issued as a related matter which substantively affects this appeal.

(d) Appellant cites  In re: Kim Laube and In re: Kim Laube & Co., Inc, pending in the U.S. Bankruptcy Court,  C.D.Ca – San Fernando Valley Division, Case Nos 1:13-bk-17331 VK and 1:13-bk-17332 VK as cases which affect this case as set forth in this motion.

(e) No other cases are pending in the Supreme Court, this Court, or any other circuit court of appeals at this time.

Mar 26, 2014                                    /s/Kent A. Rowald/s/
Date                                                  Kent A. Rowald
                                                         Counsel for Appellants

## STATEMENT OF JURISDICTION

The trial court had original subject matter jurisdiction pursuant to 28 U.S.C. §1338(a) as a civil action arising under Acts of Congress relating to patents. This Appeal is from the trial court's final decision in: (1) the Order lifting the stay pending reexamination based on a finding that the reexamination proceeding was "final", dated January 23, 2012 and entered January 27, 2012 (Dkt 121)(App 82 - 83); (2) the Minute Order denying Plaintiff's Motion to Dismiss Claim Without Prejudice, dated  October 15, 2012 and entered October 23, 2012 (Dkt 169)(App 84 - 86); (3)  the Minute Order dated October 30, 2012 and entered October 31, 2012 (Dkt 172) (the Markman decision)(App 87 - 107); (4) the district court's Summary Judgment Minute Order dated February 25, 2013 and entered February 26, 2013 (Dkt 308) (App 108 - 109); (5) the Order regarding non-patent issues on summary judgment dated and entered March 8, 2013 (Dkt 313) (App 110 - 122); (6) the Order regarding patent issues on summary judgment dated and entered March 8, 2013 (Dkt 314) (App 123 - 133); (7) the jury instructions given to the jury dated May 2, 2013 and entered May 3, 2013 (Dkt 361) (App 134 - 177); (8) the special jury verdict form dated and

entered May 3, 2013 (Dkt 362) (App 178 - 189); (9) the Minute Order denying judgment as a matter of law issued June 18, 2013 as reflected in the minutes from the trial dated June 18, 2013and entered June 19, 2013 (Dkt 410) (App 190 - 191); (10) the Minute Order finding inequitable conduct and awarding attorneys fees, dated July 18, 2013 and entered July 19, 2013 (Dkt 425) (App 192 - 218); (11) the Minute Order denying judgment notwithstanding the verdict or new trial, dated August 19, 2013 and entered August 20, 2013 (Dkt 436) (App 219 - 223); (12) the Minute Order denying the Motion to Dismiss the patent related claims in light of the reexamination proceeding dated October 17, 2013 and entered October 18, 2013 (Dkt 457) (App 224 - 230); (13) the Minute Order awarding attorneys fees and costs for the "patent related items" dated November 6, 2013 and entered November 7, 2013 (Dkt 467) (App 231 - 240); and (14) ) the Final Judgment dated November 6, 2013 and entered November 7, 2013 (Dkt 468) (App 241 - 243).[a] This Court accordingly has jurisdiction over this Appeal pursuant to 28 U.S.C. §1295(a).

---

[a] Just prior to this brief being filed, a decision on an additional motion for the award of additional attorneys' fees was rendered. That decision will be appealed as well, after which it is anticipated that it will be consolidated with these appeals and heard together.

## STATEMENT OF THE ISSUES

Although there were numerous additional issues that were erroneously decided and could be presented in this appeal, this appeal will be limited to the following issues unless and until the newly issued decision which will be appealed very shortly is consolidated herewith:

1.      Whether the trial court erred in interpreting claims that did not reissue following the now concluded inter partes reexamination of the patent in suit.

2.      Whether the trial court erred in finding on summary judgment that the patent claims that did not survive the inter partes reexamination were invalid and not infringed.

3.      Whether the trial court erred in considering the alleged invalidity of patent claims 6-7, which did survive the inter partes reexamination, in light of Wahl's participation in the inter partes reexamination proceeding that has now been concluded.

4.      Whether the trial court erred in entering findings on summary judgment far in excess of those required to dispose of all patent claims that had been asserted.

5.     Whether the trial court erred in finding inequitable conduct based on claims that did not reissue following the now concluded inter partes reexamination of the patent in suit.

6.     Whether the trial court erred in finding that there was inequitable conduct relating to the patent in suit without making any findings regarding whether the art asserted to have been withheld was material and not cumulative.

7.     Whether the trial court erred in finding that there was inequitable conduct relating to the patent in suit based solely on the demeanor of the patentee at trial without any contradicting evidence of patentee's good faith belief that the withheld material was at most cumulative of the art before the patent office during the prosecution of the application.

8.     Whether the trial court erred in finding that this was an exceptional case based solely on the alleged inequitable conduct founded upon claims that did not reissue following the now concluded inter partes reexamination of the patent in suit.

9.     Whether the trial court erred in awarding attorney's fees where the evidence of the alleged fees relating to the patent issues only was a

guesstimate based on an arbitrary apportionment of a percentage of the total fees to the patent issues without any basis for such an apportionment.

10. Whether the trial court erred in finding on summary judgment that the specific circuit and its components employed by Appellants were not trade secrets.

11. Whether the trial court erred in preventing Appellants from proffering evidence of Appellees intent to improperly obtain Appellants' technology and put Appellants out of business when the jury considered whether Appellees misappropriated and improperly used Appellants' trade secrets relating to its replaceable tip lever technology.

12. Whether the trial court erred in excluding the evidence showing Appellees targeted Appellants' trade secrets and had access to them, thereby improperly preventing Laube from arguing the breach of contract to the jury.

## STATEMENT OF THE CASE

On February 6, 2009, Plaintiff Kim Laube & Co., Inc. and Kim Edward Laube (hereinafter "Laube") asserted that Wahl Clipper Corp (hereinafter "Wahl") infringed U.S. Patent Number 6,473,973 (the "973 Patent"), breached a contract in which Wahl agreed, among other things, to

transfer the 75% ownership interest in Laube that Wahl had previously purchased back to Laube, as well as cease using any trade secrets and proprietary information that Wahl had learned from Laube during Wahl's majority ownership of Laube.

More particularly, Laube asserted that, in furtherance of the parties' relationship, which began on September 17, 1998, when Wahl purchased a 75% ownership interest, Laube shared with Wahl certain proprietary inventions and ideas. Specifically, this included a detachable lever tip that Kim Laube had designed in 1989, and a design for a pulsed variable speed controller. Another aspect of Plaintiffs' proprietary technology is the reduction in size of the pulse switch power supply, which originally measured approximately four inches tall and seven or eight inches long, so that it would be reduced to the size of a coin and fit inside a handheld clipper.

Laube asserts that these proprietary inventions and ideas contained information not known to the general public or to other persons who could obtain value from their disclosure or use. Further, Laube duly maintained the secrecy of this information, which thereby derived economic value from

not being generally known. Some of the measures taken by Laube to safeguard the secrecy of their proprietary technology included the requirement that each employee sign a confidentiality agreement, and the "masking" of the controllers in their clippers so as to obstruct the part numbers on the circuit boards in the clippers.

On January 7, 2002, Kim Laube, individually, filed the patent application that, on November 5, 2002, resulted in issuance of U.S. Patent Number 6,473,973 (the "973 Patent") to Mr. Laube.

Thereafter, the parties' relationship soured and, on October 16, 2002, Kim Laube filed a prior suit against Wahl, alleging that Wahl had provided trade secret information (unrelated to the trade secrets in this case) to one of its affiliate companies. The parties settled that suit, and, on December 24, 2002, Laube and Wahl entered into a Stock Transfer Agreement (hereinafter the "STA"). As part of the STA settlement, Wahl transferred its entire interest in the Corporation back to Kim Laube.

Pursuant to Section 8.1 of the STA, Wahl acknowledged and agreed "not to divulge, communicate, use to the detriment of Corporation or [Kim Laube] or for the benefit of any other person or entity, or misuse in any

way, any confidential information or trade secrets of Corporation or [Kim Laube]."

Pursuant to Section 8.2 of the STA, Wahl acknowledged and agreed that it had "no interest in or right to any. . . patents or applications Corporation or [Kim Laube] as listed in Schedule 5 . . ..". Schedule 5 specifically identifies the '973 Patent along with other patents, patent applications and trademarks of both the Corporation and Kim Laube.

After entering into the STA, Laube discovered that Wahl had misappropriated Plaintiffs' trade secrets, including the lever mechanism technology and the variable speed technology, as well as the comb technology which Plaintiffs believed the '973 Patent claimed. This misappropriation resulted in the manufacture, use, distribution, sale and/or offer for sale, of products which use a replaceable actuator tip as disclosed in Kim Laube's drawing of a detachable lever tip dated December 4, 1989; products which use the pulse technology developed by Kim Laube and which have the same circuit board; and products which incorporate the invention claimed in the '973 Patent claims, when they are properly construed. Additionally, Plaintiffs' proprietary inventions and ideas

regarding lever mechanism technology were converted by Wahl to its own use and were reduced to claims within Wahl's United States Patent Applications bearing Nos. 20060042093 (claims 12, 13, 15 and 17) and 20060064878 (claims 1-20). Wahl was the assignee of these patent applications.

On February 6, 2009, Plaintiffs then filed this suit, seeking injunctive relief and to recover the substantial damages sustained as a result of Wahl's misappropriation of Laube's trade secrets in his replaceable lever tip mechanism and his variable speed circuitry, now believed to be in excess of approximately $75 million. Laube also asserted patent infringement claims based on Wahl's use of Laube's clipper comb attachment which Laube believed to be covered by the claims of the '973 patent.

After filing motions to disqualify Laube's counsel and various other preliminary wrangling, Wahl filed an inter partes reexamination of the '973 patent and, on December 28, 2009, moved to stay the case pending reexamination. Laube did not oppose and the case was stayed.

On December 6, 2011, Wahl sought to have the stay lifted. On January 23, 2012, the trial court erroneously concluded that issuance of a

final office action in the reexamination concluded the matter so that the stay should be lifted.

On August 6, 2012, Laube sought leave to amend to dismiss all patent claims given the status of claims 1-5 as rejected in the reexam pending the then on-going appeal. That motion was denied. Nevertheless, the Court ordered Markman briefing and held a Markman hearing and entered claim interpretations for all claims 1-7, including the rejected claims 1-5. Although Laube does not believe that the Markman decision is correct in its entirety, Laube sought to have judgment entered against Laube based on non-infringement of all seven claims as interpreted by the Court. Thereafter, Laube issued a covenant not to sue to Wahl on any of the claims in the '973 patent.[b] The inter partes reexamination proceeding then concluded with the issuance of the certificate of reexamination on January 8, 2014, Claims 1-5 were finally rejected and claims 6-7 were reissued.

---

[b] Because the covenant not to sue removes any case in controversy relating to the patent from this case, Laube is not seeking to have the Markman decision as to claims 6-7 corrected, but rather to have the entire Markman decision, which is replete with improper advisory rulings, reversed and remanded with instructions to dismiss the Complaint to the extent that it asserts infringement of remaining claims (6-7) and all counterclaims which were brought as to any patent claims.

**Statement of Facts**

While this suit involves the invention claimed in United States Patent No. 6,473,973 (in the '973 patent), the focus of the suit was far more on the relationship between Laube and Wahl and Wahl's desire to obtain Laube's technology so that it could compete in the animal clipper market and at the same time eliminate Laube as a competitor. To that end, on September 17, 1998, Wahl purchased a 75% ownership interest in Laube and thereby gained executive level access to certain of Laube's proprietary inventions and ideas, including a detachable lever tip that Kim Laube had designed in 1989, a design for a pulsed variable speed controller, and Laube's design for a comb element for use on electric clippers.

At Wahl's encouragement and during Wahl's ownership period, Laube filed the patent application that ultimately resulted in the '973 patent relating to the connection of the comb to the clipper. The parties and the Court disagree regarding what the patent discloses and claims in that regard, but in light of the withdrawal of claims 1-5 in reexamination and the covenant not to sue on claims 6-7, the specific meaning of the claim terms is no longer relevant to any issue properly left in this case.

During that same time, Wahl's management visited Laube's factory and was provided access to Laube's design drawings and shown the specific projects that were being phased in by Laube as money permitted and as patent protection on earlier generations expired. One of the items that Wahl became privy to was Laube's design drawing of his replaceable lever tip. Trial Transcript for April 24, 2013, Day 2, P.M. Session, Pg. 24, l. 9 - p. 28, l. 4 (APP 335-339). Moreover, Wahl's President, Greg Wahl, was shown not only Laube's dated drawings showing Laube's replaceable lever tip design, but he was shown a prototype that Laube had built. Trial Transcript for April 24, 2013, Day 2, P.M. Session, Pg. 64, l. 5 - p. 65, l.20 (APP 346-347). Additionally, the testimony showed that one of Laube's prototype replaceable lever tips was transported by Wahl management to Wahl prior to the start of Wahl's design efforts. Trial Transcript for April 24, 2013, Day 2, P.M. Session, Pg. 58, l. 17 - p. 63, l.16 (APP 340-345). Even Mark Wahl confirmed that Mr. Laube built prototypes. Trial Transcript for April 23, 2013, Pg. 50, ll. 17 - p. 19 (APP 325).

One prototype (Exh. 1001) was proffered by Laube during trial, but excluded by the Court. Trial Transcript for April 19, 2013, Pg. 11, l. 1 - p.

21, l.4 (APP 311-321). A photo of that physical exhibit is attached in the Appendix hereto (APP.286). Notably, lever tip wear was an issue for Laube and not for Wahl because Laube's clippers were manufactured for the animal market while Wahl's were for the human market. As a result, Laube's clippers were required to run much faster than Wahl's clippers, resulting in far faster wear patterns. In short, Laube had a problem due to his market while Wahl did not have the same problem. Nevertheless, Wahl exercised its right as a 75% owner to, subject to the confidentiality agreements in the purchase agreement, see the Laube's designs.

Similarly, during that same time, Wahl became privy to Laube's proprietary variable speed circuitry. The circuitry was critical to Laube's products because it allowed the clippers to be run at lower speeds without losing the torque necessary to cut relatively heavier animal fur when compared to the human hair that Wahl's products were designed for. Notably, one aspect of Plaintiffs' proprietary variable speed technology is the reduction in size of the pulse switch power supply, which originally measured approximately four inches tall and seven or eight inches long, so that it would be reduced to the size of a coin and fit inside a handheld

clipper. That circuit (shown in Trial Exhibit 1183 (App 528)) is on the circuit board at the bottom of the opened Wahl clipper in the exhibit photo. Again, Wahl did not have a business need for the variable speed circuitry, but wanted it so that Wahl could move into the animal market.

Some time in 2002, the parties' relationship soured and, on October 16, 2002, Kim Laube filed suit against Wahl, alleging that Wahl had provided trade secret information relating to Laube's shampoo formulas to one of Wahl's affiliate companies. The parties settled that suit, and, on December 24, 2002, Kim Laube, the Corporation and Wahl entered into a Stock Transfer Agreement (hereinafter the "STA") which embodied the terms of the parties' settlement. As part of the settlement, Wahl transferred its entire interest in the Corporation back to Kim Laube.

Pursuant to Section 8.1 of the STA, Wahl acknowledged and agreed:

"not to divulge, communicate, use to the detriment of Corporation or [Kim Laube] or for the benefit of any other person or entity, or misuse in any way, any confidential information or trade secrets of Corporation or [Kim Laube]."

Nevertheless, after splitting the companies apart, Wahl promptly went to work using the information obtained from Laube to source its own copy of Laube's variable speed circuitry, began researching how to fix the

(to Wahl) non-existent lever tip wear problem, and copied Laube's clipper combs including the mechanism for attaching the combs to the clipper. When Wahl then introduced these features into the market, this suit soon followed.

## SUMMARY OF THE ARGUMENT

Once this case was filed and Wahl instituted inter partes reexamination proceedings against the '973 patent, the case was properly stayed pending reexamination. However, the Court erred in lifting that stay premised upon the reexamination being over when the examiner rejected claims 1-5 in the reexamination. The Court was later faced with a motion to enter judgment which (a) invited the Court to accept the rejection of claims 1-5 as essentially final since the appeal to this Court had affirmed that rejection and any appeal had been waived, (b) give the reexamination the effect of finality, including making it binding on the parties and (c) enter judgment of no inequitable conduct since the inequitable conduct findings were premised solely on the withdrawn claims 1-5. However, the Court then, inconsistent with its earlier finding that the reexamination was essentially final prior to its appeal, rejected that argument noting that the

reexamination was at that time subject to a final decision by this Court, but the certificate of reexamination had not yet been issued.  As a result, the Court noted that if the reexamination certificate were issued during the pendency of this appeal, it would make the patent related appeal very short and easy. (Dkt 457) (App 224 – 230).  The court was correct in that regard: with the issuance of the certificate of reexamination on January 8, 2014, the reexamination IS now final and this Court must give it retroactive effect and reverse the patent related decisions as improper under the statutory edicts relating to inter partes reexaminations.  Thus, all findings relating to claims 1-5, which permeate all the patent related findings in this case, are improper and should be reversed.  In addition, because claims 6-7 are subject to an unconditional covenant not to sue, the causes pled relating to claims 6-7 should be dismissed and all findings relating to those claims should be reversed.

Not only are patent claims 1-5 no longer in existence or in this suit, but Wahl's participation in the now concluded inter partes reexamination proceeding prevents Wahl from asserting that claims 6-7 are invalid.  With no ability to assert invalidity of the only remaining claims, there is nothing

for Wahl to base its inequitable conduct counterclaims on.  Moreover, even though the Court improperly allowed Wahl to assert inequitable conduct on all seven claims, after all the evidence that was presented, the Court found that claims 1-5 were procured by inequitable conduct, but did not make that finding as to claims 6-7.  As a result, not only is Wahl barred from making the requisite invalidity assertion to show inequitable conduct, but the Court has already found that Wahl failed to make such a showing of inequitable conduct as to claims 6-7.  As such, all inequitable conduct counterclaims should be dismissed and the finding of an exceptional case and award of attorneys fees based on the inequitable conduct finding should be reversed and rendered.

In the unlikely event that this Court wishes to address the issue in light of the clear basis for reversal of the inequitable conduct finding based on the lack of proper assertions of invalidity of the remaining claims and the required reversal for the only finding made relating to now non-existent claims 1-5, Laube respectfully suggests that the trial court erred in finding that there was inequitable conduct relating to the patent in suit without making any findings regarding whether the art asserted to have been

withheld was material and not cumulative. The Court simply found that art was relevant but failed to address the assertion that the admittedly withheld material was merely cumulative of the art before the examiner and thus could not be deemed material. (Dkt 425) (app 192 – 218).

Further, in the unlikely event that this Court wishes to address the issue in light of the clear bases for reversal of the inequitable conduct finding above, Laube respectfully suggests that the trial court erred in finding that there was inequitable conduct relating to the patent in suit based solely on the demeanor of the patentee at trial without any contradicting evidence of patentee's good faith belief that the withheld material was at most cumulative of the art before the patent office during the prosecution of the application. In short, the trial court disregarded the evidence before it and presumed an intent that doesn't exist! (Dkt 425) (App 192 – 218).

Further, in the unlikely event that this Court wishes to address the issue in light of the clear bases for reversal of the inequitable conduct finding above, the manner in which the trial court determined the amount of attorney's fees to award is improper. Rather than determining how much was attributable to patent related matters, the Court found the time entries

were intertwined between the patent and non patent issues. The court then allowed Wahl to provide a guesstimate based on an arbitrary apportionment of a percentage of the total fees to the patent issues without any basis for such an apportionment. While an apportionment may be proper if supported, here there is nothing more than the bald assertion by one of Wahl's counsel that the arbitrary apportionment is consistent with what actually happened. There are no facts developed to support that and in fact the supporting declarations were inconsistent, making reliance upon them improper at best.

With regard to the non-patent issues, the trial court erred in finding on summary judgment that the specific circuit and its components employed by Laube were not trade secrets. The trial court ignored that Laube had taken specific steps to prevent others from learning what the proprietary circuitry was. The trial court ignored these reasonable steps taken by Laube, which is all that is required to maintain trade secrets under California law, and imposed an improper absolute secrecy standard. As a result, when the Court found that Wahl could have reverse engineered the circuit, the Court found that the absolute secrecy standard was not met by Laube. The

fact that Wahl did NOT reverse engineer the circuit until after the suit was filed and it had already improperly taken and used the circuit does not change that Wahl misappropriated the secret. Wahl could have done it right, but chose to do it illegally.

Additionally, the trial court erred in preventing Appellants from proffering evidence of Appellees intent to improperly obtain Appellants' technology and put Appellants out of business when the jury considered whether Appellees misappropriated and improperly used Appellants' trade secrets relating to its replaceable tip lever technology. Wahl's sham independent creation story is clearly just that, a sham, when it is viewed in light of Wahl's internal correspondence that reflects Wahl bought an interest in Laube initially so that it could learn Laube's trade secrets, steal them and drive Laube out of business. Such evidence evinced both that Wahl misappropriated Laube's trade secrets and that Wahl did so intentionally. Preventing Laube from proffering that evidence to the jury was clearly erroneous and highly prejudicial to Laube, warranting reversal of the jury verdict on the trade secrets issue and remand for new trial.

Similarly, the trial court erred in prohibiting Appellants from including sales by Appellee's foreign subsidiaries in the damages caused by Appellee's misappropriation of Appellants' trade secrets. The evidence showed that Wahl's foreign subsidiaries sold products which incorporated Laube's replaceable tip technology, that Wahl controlled that activity and that Wahl profited from it. Nevertheless, the Court improvidently refused to allow the jury to consider such evidence. Because of the erroneous finding that the lever tip technology was not misappropriated, the amount of damages was not a question that was reached. However, on remand, the Court should be instructed to allow all damages, including those flowing from Wahl's foreign subsidiaries, to be presented to the jury.

## ARGUMENT AND AUTHORITY: ISSUES I, II, III, IV, V and VIII

## Standard of Review

How the now final reexamination proceeding affects the litigation underlying this appeal is a matter of law. As a purely legal question, the effect of the conclusion of the reexamination proceeding is reviewed *de novo* on appeal. *See Cybor Corp. v. FAS Technologies, Inc.,* 46 U.S.P.Q.2d 1169 at 1174-75. (Fed. Cir. 1998) (relating to claim construction being review *de*

22

*novo* because it is a matter of law). Further, presumed fact findings underlying any patent related verdict are clearly erroneous when made contrary to the edicts of the rules relating to reexamination proceedings. <u>*See*</u> *Panduit v. Dennison Mfg. Co.,* 810 F. 2d 1561, 1565 (Fed. Cir.), *cert denied,* 481 U.S. 1052 (1987).

Many of the issues on appeal are patent related and must be examined in light of the now final reexamination decision.[c]

Notably, the trial court erred as a matter of law by not taking into account the inter partes reexamination final decision in: (3) the Minute Order dated October 30, 2012 and entered October 31, 2012 (Dkt 172) (the Markman decision)(App 87 - 107); (4) the district court's Summary Judgment Minute Order dated February 25, 2013 and entered February 26, 2013 (Dkt 308) (App 108 - 109);(6)[d] the Order regarding patent issues on

---

[c]While the District Court erred in (1) the Order lifting the stay pending reexamination based on a finding that the reexamination proceeding was "final" , dated January 23, 2012 and entered January 27, 2012 (Dkt 121) (App 82 - 83); (2) the Minute Order denying Plaintiff's Motion to Dismiss the Patent Claims Without Prejudice, dated October 15, 2012 and entered October 23, 2012 (Dkt 169) (App 84 - 86) and those Orders were initially appealed, those Orders are not being pursued in this appeal since a proper determination of the remaining issues will moot the errors in those Orders.

[d] The reference numerals herein are not sequential, but are maintained to be consistent with the initial list of orders on appeal in the statement of jurisdiction.

23

summary judgment dated and entered March 8, 2013 (Dkt 314) (App 123 - 133);; (10) the Minute Order finding inequitable conduct and awarding attorneys fees, dated July 18, 2013 and entered July 19, 2013 (Dkt 425) (App 192 - 218); (12) the Minute Order denying the Motion to Dismiss the patent related claims in light of the reexamination proceeding dated October 17, 2013 and entered October 18, 2013 (Dkt 457) (App 224 - 230); and (13) the Minute Order awarding attorneys fees and costs for the "patent related items" dated November 6, 2013 and entered November 7, 2013 (Dkt 467) (App 231 - 240); are all now presented for *de novo* review.

**1.**    <u>**The Court's Rulings relating to Claims 1-5 must be vacated.**</u>

It is undisputed that the ultimate results of the *inter partes* reexamination proceeding are as follows:

Claims 1-5 of U.S. Patent 6,473,973 (the "'973 Patent,"), (App 67 - 81) have been determined to be invalid on various and differing grounds[e] and withdrawn. Claims 1-5 are thus no longer a part of the patent before this Court and any decision rendered by this Court relating to those claims would

_____

[e] Some were rejected based on art that was both before the patent office originally and cumulative "new" art presented by Wahl in the reexamination (no rejection was made solely on any "new" art). Some were allowable over the art, but rejected for lack of meeting the written description requirement. Original Claims 6 and 7 survived the reexamination.

24

be directed toward non-existing claims, would be advisory in nature and inappropriate. As explained in *Fresenius USA, Inc. v. Baxter Int'l, Inc.,* 721 F.3d 1330 (Fed. Cir. 2013), in cases such as this one where a reexamination becomes final resulting in claims no longer existing while those same claims are as far along as on appeal from a district court ruling, the result is that the appellate court will "vacate the district court's judgment and remand with instructions to dismiss." *Id at* 1347.

In this case, the decisions that must be vacated and remanded include, without reservation, the Markman claim construction ruling that includes the withdrawn claims 1-5, final entry of the summary judgment findings of invalidity and non-infringement of withdrawn claims 1-5, and the inequitable conduct findings based on findings of invalidity of the now non-existent claims 1-5 since such underlying claims are clearly improper.

It is clear from the Court's ruling that all of the factual findings on which the inequitable conduct determination was made by the Court relate to art showing a spring clip at the rear edge of the base plate of the comb. *See, e.g.* Dkt. 425, pg. 19, para 1a., para. 3, line 5 (App 210) ("The Laube prior art bore directly on the question of whether prior art combs have spring clips and groove notches for retaining the comb on the cutting head." (citing pg 5

of Dkt 425, para A.)).  While now non-existent Claims 1-5 included spring clips, Claims 6-7 do not contain spring clips and thus cannot form the basis for the inequitable conduct findings.  Therefore the inequitable conduct findings are based solely upon claims that no longer exist. Because the sole basis for the inequitable conduct finding fails as a matter of law because it is based on claims that did not issue, the inequitable conduct findings must be reversed.

> **2.** **The Court's Rulings relating to Claims 6-7 must also be vacated.**
>
> **a) The Reexamination Bars Wahl from asserting invalidity**

While original Claims 1-5 were rejected in the reexamination proceeding, Claims 6-7 of the '973 Patent were reissued in the reexamination proceeding without any modification or amendment.  This is critical for several reasons.

Notably, in *In re Swanson, et al.*, 540 F.3d 1368, 1375 (Fed. Cir 2008) (App 277 - 285 for ease of reference), the Federal Circuit refused to limit the grounds on which an interested third party could seek to invalidate a patent through re-examination, expressly recognized that Congress had amended 35 U.S.C. § 303(a) to overrule the Court's prior rule established in *In re Portola Packaging Inc.*, 110 F.3d 786 (Fed. Cir. 1997), and upheld a Patent Office

re-examination decision invalidating patent claims in view of a piece of prior art (Deutsch) that the Patent Examiner had cited during the original patent prosecution.

This is particularly important where, as here, Wahl participated in the reexamination and thus affirmatively waived the invalidity claims relating to surviving claims 6-7 of the '973 Patent. Simply put, Wahl is precluded from ever asserting in this civil action or any subsequent *inter partes* reexamination the invalidity of <u>any claim on any ground</u> Wahl raised, <u>or could have raised</u>, during the *inter partes* reexamination proceeding. 37 C.F.R. § 1.907.[f] See also 35 U.S.C. §315(c) ("A third-party requester . . . is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings.").

---

[f] 37 C.F.R. § 1.907 (c) provides that: "If a final decision in an inter partes reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request inter partes reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such inter partes reexamination proceeding."

Because Wahl was a third party requester in the reexamination, Wahl is barred from asserting invalidity of surviving claims 6-7. Because Wahl is barred from asserting that surviving claims 6-7 are invalid, Wahl is precluded from asserting that the allegedly withheld art is "material", i.e. that it would invalidate the claims. Similarly, since Wahl is barred from making a prima facie claim of invalidity, the District Court erred in finding surviving Claims 6-7 invalid and/or unenforceable.

This requirement that surviving Claims 6-7 are valid and enforceable as a matter of law affects several of the District Court's rulings. Initially, the Court did not take the valid and enforceable requirement into account in rendering its Markman decision. Rather, the Court interpreted the claims in such a way that it could then exacerbate the error by finding on summary judgment that Claims 6-7 were invalid. Moreover, because surviving Claims 6-7 are deemed to be valid and enforceable against Wahl as a matter of law, it would have been improper for the District Court to find that any of the allegedly withheld prior art was material, i.e. affected the validity of, Claims 6-7.[g] The inequitable conduct claim also must thus fail as a matter of law.

---

[g] As noted *supra*, the District Court in fact based its inequitable conduct claims only on the non-issued Claims 1-5.

To prove inequitable conduct, Wahl was required to establish "but-for" materiality, defined as where "the PTO would not have allowed the claim had it been aware of the undisclosed prior art." *Therasense Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1291, 99 U.S.P.Q.2d 1065 (Fed. Cir. 2011) (en banc). That necessarily requires that Wahl assert invalidity as a required underpinning to its inequitable conduct claim. Because Wahl is statutorily barred from asserting invalidity of the surviving claims and can thus not meet a required element of the inequitable conduct claim brought by Wahl, the inequitable conduct findings entered by the District Court are clearly erroneous as a matter of law since they are necessarily founded on factual findings which could not properly be considered.

Moreover, the issue <u>was</u> tried and the Court expressly found inequitable conduct based <u>only</u> on the now non-existent claims 1-5. The Court did <u>not</u> find inequitable conduct relating to surviving claims 6-7. The Court's inequitable conduct decision relying solely on the invalidity of non-existent claims 1-5 is clearly improper as a matter of law and should be reversed and rendered. Additionally, Wahl is barred from presenting any new evidence to support any claim that claims 6-7 are invalid. Without such a finding, the inequitable conduct finding by the Court is clearly erroneous

and should be reversed and rendered, with judgment on the inequitable conduct claim being entered in Laube's favor.

Moreover, the Court's award of attorney's fees to Wahl for the patent related portion of this case is based solely upon the improper inequitable conduct finding relating to now non-existing claims 1-5.  Without the inequitable conduct finding to support the exceptional case finding, there is no basis to award Wahl its attorney's fees.  Therefore the award of attorney's fees should be reversed and rendered as well.

In addition and in the alternative, surviving claims 6-7 are subject to a covenant not to sue.  Because the reexamination disposed of claims 1-5 and Laube's covenant not to sue on any remaining claim removes this Court's declaratory judgment subject matter jurisdiction over Wahl's patent related counterclaims, Wahl's patent related declaratory judgment counts must be dismissed.

### b)  <u>The Surviving Claims 6-7 Are Further Subject to A Covenant Not To Sue</u>

Not only can the inequitable conduct claims not be founded on Claims 6-7 due to their intact survival in the Inter Partes Reexamination, but they were subject to a convenant not to sue with removed them from the District

Court's proper review by eliminating any notion that there was any case in controversy on which to base jurisdiction over the claims.

In their motion to dismiss (App 252), Laube expressly gave Wahl the following covenant not to sue:

> **Laube releases and unconditionally covenants not to sue Wahl for infringement of U.S. Patent No. 6,473,973 (the "Laube Patent") based on Wahl's manufacture, importation, use, sale, and/or offer for sale of products on or before September 17, 2013. Laube unconditionally covenants not to sue Wahl for infringement of the Laube Patent based on Wahl's future manufacture, importation, use, sale, and/or offer for sale of products reflected on the Wahl website <u>www.wahl.com</u>, as of September 17, 2013.**

Laube's release and covenant not to sue divested the trial court of subject matter jurisdiction over Wahl's declaratory judgment counterclaims. In order to maintain a declaratory judgment counterclaim, there must be an "actual controversy." 28 USC § 2201(a). This actual controversy must exist at all stages, even after the counterclaim is filed. *Intellectual Property Development, Inc., v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1340 (Fed. Cir. 2001)(citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). The declaratory judgment plaintiff bears the burden of establishing that declaratory judgment exists at all times after the counterclaim was filed. *Id*.

31

A two-part test exists for determining whether an actual controversy exists in a patent declaratory judgment action:

> There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringment suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

*Intellectual Property Development,* 248 F.3d 1340-41. A covenant not to sue, such as the one set forth by Laube, that covenants "not to sue for infringing acts involving products 'made, sold, or used' on or before the filing date is sufficient to divest a trial court of jurisdiction over a declaratory judgment action." *Amana Refrigeration, Inc. v. Quadlux, Inc.,* 172 F. 3d 852,855 (Fed. Cir. 1999)(quoting *Super Sack Mfg. Corp. v. Chase Packaging Corp*., 57 F.3d 1054, 1060 (Fed. Cir. 1995). Laube's covenant goes even further than the requirements of *Amana* and *Super Sack*.

Laube's covenant not to sue covers not only all acts of infringement of the Laube patent committed by Wahl, but also prevents Laube from asserting future infringement by Wahl of the '973 patent based on any product currently offered for sale on Wahl's website. This would therefore

include any other devises currently offered by Wahl on Wahl's website that would infringe the Laube Patent, beyond the combs that were asserted to infringe herein. To the extent that Wahl argues that it can still maintain an actual controversy regarding future products it is not yet offering for sale, this assertion has already been rejected by the Federal Circuit. *See Amana*, 172 F. 3d at 855 ("[A]n actual controversy cannot be based on a fear of litigation over future products.").

Without an actual controversy to sustain the declaratory judgment counterclaims, Wahl's patent related counterclaims should have been dismissed by the District Court. *See Super Sack*, 57 F. 3d at 1059. With no claims or counterclaims to support them, each of the Court's patent related findings and orders must also be reversed and remanded.

## **ARGUMENT AND AUTHORITY: ISSUES VI and VII**

### **Standard of Review**

A trial court's failure to make any factual findings required to allow a remedy exceeds its jurisdiction as a matter of law. *Lauf v. E. G. Shinner & Co.*, 303 U.S. 323, 329-30, 58 S.Ct. 578, 581-82, 82 L.Ed. 872, 877 (1938) ("The District Court made none of the required (§ 107) findings save as to

irreparable injury and lack of remedy at law. It follows that in issuing the injunction it exceeded its jurisdiction."). As a purely legal question, the the failure to make or address underlying factual requirements is reviewed *de novo* on appeal. *See Cybor Corp. v. FAS Technologies, Inc.,* 46 U.S.P.Q.2d 1169 at 1174-75. (Fed. Cir. 1998) (relating to claim construction being review *de novo* because it is a matter of law).

While the District Court's failure to event address requisite factual underpinnings for its inequitable conduct findings need not be addressed in light of the clear error noted above, it is abundantly clear from the Court's inequitable conduct finding that the trial court erred in finding that there was inequitable conduct without making any findings regarding whether the art asserted to have been withheld was material and not cumulative. The Court simply found that art was relevant but failed to address the assertion that the admittedly withheld material was merely cumulative of the art before the examiner and thus could not be deemed material. (Dkt 425) (app 192 – 218).

Further, the trial court erred in finding that there was inequitable conduct relating to the patent in suit based solely on the demeanor of the patentee at trial without any contradicting evidence of patentee's good faith

belief that the withheld material was at most cumulative of the art before the patent office during the prosecution of the application. In short, the trial court disregarded the evidence before it (Laube's testimony that he believed the art was at most cumulative), failed to make any finding regarding whether it was cumulative despite the reexamination record in which there was not a single rejection based on the "new" prior art that was not also made based on the art cited by Laube to the patent examiner. Instead, the Court deemed Laube's testimony to be discounted because of his demeanor, ignored the reexamination record which reflects that the allegedly withheld art was at most cumulative, and then presumed that Laube had an intent to withhold material, non-cumulative art, an intent that simply doesn't exist and for which there is no evidence! (Dkt 425) (App 192 – 218).

With no evidence of intent contrary to Laube's uncontested testimony, regardless of how little weight the Court may have chosen to give such testimony, there is at most no evidence of intent, much less the clear and convincing evidence required to find inequitable conduct.

To find inequitable conduct, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference,

knew that it was material, and made a deliberate decision to withhold it."
*Therasense, Inc. v. Becton Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (en banc). See also *Avocent Huntsville Corp. v. ClearCube Technology, Inc.,* 443 F.Supp.2d 1284, ftnt 297 (N.D. Ala 2006) (the alleged infringer must show that prior art is material (and) under Patent Office Rule 56 must thus show it is not cumulative). Here Laube believed that the withheld references were at most cumulative of the prior art of record. The rejections of the claims in the reexamination proceeding based on both the prior art previously of record and the new art further supports Laube and his attorney's belief that the new art was cumulative.

Patent Office Rule 56 "states that information is "material" if it is "not cumulative to information already of record or being made of record in the Application" and meets other criteria. *Id.* at 1326. Notably, if the material IS cumulative, then it is NOT material. Laube and Mr. Beech's belief that the withheld prior art was not material because they believed it to be cumulative is thus amply supported by the law. Moreover, the testimony at the bench trial confirmed that withheld prior art operated, as Laube and Beech contended, in the same way that the prior art before the Patent Office

operated. Thus, not only did they reasonably not believe the art was material, it in fact was not material. (Dkt 414) (App 304 – 309).

In addition, "(i)ntent and materiality are separate requirements. *Hoffmann– La Roche, Inc. v. Promega Corp.,* 323 F.3d 1354, 1359 (Fed.Cir.2003). A district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive. *See Star Scientific, Inc., v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed.Cir.2008) (reh'g en banc denied).("the fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct")." *Therasense, Inc. v. Becton Dickinson & Co.*, 649 F.3d 1276, 1300 (Fed Cir. 2011) (en banc) (citation to Star enhanced).

Here, the only evidence of intent is Mr. Laube's testimony that he provided all the pertinent art of which he was aware to his patent attorney, Mr. Beech, who determined what was duplicative and thus followed PTO protocol by not citing it. Mr. Beech's testimony was not contrary to Mr.

Laube's but rather was simply that he did not keep records of what was specifically provided to him and thus could not tell what was or was not given to him.  Taken together, there is clear evidence of an intent to follow the rules, not hide anything!

Because Wahl has wholly failed to establish materiality or a specific intent to deceive, the Court's finding of inequitable conduct is erroneous as a matter of law. Notably, "'To meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.' *Star,* 537 F.3d at 1366. Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.' *Kingsdown Medical Consultants, Ltd v. Hollister, Inc.,* 863 F.2d 867, 873 (Federal Circuit 1988) (emphasis added). Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp.,* 528 F.3d 1365, 1376 (Fed.Cir.2008)" *Therasense, Inc. v. Becton Dickinson & Co.,* 649 F.3d 1276, 1300 (Fed Cir. 2011) (en banc).

Here, the most reasonable inference is that Laube and his attorney sought to follow the Patent Office rules and not submit what they believed to

be art that was at most cumulative. Thus, even if Wahl's specious argument that it is reasonable to infer that Laube and his lawyer intended to deceive the patent office were accepted, the existence of multiple reasonable inferences would require that no intent to deceive be found. Here, Wahl's argument is not well founded in light of the competing and compelling inference of studious adherence to the Patent Office rules by Laube and his counsel.

Notably, the Court found that Mr. Beech fulfilled his obligations to the Patent Office, but found without any supporting evidence, that Mr. Laube must have withheld the art which the District Court found to be material from Mr. Beech. There is simply no evidence that Mr. Laube withheld anything from Mr. Beech! Thus the Court's underlying factual findings relating to inequitable conduct fail on this grounds as well, as a matter of law.

## ARGUMENT AND AUTHORITY: ISSUE X
### Standard of Review

Questions of law are reviewed *de novo* on appeal. Whether covenants not to sue issued for prior patents in a patent family are implied licenses under later issued patents is a pure question of law. Pure questions of law

are reviewed *de novo. Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1577 (Fed. Cir. 1993). The appellate court need not defer to decisions on the law by the trial court and may freely reverse legal errors. Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789 (1982). If the critical conclusion of the trial court is a finding of fact and such a finding is grounded on an erroneous view of the law or a wrong legal standard it does not have any binding effect on the appellate court. *Id.*

**1. Laube's Variable Speed Technology Properly Qualifies As a Trade Secret.**

The trial court's preemptory ruling that Laube's variable speed circuitry cannot be a trade secret (App 110 - 122) can only be based upon an application of an erroneous principle of law by the trial court.

More particularly, the Trial Court, in its ruling on the non-patent issues on summary judgment (Dkt 313) (App 110 - 122) found that variable speed or pulse technology was generally known in the electronics industry and thus could not be a trade secret. In fact, the Court described this trade secret by saying, "The uncontroverted descriptions of the claimed variable speed trade secret do not clearly show that Plaintiffs contend that this alleged trade secret is anything more than use of electric current pulses rather than a

resistor method.  It is uncontroverted that a description of the trade secret at this level of generality was fully disclosed by Plaintiffs' own advertisements in 1996. Accordingly, the technology so described cannot be a trade secret." (Dkt 313) (App 114).  The court then concluded that, "the undisputed evidence shows that the essence of the alleged trade secret Plaintiffs have described was publicly disclosed.". *Id.*

The trial court clearly missed the critical point – it is not the general method of varying the speed of the electric motor that is the trade secret; it is <u>how</u> Laube shrunk the circuitry sufficiently that it would fit into a hand held clipper that is the trade secret.  The specific components used are critical to that shrinking of the previously very bulky circuitry. And as the Court acknowledged, "Plaintiffs argued that the masking of the chip numbers in the circuitry was evidence that Plaintiffs had made reasonable efforts to maintain the secrecy of the circuitry notwithstanding that the product was publicly available."  The Court then went on to confuse how the circuitry works (which Laube conceded would be known "if it were already known that Plaintiffs were using pulse width modulation technology. As noted, use of this technology was already disclosed by Plaintiffs in their

advertisements.". *Id.)* with how the circuitry had been shrunk. It is the manner in which Laube shrunk the circuitry so that it would fit in a clipper handle and be usable that is critical and was not generally known. (Dkt 245, pp. 10-12 and Ex. 6 and 7 thereto (App.411-413, 489-495). Simply put, the Court found that the basic concept (using variable speeds) was known, so how it was implemented (the specific circuitry that allowed it to be made sufficiently small), which was NOT known, couldn't constitute a trade secret. The District Court is simply wrong as a matter of law.

At the outset, it is important to note that the existence of Laube's trade secrets is not contingent on the *patentability* or absolute novelty or secrecy of those secrets. Although a trade secret may be a device or process that is patentable, patentability is not a condition precedent to the classification of a trade secret. Novelty and invention are not requisite for a trade secret as they are for patentability. *Rigging Int'l Maint. Co. v. Gwin* (1982) 128 Cal. App. 3d 594, 613, 180 Cal. Rptr. 451. Whereas patent law is based on a policy of rewarding or otherwise encouraging the development of secret processes or devices, trade secret protection merely guards against breach of faith and

42

reprehensible means of learning another's secret. *Futurecraft Corp. v. Clary Corp.* (1962) 205 Cal. App. 2d 279, 290, 23 Cal. Rptr. 198.

Another distinction between trade secrets and patents is the proof required in an action against misuse. To sustain a charge of patent infringement, all of the elements of an invention must have been present in an accused device. But to sustain a claim of trade secret misappropriation, it is only necessary that *some* secret information relating to one or more essentials of the method or apparatus have been misappropriated. *Engelhard Indus., Inc. v. Research Instrumental Corp.* (9th Cir. 1963) 324 F.2d 347, 353.

### 2. The Uniform Trade Secret Act.

The Uniform Trade Secret Act, California Civ. Code §§ 3426-3426.10 ("UTSA"), governs trade secret protection in California.

Under the UTSA, "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that

- Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

43

- Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Civ. Code § 3426.1(d).

"Misappropriation" means:
- Acquisition of another's trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or
- Disclosure or use of another's trade secret without express or implied consent by a person who:

    o Used improper means to acquire knowledge of the trade secret; or

    o At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was (i) derived through a person who used improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) derived through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

- Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

## Cal. Civ. Code § 3426.1(b)

### 3. Laube's Technology Constitutes Trade Secrets Under the UTSA.

Laube's proprietary inventions and ideas regarding variable speed technology constitute "trade secrets" under Civ. Code § 3246.1(d).

a) <u>Independent Economic Value From Not Being Generally Known</u>.

The variable speed technologies derive independent economic value, actual or potential, from not being generally known. These innovations gave Laube clippers significant advantages over clippers which do not offer these technologies, giving the Laube clippers a distinct competitive edge over those produced by Wahl and other competitors.

b) <u>Reasonable Efforts to Maintain Secrecy</u>

Plaintiffs' technologies were the subject of reasonable efforts to maintain their secrecy. Each employee was required to sign a confidentiality agreement, promising not to use or divulge information pertaining to the technologies. In addition, Plaintiffs "masked" the controllers in their clippers so as to obstruct the part numbers on the circuit boards in the clippers. Masking electronic parts by obtaining parts without serial or part numbers marked on them or obscuring them with paint or any other means is a standard way to hide the specific identity of a part in a circuit. Laube did both. (Dkt 245, pp. 10-12 and Ex. 6 and 7 thereto (App.411-413, 489-495).

45

The Court's failure to differentiate between how the circuit operates and how the circuit was made small enough caused it to erroneously conclude that there was no trade secret. Laube was the only clipper manufacturer that knew how to made the variable speed circuit small enough to be usable in a clipper. How that circuit was shrunk, not that a variable speed circuit was used, is the trade secret. Laube should have been provided the opportunity to present that trade secret to a jury, but the District Court erroneously took that opportunity from him by holding that because how the circuit operates was not a trade secret, nothing about the circuit could be a secret either. Because the Court erred in that regard, the granting of summary judgment to Wahl on Laube's circuitry trade secret claim should be reversed and remanded so that Laube may present his actual claims rather than the Court's erroneous short hand for the claims to an appropriate fact finder.

## ARGUMENT AND AUTHORITY: ISSUE XI

### Standard of Review

Questions of law are reviewed *de novo* on appeal. Whether covenants not to sue issued for prior patents in a patent family are implied licenses

under later issued patents is a pure question of law. Pure questions of law are reviewed *de novo. Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1577 (Fed. Cir. 1993). The appellate court need not defer to decisions on the law by the trial court and may freely reverse legal errors. Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789 (1982). If the critical conclusion of the trial court is a finding of fact and such a finding is grounded on an erroneous view of the law or a wrong legal standard it does not have any binding effect on the appellate court. Id.

The Supreme Court has often indicated that all evidentiary rulings are reviewed for "abuse of discretion." *See General Electric Co. v. Joiner*, 522 U.S. 136, 140 (1997) (noting courts of appeals must "give the trial court the deference that is the hallmark of abuse of discretion review.") However, a court that is interpreting the meaning of a particular provision of the FRE is deciding a "legal" question, to which no deference must be given the trial court. If the issue is the proper interpretation of the FRE, then a more appropriate standard is "a more searching standard such as 'error of law.'" Park, *et al.*, EVIDENCE LAW § 12.01, at 540-41 (1998). The problem may be that the term "abuse of discretion" is malleable, and thus of little concern

47

to the Supreme Court. In *Koon v. United States*, 518 U.S. 81, 100 (1996), the Court stated, in interpreting a statute other than the FRE, "[l]ittle turns, however, on whether we label review of [a] particular question abuse of discretion or de novo, for an abuse of discretion standard does not mean a mistake of law is beyond appellate correction. ... A district court by definition abuses its discretion when it makes an error of law."

In this case, the Trial Court abused its discretion by excluding certain evidence that was highly probative and relevant to Wahl's access to Laube's replaceable tip technology and Wahl's intentional and knowing targeting of Laube's technology and general business. In particular, and perhaps most critically, the Court repeatedly prevented Plaintiffs from introducing and explaining the significance of Laube's prototype lever (Exh. 1001)(App. 286 and Addendum hereto), even though it was identified to Defendant during discovery, was expressly referenced in the expert report of James Albert (Exh. 115)(App.352-401), was expressly made available for inspection by Defendants' counsel during Mr. Albert's deposition, was identified in the trial testimony of Kim Laube, and again identified in the trial testimony of Mr. Davis when he noted that Mr. Laube provided prototype clippers (which

included the replaceable tip) to Bo Langley for testing by Wahl (See April 30 transcript at p. 105-106)(App. 289-290).

As a result of this highly prejudicial and repeated ruling, Laube was prevented from showing the jury the specific prototype that Wahl had obtained from Laube and which Mr. Laube had personally built from his drawings, as well as making detailed comparisons to Wahl's replaceable tip type levers and showing how similar they are. Had the jury been allowed to consider this highly probative evidence, i.e. the improperly excluded Exhibit 1001 and related demonstrative exhibits (photographic blowups and overlays) or any questioning associated with it, it is likely that they would have found, as Scott Melton, Wahl's alleged designer exclaimed that the similarities between the Wahl design and Laube's design were "surprising" because "it took us quite a bit of development and evolution to get to that point, and this appears to be one document from 1989, so I -- I am surprised that we got there in one step". May 1, AM session transcript at p. 51, l. 16-p. 53, l. 5)(App. 349-351)   Thus this error was highly prejudicial and prevented a fair trial in this matter.

This error was compounded by Wahl being allowed to introduce power point presentations of color photos of Wahl's CAD drawings and replaceable tips without allowing the jury to compare them to the prototype that Wahl had from Laube before starting its own design project. Thus, this error clearly was highly prejudicial and prevented a fair trial in this matter.

Additionally, the Court repeatedly admonished Laube's counsel and suppressed a letter (App. 292 - 303) written by Mark Wahl to the Chairman of the Board for Wahl in which Mr. Wahl admits that Wahl wanted Laube's technology and particularly the technology that allowed Laube to be successful in the animal grooming market, that Wahl set out to (a) obtain Laube's trade secrets that allowed that success, namely the very secrets that Wahl was accused of taking in this case, and then to (b) destroy Laube to get rid of the competition. See also Mark Wahl testimony at Trial Transcript for April 23, 2013, Day 1, P.M. Session, Pg. 42, ll. 3-p. 43, l 9(App.323-324) wherein Mark Wahl confirms each of the statements in his letter were true and accurately represented Wahl's intentions. (See also admonishments, April 23, PM session transcript at p. 58, l. 1 – p. 59, l. 2; p. 64, l. 5 – p. 69, l. 6)(App. 326-327, 328-333) Wahl willfully and intentionally set out to

misappropriate Laube's trade secrets and Mark Wahl's letter is tantamount to an admission that Wahl's actions were willful and intentional and not an isolated incident. And despite Laube's need to prove Wahl's intent to enhance the damages associated with Wahl's misappropriation of trade secrets, the Court completely blocked every effort to offer the letter into evidence and to question witnesses about the content of the letter. (See admonishments, April 23, PM session transcript at p. 58, l. 1 – p. 59, l. 2; p. 64, l. 5 – p. 69, l. 6)(App. 326-327, 328-333)

As a result of the Court's abuse of discretion in refusing to allow the prototype lever or the Mark Wahl letter to be considered by the jury, the jury was left with Wahl's story, concocted at trial, that it had gone to great lengths to design and develop the technology that Wahl's president had taken from Laube and put into the "to be considered" items for the design team. It is not surprising that the design team then testified that it didn't know where the design came from, an assertion that Laube could not rebut because the Trial Court excluded the evidence to the contrary on the basis that it would be too prejudicial! Because this evidence was critical and the Court abused its discretion in excluding it, the jury verdict that the lever tip

technology was not obtained from Laube should be reversed and remanded for new trial.

## ARGUMENT AND AUTHORITY: ISSUE XII

### Standard of Review

Questions of law are reviewed *de novo* on appeal. Pure questions of law are reviewed *de novo. Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1577 (Fed. Cir. 1993). The appellate court need not defer to decisions on the law by the trial court and may freely reverse legal errors. Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789 (1982). If the critical conclusion of the trial court is a finding of fact and such a finding is grounded on an erroneous view of the law or a wrong legal standard it does not have any binding effect on the appellate court. Id.

Laube's breach of contract presented to the jury was premised upon Wahl having misappropriated Laube's trade secrets and violated its duty to maintain Laube's designs in confidence. Because the jury found no trade secrets were misappropriated, the jury then found that there was not breach of contract arising out of a breach of Wahl's confidentiality obligations.

In addition to Wahl's obligation of confidentiality arising out of the parties' four-year relationship, Wahl was under a contractual duty to maintain the confidentiality of Plaintiffs' trade secrets and not improperly use that information. Section 8.1 of the STA provides:

> 8.1 Confidential Information. [Wahl] agrees not to divulge, communicate, use to the detriment of the Corporation or [Kim Laube] or for the benefit of any other person or entity, or misuse in any way, any *confidential information or trade secrets* of Corporation or [Kim Laube] including, without limitation, personnel information, secret processes, know-how, customer lists and requirements, sales data, pricing information, or other technical data. [Wahl] acknowledge [sic] and agrees that any information or data acquired by it on any of these matters or items was received in confidence and as a fiduciary of [Kim Laube] and Corporation. [Wahl] further agrees that should any dispute arise with respect to the breach or threatened breach of this Section 8, [Wahl] agrees and consents that, in addition to any and all other remedies available to Corporation and [Kim Laube], an injunction or restraining order or other equitable relief may be issued or ordered by a court of competent jurisdiction restraining any breach or threatened breach of any of such provisions.

(emphasis added).

Significantly, a breach of contract action for unauthorized disclosure of confidential information may be used when the information disclosed cannot be classified as a trade secret and no action for misappropriation of trade secret is available. See *Cybertek Computer Products, Inc. v. Whitfield*

(1977) 1977 Cal. App. LEXIS 2140 at *10-13. The language of the confidentiality provision in this case also reflects the parties' intent to prohibit disclosure or use of "confidential information or trade secrets." Therefore, even if Plaintiffs' technology is determined not to meet the definition of trade secret under UTSA, Wahl is still liable for breaching its contractual obligations of confidentiality under § 8.1 of the STA.

Having used Plaintiffs' confidential information in the manufacture of its own products, Wahl's liability for breach of contract is clear. However, because the Court excluded the evidence showing Wahl targeted Laube's trade secrets and had access to them, the Laube was improperly prohibited from arguing the breach of contract to the jury. Because this evidentiary ruling is clear error , the jury finding that the STA was not breached by Wahl's use of Laube's trade secrets or confidential information should be reversed and remanded for further consideration along with the trade secrets allegations.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Because the *inter partes* reexamination of the patent in suit was final effective with the issuance of the certificate of reexamination on January 8, 2014, the results of that proceeding are binding on the parties here. As

discussed above, the withdrawal of claims 1-5 and affirmation of claims 6-7 require a reversal of essentially all patent related claims and counterclaims entered by the Court. The inequitable conduct finding and all orders flowing therefrom are clearly improper as directed toward claims that are treated as if they never issued (Claims 1-5). As such the finding of inequitable conduct, that this is an exceptional case, and the award of attorneys fees should all be reversed and rendered.

In addition, each ruling on invalidity is clearly improper as directed toward claims that are treated as if they never issued (Claims 1-5) or claims that Wahl is estopped from asserting are invalid (Claims 6-7). As a result, the summary judgment ruling that each of claims 1- 7 are invalid should be reversed and rendered as a matter of law. Finally, because Laube granted an unconditional covenant not to sue on claims 6-7 to Wahl, each of Laube's claims and any related claims by Wahl should be dismissed due to the lack of a case in controversy as required to support jurisdiction in the trial court over the patent related issues. Therefore, all remaining patent claims by Laube and/or Wahl should be dismissed and the trial court's denial of Laube's motion to dismiss all patent related claims should be reversed and rendered.

Additionally, because the trial court improperly granted Wahl's motion for summary judgment relating to Laube's trade secrets relating to variable speed technology as a result of the Court's failure to appreciate the difference between what Laube was doing (which was not secret) and how Laube was doing it (which is secret), the summary judgment dismissing the trade secrets allegations relating to the variable speed technology should be reversed and remanded for further consideration.

Additionally, because the Court abused its discretion in refusing to allow certain highly relevant and probative evidence to be presented to the jury, which resulted in an erroneous jury verdict that Wahl did not misappropriate Laube's trade secrets relating to Laube's lever mechanism's replaceable tip technology and prevented Laube from asserting breach of contract on the basis of that misappropriation, that jury findings on those issues should be reversed and remanded for new trial with instructions to allow all of the relevant and admissible evidence to be allowed in.

Finally, just prior to this brief being filed, a decision will be entered by the district court on a pending motion for additional attorneys' fees relating to the trade secrets claims. That determination will be appealed by Laube and should be consolidated with this matter. Further briefing should

be allowed in such an instance on this limited issue. However, because the decision has just been handed down and has not yet been appealed, briefing at this time is not appropriate.

Respectfully submitted,

_____/s/ Kent A. Rowald /s/
Kent A. Rowald, Esq.
State Bar No. 17329300
LAW OFFICES OF KENT A.
ROWALD, P.C.
2000 Bering Drive, Suite 700
Houston, TX 77057
Telephone: (281) 516-3844
Telephone: (832) 814-6871
Facsimile: (281) 516-3845
krowald@patentlawyers.com

**ATTORNEYS FOR**
**APPELLANTS,**
**KIM LAUBE &Co., INC and**
**KIM EDWARD LAUBE**

# ADDENDUM



US006473973B2

(12) **United States Patent**
Laube

(10) **Patent No.:** US 6,473,973 B2
(45) **Date of Patent:** Nov. 5, 2002

(54) **DISPOSABLE CUTTING HEAD FOR CLIPPERS**

(76) Inventor: **Kim Laube**, 537 Calle Yucca, Thousand Oaks, CA (US) 91360-2583

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/042,547**

(22) Filed: **Jan. 8, 2002**

(65) **Prior Publication Data**

US 2002/0053141 A1 May 9, 2002

**Related U.S. Application Data**

(60) Division of application No. 09/610,645, filed on Jun. 27, 2000, now Pat. No. 6,393,702, which is a continuation-in-part of application No. 09/457,454, filed on Dec. 8, 1999, now abandoned, and a continuation-in-part of application No. 09/222,049, filed on Dec. 29, 1998, now abandoned.

(51) Int. Cl.⁷ ................................................. **B26B 19/04**

(52) **U.S. Cl.** .......................................... **30/223;** 30/225

(58) **Field of Search** ........................ 30/216, 223, 224, 30/210, 200, 201, 233.5

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,328,616 A | * | 5/1982 | Andis | 30/216 |
| 5,970,616 A | * | 10/1999 | Wahl et al. | 30/216 |
| 6,073,350 A | * | 6/2000 | Elston et al. | 30/216 |

* cited by examiner

*Primary Examiner*—Douglas D. Watts
(74) *Attorney, Agent, or Firm*—Dennis W. Beech

(57) **ABSTRACT**

The disposable cutting head is basically a four element clip together assembly with a base, lower and upper cutting blades, and spring. The base serves as the support for the entire assembly and incorporates the attachment elements for retention to a clipper. The spring holds the elements together, forces the cutting blades together and includes the runner under which the upper blade slides. The entire assembly is such that the head assembly with blades is of the disposable type, but uses metal blades. If desired the blades alone may be disposed and the head assembly reused; however, the structure is not intended for long wear and use. The head and blades are constructed such that the common problems encountered with existing removable/disposable heads and blades as for example heat retention in the blades and head and the catching and pulling of hair are minimized. Use with clipper comb elements is also accommodated.

**7 Claims, 8 Drawing Sheets**





*FIG.1*

*FIG.2*

Case: 14-1111 Case: 14-1111 Document: 28 Document: 71 Filed: 04/11/2014 Page: 71 Page: 04/11/2014



*FIG.3*

*FIG.3A*

*FIG.12A*



FIG.4

FIG.5

FIG.6

FIG.7

FIG.8

FIG.9

FIG.10

FIG.11

FIG.12



FIG.4A

FIG.5A

FIG.15

FIG.6A

FIG.17



*FIG.13*

*FIG.14*



*FIG.16*

*FIG.18*



FIG.19

FIG.19A

FIG.20

FIG.21

FIG.25

FIG.26



FIG.22

FIG.23

FIG.24

FIG.24A

FIG.27

US 6,473,973 B2

1

**DISPOSABLE CUTTING HEAD FOR CLIPPERS**

CROSS-REFERENCE TO RELATED APPLICATIONS

This is a divisional application of U.S. patent application Ser. No. 09/610,645, filed Jun. 27, 2000, now U.S. Pat. No. 6,393,702, that is a continuation-in-part of U.S. patent applications Ser. Nos. 09/457,454 filed Dec. 8, 1999, and 09/222,049 filed Dec. 29, 1998 both abandoned. Application Ser. No. 09/610,645 is pending.

BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to devices used to clip or cut hair, fur and the like of humans and animals. The new device provides for a disposable cutting head including blades to simplify in an economical manner the maintenance of a relatively sharp cutting instrument.

2. Decription of Related Art

There are currently in use a variety of devices for clipping, cutting and shearing hair and fur. These include devices commonly known as hair clippers or just clippers which in most instances modernly are powered by electric motors. Clippers as originally conceived and developed include cutting blades which are intended to be removed from the head of a clipper and sharpened to maintain the clipper device cutting performance. Such blades may be attached to the clipper head by screws and the like or may have clips, clamps or other retention means for attachment to the clipper.

More modernly clippers have incorporated heads which are designed to include replaceable blades which blades are not intended to be continually sharpened, but rather to be removed and disposed. U.S. Pat. No. 2,722,742, issued Nov. 8, 1955 is an example of such a device. Also, clipper head assemblies which are disposable have been designed for use with clippers. An example of a plastic disposable head assembly for clippers is disclosed in U.S. Pat. No. 4,563,814, issued Jan. 14, 1986.

The present invention provides an improved structure for a clipper head assembly with disposable blades. The entire assembly is such that the head assembly with blades is of the disposable type, but uses metal blades. If desired, the blades alone may be disposed and the head assembly reused; however, the structure is not intended for long wear and use. The head and blades are constructed such that the common problems encountered with existing removable/disposable heads and blades as for example heat retention in the blades and head and the catching and pulling of hair are minimized.

The support front edge of the base member of the present invention has no structure, such as comb teeth, which are under any portion of the cutting blades which comb teeth can catch and pull hair as, for example, in the U.S. Pat. No. 4,328,616, issued May 11, 1982 which has comb teeth under the cutting blade teeth such that when the two tooth elements are not in contact hair will be caught and pulled. In addition both cutting blades of the instant invention have a slightly concave shape, one relative to the other, along the entire blade longitudinal dimension to counter the tendency for blades to curl and separate which could cause the catching and pulling of hair as well as other Aid problems. U.S. Pat. No. 4,765,060, issued Aug. 23, 1988 discloses a bend in the blade ends which may cause problems of separation as a result of a lack of a continuous concave shape along the longitudinal axis.

2

The cutting blades of the instant invention have indentations in the teeth to minimize heat build up and provide structural strength for the teeth. This is accomplished without the need for cut outs in the tooth edge wall which is done for example in sheep cutting clipper blades to provide flexibility. Such cut outs can cause loss of lubricants and also serve as a point that may catch and pull hair. In general, the new structure thus provides better cutting efficiency and minimum heat transfer to the subject being trimmed. The a disposable system achieves improved performance in cutting efficiency and is constructed to be used with existing comb snap on devices.

SUMMARY OF THE INVENTION

One object of the present invention is an improved cutting head structure for clippers which lowers friction and improves heat dissipation of the combination cutting head and blades to allow for a disposable clipper cutting head assembly. Another object is to reduce warpage of the head and/or blades during use in cutting to minimize hair pulling caused by hair becoming caught between the cutting blades rather than being cleanly cut. A further object is a disposable head and blade design which may be used with existing clip on combs. Another object is adaption of the cutting head for use with spring lock comb elements. A still further object is an upper cutting blade shoe structure for reduced friction wear of a clipper drive lug, which is usually plastic material, to which the upper blade shoe is engaged during clipper reciprocal drive operation. Another object is shielding of the clipper cavity which receives the cutting head to reduce the amount of hair or fur entering therein during a cutting operation. Yet another object is incorporation of protrusions in the base member to accommodate a variety of size of clipper blade socket mounting apparatus.

In accordance with the description presented herein, other objectives of this invention will become apparent when the description and drawings are reviewed.

BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 illustrates a perspective view of the head assembly with blades and outline of clipper.

FIG. 2 illustrates a perspective view, exploded, of the head assembly and blades.

FIG. 3 illustrates a perspective view, exploded, of an alternate embodiment of the head assembly and blades.

FIG. 3A illustrates a perspective view of an alternate embodiment of the head assembly with a deflector plate.

FIG. 4 illustrates a bottom plan view of the upper cutting blade.

FIG. 4A illustrates a bottom plan view of an alternate embodiment of the upper cutting blade.

FIG. 5 illustrates an elevation edge view of the upper cutting blade.

FIG. 5A illustrates an elevation edge view of an alternate embodiment of the upper cutting blade.

FIG. 6 illustrates a top plan view of the upper cutting blade.

FIG. 6A illustrates a top plan view of the upper cutting blade with shoe lugs.

FIG. 7 illustrates a side elevation cross-section view of the upper cutting blade taken at line 6—6.

FIG. 8 illustrates a bottom plan view of the lower cutting blade.

FIG. 9 illustrates an elevation edge view of the lower cutting blade.

US 6,473,973 B2

3

FIG. **10** illustrates a top plan view of the lower cutting blade.

FIG. **11** illustrates a side elevation cross-section view of the lower cutting blade taken at line **10**—**10**.

FIG. **12** illustrates a side elevation cross-section view of the head assembly with blades.

FIG. **12**A illustrates a side elevation cross section view of the head assembly with blades and a spring member with a deflector plate.

FIG. **13** illustrates a perspective view of the head assembly with blades and outline of an attached large tooth comb.

FIG. **14** illustrates a perspective view of the head assembly with blades attachable to a modified tooth comb mounting apparatus.

FIG. **15** illustrates a perspective view of the head assembly with blades attachable to an alternate tooth comb mounting apparatus.

FIG. **16** illustrates a perspective view, exploded, of an alternate embodiment of the cutting head assembly for attachment of a comb element.

FIG. **17** illustrates a side elevation cross-section view of an alternate embodiment of the head assembly with blades and spring mounting apparatus.

FIG. **18** illustrates a bottom plan view of the alternate cutting head with spring mounting apparatus.

FIG. **19** illustrates a perspective view of the tool for use with the spring mounting apparatus.

FIG. **19**A illustrates a perspective view of an alternate form of the tool.

FIG. **20** illustrates a side elevation cross-section view of an alternate embodiment of the head assembly with base cutting blade.

FIG. **21** illustrates a top plan view of the base cutting blade.

FIG. **22** illustrates a top plan view of an alternate embodiment of the base cutting edge.

FIG. **23** illustrates a side elevation cross-section view of an alternate embodiment of the head assembly with base cutting blade.

FIG. **24** illustrates a perspective view of the comb element and base member with tabs and notches.

FIG. **24**A illustrates a side elevation cross-section view of a comb element tooth.

FIG. **25** illustrates a perspective view of the comb element with taper feature.

FIG. **26** illustrates a side elevation cross-section partial view of the comb element taper feature.

FIG. **27** illustrates a perspective view of a comb tooth.

## DISCRIPTION OF THE PREFERRED EMBODIMENT

The disposable cutting head is basically a four element clip together assembly with a base, lower and upper cutting blades, and spring. The base serves as the support for the entire assembly and incorporates the attachment elements for retention to a clipper. The spring holds the elements together, forces the cutting blades together and includes the runner under which the upper blade slides. Attachment of a comb element may also be included. Alternate embodiments are described which use screw retention means for the spring and which use a spring lock for retention of comb elements. A plastic comb element for use with the spring lock retention means is incorporated. A deflector plate may be added to the spring structure to inhibit hair entering the clipper cavity.

4

Referring to FIGS. **1** through **15**, disposable cutting head (**1**) has base member (**2**) having a rear mounting portion (**3**) and lower blade support portion (**4**). The rear mounting portion (**3**) has an upstanding central bridge (**5**) with clipper (**6**) attachment lugs (**7**). The lower blade support portion (**4**) has posts (**8**) to retain seven cutting blades (**9**). The lower blade support portion (**4**) support front edge (**37**) does not extend such that it protrudes under the lower cutting blade (**9**) lower teeth (**13**). This alleviates the problem with existing cutting heads wherein the blade support element tends to catch and pull hair on the support base during cutting.

The lower cutting blade (**9**) is placed in lower blade support portion (**4**) with apertures (**14**) receiving posts (**8**). The posts (**8**) inhibit horizontal motion of the lower cutting blade (**9**) relative to the lower blade support portion (**4**) yet allow vertical motion of the lower cutting blade (**9**). This provides for a vertical "floating" condition to maintain contact with the upper cutting blade (**15**) under conditions as for example when heating causes a blade to curl or warp. The posts (**8**) and apertures (**14**) also allow ease of blade replacement if such is desired and do not flatten the concave curvature of the blade as when fixed in place by permanent attachment in other cutting heads.

Lower cutting blade (**9**) has a generally planar rectangular shape with a recessed portion (**10**) the longitudinal length of the blade. There are ribs (**11**) formed in the recessed portion (**10**) to provide structural strength and to aid in minimizing heat build up. The lower cutting blade (**9**) also has indentations (**12**) or creases formed in the lower teeth (**13**) to reduce the sliding friction surface to minimize heat build up, to allow coolant flow and to provide structural strength.

The lower cutting blade (**9**) is placed in lower blade support portion (**4**) with apertures (**14**) receiving posts (**8**). Upper cutting blade (**15**) is placed in sliding relationship on lower cutting blade (**9**) with lower teeth (**13**) parallel to upper teeth (**16**). In operation the upper cutting blade (**15**) slides longitudinally relative to the fixed lower cutting blade (**9**).

Upper cutting blade (**15**) is a generally planar rectangular shape with a recessed portion (**17**) formed along the longitudinal length of the blade which as illustrated in FIG. **2** may be formed in a stamping operation to be of upwardly arched geometry in the lateral dimension. There are a plurality of upper teeth (**16**) forming the forward portion which may have indentations (**12**) similar to lower teeth (**13**). There is a groove (**18**) parallel with and spaced from the front toothed edge.

The rear edge (**19**) of the upper cutting blade (**15**) contains an enlarged recess (**20**) adapted to receive a drive lug (**21**) or other drive element of a clipper (**6**). There are a pair of shoes (**22**) formed in enlarged recess (**20**) to reduce friction wear caused by the reciprocal operation of clipper drive lug (**21**) operating to move upper cutting blade (**15**) in a sliding reciprocating motion across lower cutting blade (**9**). The shoes (**22**) preferably have rounded edges (**38**) to reduce wear of the drive lug (**21**). However, a suitable curved shoe lug (**40**) as illustrated in FIG. **5**A may also be used.

The spring member (**23**) is generally a U-shape element of spring steel or the like having opposed arms (**24**) shaped to fit the back edge (**25**) of the mounting portion (**3**) of base member (**2**). The opposed arms (**24**) may be retained on the base member (**2**) by arm apertures (**26**) engaging attachment posts (**27**). The opposing arms (**24**) curve upwardly from the base member (**2**) and project forward in an arched manner over the upper cutting blade (**15**) to terminate in a downwardly manner presenting a transverse, elongated runner

US 6,473,973 B2

5

(28) to engage the upper cutting blade (15) groove (18). The runner (28) would preferably have a plastic coating, sleeve or the like surface for ease in sliding motion with the groove (18).

The spring member (23) may also be retained on the base member (2) by a thread attachment method. An example is illustrated in FIG. 3 wherein posts (27) are replaced with apertures (47) and the arm apertures (26) are threaded apertures (46) to M receive screws (48). In addition, apertures (45) are included to allow the screws to pass through the opposed arms (24) upper portion. The threading of the screws (48) into the spring member (23) provides a means to adjust the tightness by which the spring member (23) is removably attached. Thereby the tension may be loosened when cutting fine or loose hair to reduce blade wear due to friction and heat; yet the tension may be increased when thick or matted hair to be cut.

The spring member (23) may also have an extended plate element or deflector plate (55) as best illustrated in FIGS. 3A and 12A to inhibit entry of hair or fur into the clipper cavity (41) during cutting operation.

In the preferred embodiment the lower cutting blade (9) and the upper cutting blade (15) are formed with a slightly concave shape along their longitudinal dimension one to the other in a plane parallel to the rows of cutting teeth (13, 16) as in FIG. 4 and 8. This serves to counter the tendency of cutting blades to curl and partially separate from each other from the ends (29, 30) inward when there is heat build up due to sliding friction during use. This warping can occur both in manufacture and during use. The upper cutting blade (15) may be further modified by forming a generally rectangular opening to serve as a heat aperture (70) to further facilitate heat dissipation.

The blades (9, 15) may be press, cut and/or punched in manufacture. When manufactured there is a ragged edge on the side of the blade exiting the cutting tool. For the preferred embodiment the ragged mating edges are at the top edge, that is, the edge between blades. Thus the blades need only be machined smooth on the mating edges and the jagged edges remain to aid in, cutting hair, but do not touch the subjects skin to cause injury. To aid in attaching the upper cutting blade (15) to the fixturing for manufacture, fixturing holes (44) may be provided.

Referring to FIG. 13, a disposable cutting head (1) has attached a large tooth comb (31). The compact shape and the back-to-front width or lateral dimension of the assembly approximate more standard clipper heads and blades to allow attachment of standard comb attachments. Where a relatively flat comb attachment is desired, a metal or other strong structural material may be used as compared to the typical plastic comb (31). FIG. 14 illustrates an example of a thin comb element (32) with comb teeth (33) having groove notch (34) to receive the front edge (36) of the disposable cutting head (1) and spring clip (35) back edge to engage and retain the thin comb element (32). Either the plastic comb (31) or thin comb element (32) may include one or more mounting tabs (76) under which the base member (2) support front edge (37) may be placed when attaching a comb (31,32). Mounting notches (75) may be formed in the support front edge (37) to mate with the mounting tabs (76). The comb teeth (33) may include a tooth ridge element (78) attached to the tooth front edge (77). This reduces flatness of the comb teeth (33) at the front edge which is experienced in the manufacturing molding process. The tooth ridge element (77) aids in guiding the hair to be cut between the comb teeth (33).

6

The tooth comb (31), comb element (32) and comb teeth (33) may be coated with a low friction substance, as for example, that sold under the tradename TEFLON, vacuum deposited aluminum with a lacquer coating and the like coatings and sealers. The comb (31), comb element (32) and comb teeth (33) may be formed of metallic and silica additives in plastic for added strength of material as compared to plastic combs.

A variation of this spring force attachment is illustrated in FIGS. 15 through 18. In this case a back plate (51) replaces the spring clip (35) and side elements (65) are added. This provides a structure for the comb element (32) when a thin comb made of plastic or similar material is desired. A rivet indentation (66) may be provided if clearance is required when the comb element (32) is mounted. The back plate (51) has a slot (52) therein into which plate (53) protrudes by extension (56). The plate (53) has spring tabs (43) which engage springs (50) placed in spring cavities (49). The back plate (51) may be tapered ;in the portion (68) above the slot (52) for ease of inserting the extension (56) into the, slot (52). The plate (53) is attached to the base member (2) by means of a rivet (61), screw or the like passing through aperture (60) and sliding aperture (62). Pressure on push tabs (42) compresses the spring (50) as the plate (53) is pushed against the force of the spring (50). This moves extension (56) to allow comb element (32) to be removed from or mounted on the cutting head (1). When thus mounted the groove notch (34) will engage the front edge (36) of the cutting teeth and when the plate (53) is released the extension (56) will engage the slot (52). A tool (63) with posts (64) may be provided as illustrated in FIGS. 16 and 19 to aid in pushing push tabs (42). The tool (63) with posts (64) may also have a blade or hex head for use in adjusting the tension for screws (48).

An alternate configuration of the tool (63) is illustrated in FIG. 19A wherein posts (64) are round tipped and the blade or hex head (67) is located opposite the posts (64).

The base (2) may have a more exaggerated rounding of the corners (54) to aid the user in turning the clipper while cutting in confined areas such as animal limb joints and the like.

The base member (2) may also include protrusions (58) on the inside of attachment lugs (7) and in mounting cavity (57) which protrusions (58) are compressible. When the cutting head (1) is mounted to a clipper (6) a tongue is inserted in mounting cavity (57). The clipper tongues of various clippers (6) are not always of the same dimensions. The protrusions (58) accommodate a variety of sizes of tongues to reduce vibration from what otherwise would be a loose fit. The protrusions (58) on attachment lugs (7) serve a similar purpose when the cutting head (1) is attached to the clipper (6).

The base member (2) and lower cutting blade (9) may be replaced with a one piece base cutting blade (80). In this embodiment the upstanding central bridge (5) and other elements are attached and supported by the base cutting blade (80). The spring clip (23) is attached on the base cutting blade (80) and the plate (53) with springs and other elements is replaced by a leaf spring (81) having a spring extension (82) for engaging slot (52).

While the invention has been particularly shown and described with respect to the illustrated and preferred embodiments thereof, it will be understood by those skilled in the art that the foregoing and other changes in form and details may be made therein without departing from the spirit and scope of the invention.

A 78

US 6,473,973 B2

7

I claim:

1. A comb element for attachment to a clipper cutting head comprising:

a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and

a spring clip attached at a rear base edge of the support base element opposite the comb teeth.

2. The comb element as in claim 1 wherein the comb teeth are coated with a low friction substance.

3. The comb element as in claim 1 wherein the front base edge having a mounting tab and a support front edge of a base member having a mounting notch for engagement with the mounting tab.

4. A comb element for attachment to a clipper cutting head comprising:

a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having

8

a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and

a back plate attached at a rear base edge of the support base element opposite the comb teeth and two side elements attached there between with the back plate having a slot therein for engagement with the cutting head.

5. The comb element as in claim 4 wherein the comb teeth are coated with a low friction substance.

6. The comb element as in claim 4 wherein the back plate is tapered above the slot.

7. The comb element as in claim 4 wherein the front base edge having a mounting tab and a support front edge of a base member having a mounting notch for engagement with the mounting tab.

*   *   *   *   *

US006473973C1

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (783rd)
# United States Patent
Laube

(10) **Number:** US 6,473,973 C1
(45) **Certificate Issued:** Jan. 8, 2014

(54) **DISPOSABLE CUTTING HEAD FOR CLIPPERS**

(76) Inventor: **Kim Laube**, Thousand Oaks, CA (US)

**Reexamination Request:**
No. 95/000,523, Dec. 9, 2009

**Reexamination Certificate for:**
Patent No.: **6,473,973**
Issued: **Nov. 5, 2002**
Appl. No.: **10/042,547**
Filed: **Jan. 8, 2002**

**Related U.S. Application Data**

(60) Division of application No. 09/610,645, filed on Jun. 27, 2000, now Pat. No. 6,393,702, which is a continuation-in-part of application No. 09/457,454, filed on Dec. 8, 1999, now abandoned, and a continuation-in-part of application No. 09/222,049, filed on Dec. 29, 1998, now abandoned.

(51) **Int. Cl.**
*B26B 19/04* (2006.01)

(52) **U.S. Cl.**
USPC ............................................. **30/223**; 30/225

(58) **Field of Classification Search**
USPC .................................................. 30/220, 223
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/000,523, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Jimmy G. Foster

(57) **ABSTRACT**

The disposable cutting head is basically a four element clip together assembly with a base, lower and upper cutting blades, and spring. The base serves as the support for the entire assembly and incorporates the attachment elements for retention to a clipper. The spring holds the elements together, forces the cutting blades together and includes the runner under which the upper blade slides. The entire assembly is such that the head assembly with blades is of the disposable type, but uses metal blades. If desired the blades alone may be disposed and the head assembly reused; however, the structure is not intended for long wear and use. The head and blades are constructed such that the common problems encountered with existing removable/disposable heads and blades as for example heat retention in the blades and head and the catching and pulling of hair are minimized. Use with clipper comb elements is also accommodated.



US 6,473,973 C1

1

2

# INTER PARTES
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 316

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **1-5** are cancelled.

Claims **6** and **7** were not reexamined.

\* \* \* \* \*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | January 23, 2012 |
|----------|-------------------------|------|------------------|
|          | LA CV12-00106 JAK (JCx) |      |                  |
| Title    | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |
|          | Wahl Clipper Corporation v. Kim Laube & Company | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|------------------------|-------------------------------------------------|

| Andrea Keifer | Alexander Joko |
|---------------|----------------|
| Deputy Clerk  | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|-----------------------------------|-----------------------------------|
| Kent A. Rowald | Michael J. Niborski |
|                | Levi W. Heath |

| Proceedings: | **DEFENDANT'S RENEWED MOTION TO LIFT STAY (Dkt. 112)** *(LA CV09-00914 JAK (JCx))* |
|--------------|-----------------------------------------------------------------------------------|
|              | **STATUS CONFERENCE RE RELATED CASE** *(Both Cases)* |

The motion hearing is held. The Court notes that this matter has been stayed pending a patent reexamination proceeding. That proceeding has concluded and the Patent Examiner has issued a final decision. Although the reexamination decision has been appealed, the entry of a final decision constitutes a substantial change in circumstance from the time when the initial stay was entered in this action by a prior bench officer. The Court states its tentative view on the record, which is that the motion to lift the stay should be granted in light of this development.

Counsel for Plaintiffs and Defendants address the Court regarding the issues it raises, including: (i) whether the parties can proceed in this matter during the reexamination appeal; (ii) the likely duration of the pending appeal; and (iii) whether unrelated claims can move forward in the absence of a final decision on the reexamination.

The Court adheres to its tentative view and GRANTS Defendant's motion and lifts the stay. The Court will actively manage the case to avoid any duplication of efforts that might arise as a result of the reexamination. The Court is mindful that, on their face, the issues raised in this action are distinct from those raised in the patent action.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | January 23, 2012 |
|----------|--------------------------|------|------------------|
|          | LA CV12-00106 JAK (JCx)  |      |                  |
| Title    | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |
|          | Wahl Clipper Corporation v. Kim Laube & Company | | |


The status conference is held. The Court sets a scheduling conference in both related matters for March 5, 2012 at 1:30 p.m. The parties shall file a joint Rule 26(b) report in accordance with the applicable rules. Such report shall include the parties' respective views on delaying, consolidating, or separating these two related cases. To the extent that the parties contend the cases should or should not be consolidated, counsel are instructed to state their respective views on the potential efficiency to be gained or sacrificed from consolidation with respect to discovery and any other relevant matters.



**IT IS SO ORDERED.**

|  | : | 09 |
|--|---|----|
| Initials of Preparer | ak | |

A 83

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | LA CV09-00914-JAK (JCx) | | Date | October 15, 2012 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Chris Silva for Andrea Keifer | Alexander Joko |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kent A. Rowald | Levi W. Heath <br> Mark A. Hagedorn |

**Proceedings:**   **PLAINTIFF'S MOTION TO DISMISS CLAIM WITHOUT PREJUDICE (DKT. 150)**

   **MARKMAN HEARING (CLAIM CONSTRUCTION) (DKT. 159, 161)**

Prior to the hearing, the Court provides the parties, in writing, its detailed, tentative views regarding claim construction. The motion hearing is held. The Court states its tentative views on the record with respect to the Plaintiff's Motion to Dismiss its patent infringement claim without prejudice; the Court is inclined to deny the motion. The Court notes that this action has been pending for several years, there have been prior motions to amend by the Plaintiff, the most recent of which was denied, and that Defendants' counterclaim for declaratory relief would require the Court to address largely the same issues raised in the Plaintiff's cause of action with respect to patent infringement. Therefore, it makes the most sense to deny the motion and proceed with the case on all present claims. That will serve the interests of judicial economy as well as fairness to Defendant who has been preparing for the adjudication of all issues, including the patent issues.

Counsel for both parties address the Court regarding the issues it raises, including: (i) Plaintiff's intention to withdraw its infringement claim if the Court adheres to its tentative views regarding the claim construction of the term "two side elements attached there between;" and (ii) the appropriate timing of Defendants' exceptional case motion should the Court adhere to its tentative and should Plaintiff thereafter elect not to pursue its patent claim in this action, while preserving its right to appeal the *Markman* determination.

The Court adheres to its tentative views regarding the motion to dismiss and DENIES the motion. If the Court adheres to its tentative views regarding claim construction, Defendants will not pursue their counterclaim; rather, the patent issue may be appealed to the Federal Circuit by Plaintiff. If the Court does not adhere to its tentative views regarding claim construction, the patent issue will proceed to trial.

The *Markman* hearing is held. As noted, the Court had provided the parties with its detailed, written tentative views regarding claim construction. Counsel for both parties address the Court regarding the issues it raises. Plaintiff objects only to the Court's tentative construction of the phrase "two side elements attached there between," which appears in claim 4 and paragraph 16 of the Court's tentative.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | LA CV09-00914-JAK (JCx) | Date | October 15, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

The parties argue that claim term.

The Court takes the matter under submission and will issue a written ruling.

The Court sets a status conference for **November 19, 2012 at 1:30 p.m.** regarding scheduling in light of the claim construction ruling and any potential settlement proceedings. The Court vacates the Post Mediation Status Conference.

Defendant lodges a number of physical exemplars to aid the Court in its consideration of the case. Plaintiff does not object, but indicates a desire to lodge certain additional exemplars later this week. The Court directs the parties to confer re the additional physical samples and requires the plaintiff to file a written submission identifying and briefly describing each exemplar to be lodged, the description not to exceed three (3) pages. The submission must include a photographic image of each exemplar. The images may be contained in an appendix. The lodged exhibits should be tagged, with the exhibit number identified in the written submission. Plaintiff's exhibit numbers are to start with Exhibit 100. Defendant may file a three (3) page reply to any submission by the Plaintiff. Such reply to be made within three days of the filing of Plaintiff's memorandum.

The Court directs that if there is any dispute concerning Plaintiff's samples, the parties are to notify the Clerk so that a telephonic hearing can be set to address the issue.

Following the hearing, by this Order, the Court directs the parties to lodge a clipper unit or cutting head assembly that works together with each lodged comb, as Defendants did during the hearing with Exhibit 3 (a Laube "352" blade housing, marked with the dimensions .800" and 20mm and the number 411352), and Exhibit 3A (a Laube "40" blade cartridge, marked with the dimensions .01" and .25mm and the number 401040). The clipper units or cutting head assemblies are to be described and identified in the written submission as set forth above. Defendants should also make a written submission accompanying the clipper units or cutting head assemblies that it will lodge to accompany the exemplar combs it lodged today labeled as Exhibits 1, 2, and 4.

**IT IS SO ORDERED**.

| | 0 | : | 45 |
|---|---|---|---|
| Initials of Preparer | | CSI | |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| Not Present | Not Present |

| Proceedings: | (IN CHAMBERS) ORDER CONSTRUING CLAIM TERMS AFTER *MARKMAN* HEARING  (Dkt. 159, 161) |
|---|---|

## I.    INTRODUCTION

Plaintiff Kim Laube & Co. ("Laube" or "Plaintiff") has brought this action against Defendant Wahl Clipper Corp. ("Wahl" or "Defendant") for, inter alia, infringement of U.S. Patent No. 6,473,973 (the "'973 patent" or "'973").  The '973 patent is titled "Disposable Cutting Head for Clippers."  The clippers are used for cutting hair.  The parties requested that the Court construe certain claim terms and phrases of the '973 patent.  On October 15, 2012, the Court held a *Markman*[1] hearing to address these requests.  At that hearing, the Court presented its tentative views in writing, heard argument from the parties, permitted the post-hearing submission of certain exhibits, and took the matter under submission.  By this Order, the Court sets forth its findings with respect to the claims construction issues.

Prior to the *Markman* hearing, the parties presented a chart to the Court with respect to 20 claim terms.  Dkt. 160, App'x C.  This chart reflected ten terms for which the parties believed no construction by the Court was necessary, six terms on which they had reached agreement on a construction, and four terms on whose construction they disagreed.  Through the presentation of its written tentative views, the Court informed the parties, prior to the formal commencement of the hearing, that the Court believed it necessary to construe some of the ten terms for which the parties did not request construction.  The Court's tentative views as to the six terms on which the parties had agreed was that it would construe some of them and would refrain from construing others.  The Court's detailed, tentative views included the rationale for each tentative construction.  At the outset of the hearing, Plaintiff objected only to the Court's tentative construction of the phrase "two side elements attached there between," which appears in claim 4.  As a result, the parties presented argument on that claim term, which is among those construed in this Order.[2]

---

[1]  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

[2]  Laube submitted unsolicited, post-hearing briefing through a submission that the Court had authorized solely to permit Laube to identify and lodge certain product samples with the Court.  Laube's Supplement to Reply, Dkt. No. 166.  Wahl responded.  Dkt. No. 167.  Although the Court could strike

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

## II.    FACTUAL BACKGROUND

The abstract, summary of the invention, and majority of the drawings and specification of the '973 patent, are directed to the cutting head.  However, part of the specification describes a comb element, which sits on top of the cutting head.  Its function is to guide hair to the blades and control the length of the uncut hair that remains.  The '973 patent's seven claims are all directed to the comb element.

An example of a comb element is illustrated in dashed lines below the cutting head in figure 13:[3]



*FIG. 13*

The claims cover two basic types of comb elements.  Claims 1-3 cover a comb element with a spring clip in the back to hold the comb element onto the cutting head.  Claim 1 is independent, and claims 2 and 3 depend from claim 1.  Claim 1 recites:

A comb element for attachment to a clipper cutting head comprising:

a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and

a spring clip attached at a rear base edge of the support base element opposite the comb teeth.

---

these submissions, because they do not present new information, the Court will accept them as additions to the already extensive briefing in this matter. It was twice the length permitted under the Local Rules of the Central District.

[3]  The Court has annotated the drawings with the descriptions from the specification corresponding to the numbers shown in the drawings.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|----------|-------------------------|---|------|------------------|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

Figure 14 shows an example of a comb element with a spring clip:



FIG. 14

In the spring clip embodiment, the spring force from the spring clip (35) works to hold the comb in place on the cutting head.

Claims 4-7 claim a comb element using a back plate with a slot, rather than a spring clip as in claims 1-3.  Claim 4 is independent, and claims 5-7 depend from claim 4.  Claim 4 recites:

> A comb element for attachment to a clipper cutting head comprising:

> a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and

> a back plate attached at a rear base edge of the support base element opposite the comb teeth and two side elements attached there between with the back plate having a slot therein for engagement with the cutting head.

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

Figure 15 shows example of a comb element with a back plate and slot:



*FIG.15*

In the back plate embodiment, the spring force from the leaf spring (81) works to hold the comb in place on the cutting head.  This pushes the spring extension (82) into the slot.  *See* '973 Figs. 22 and 23:



*FIG.22*          *FIG.23*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

Claim 6 requires the back plate to be tapered above the slot, and claim 7 requires the front base edge to have a mounting tab.  Figure 24 shows a comb element with a tapered portion of the back plate above the slot:



Figure 24A, a side view of the comb tooth portion of the comb, shows a mounting tab:



Some of the disputed claim language refers to "engagement" with the upper teeth of the cutting head. Part of the claim construction dispute between the parties involves whether "engagement" requires contact, i.e., whether the comb must touch the upper, moving blade teeth.  Figure 12A shows that the lower blade teeth protrude farther than the upper blade teeth; this configuration is relevant to the background of the dispute with respect to "engagement."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

**III.    ANALYSIS**

    **A.    Legal Standard**

A patent is a fully integrated written instrument. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The operative statute requires that a patent must provide a written description of the invention, a disclosure that would enable one of ordinary skill in the art to make and use the invention, and a disclosure of the best mode known to the inventor for practicing the invention. 35 U.S.C. § 112(1). A patent must also contain claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(2). The claims of a patent provide the measure of a patentee's right to exclude others from practicing the claimed invention. 35 U.S.C. § 154.

    1.    The Claims

The Federal Circuit explained primary claim construction principles in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312, quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*, 381 F.3d 1111, 1115 (Fed. Cir. 2004), and citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). *See also Renishaw PLC v. Marposs Societa'per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (claim construction "begins and ends" with the actual words of the claims). "That principle has been recognized since at least 1836, when Congress first required that the specification include a portion in which the inventor 'shall particularly specify and point out the part, improvement, or combination, which he claims as his own invention or discovery.'" *Phillips*, 415 F.3d at 1312.

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* at 1313. This is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.* at 1312. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Thus, in some instances, "general purpose dictionaries may be helpful," but, as the court went on to explain, "[i]n many cases that give rise to litigation . . . determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id.* "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|----------|-------------------------|---|------|------------------|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

disputed claim language to mean.'" *Id.*, quoting *Innova/Pure Water*, 381 F.3d at 1116. "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314.

In light of these standards, the claim construction process begins with the language used in the claims because "[q]uite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* (citation omitted).

"Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* This process is referred to as "claim differentiation." "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15. However, claim differentiation is a guide, not a rigid rule.

> 2. <u>The Specification</u>

The specification is also important in claim construction. "The claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.' . . . [T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315. "Consistent with that general principle," the cases recognize that: (i) "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs;" and (ii) "[i]n other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* at 1316.

Claims are read in light of the specification, but limitations from the specification must not be read into the claims. The line between the two is not always clear. *See Comark Communications, Inc. v. Harris Corp.*, 156 F. 3d 1182, 1186-87 (Fed. Cir. 1998) ("[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification"). In *Phillips*, the Federal Circuit explained that:

> the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. In particular, we have expressly rejected the contention that if a patent describes only a

A 93

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

single embodiment, the claims of the patent must be construed as being limited to that embodiment.  That is not just because Section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.

*Phillips*, 415 F.3d at 1316 (citations omitted).  The Federal Circuit went on to explain that:

> To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.  One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.  The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent.

*Id*. at 1323 (citations omitted).

Notwithstanding these longstanding principles of interpretation, the Federal Circuit also has acknowledged that "[i]n the end, there will still remain some cases in which it will be hard to determine whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature.  While that task may present difficulties in some cases, we nonetheless believe that attempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification."  *Id*. at 1323-24.

        3.    <u>The Prosecution History</u>

The words in the claim may also be interpreted in light of the prosecution history, if it is in evidence. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent.  Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent."  *Phillips*, 415 F.3d at 1317 (citations omitted).  "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id*.  "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id*.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
| --- | --- | --- | --- |
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

4.    The Court's Independent Duty to Construe Terms

Even where the parties agree on the construction of claim terms, the Court has an independent obligation in connection with claim construction.  *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) ("The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly.  In the exercise of that duty, the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties.").

5.    The Court Need Not Construe All Claims

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."  *See, e.g., Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."  *U.S. Surgical*, 103 F.3d at 1568.  "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

6.    Claim Construction Can Differ Between USPTO and District Court Proceedings:
Prosecution/Reexamination Construction is "Broadest Reasonable," District
Court Construction Can Be Narrower

The USPTO gives claims their broadest reasonable interpretation during examination proceedings. *In re Bond*, 910 F.2d 831, 833 (Fed. Cir. 1990).  This "broadest reasonable construction" rule applies to reexaminations as well as initial examinations.  *See In re Hiniker Co.*, 150 F.3d 1362, 1368 (Fed. Cir. 1998); *Yamamoto*, 740 F.2d 1569, 1571-72 (Fed. Cir. 1984) ("An applicant's ability to amend his claims to avoid cited prior art distinguishes proceedings before the PTO from proceedings in federal district courts on issued patents.  When an application is pending in the PTO, the applicant has the ability to correct errors in claim language and adjust the scope of claim protection as needed.")

Courts may find a more narrow construction of claims than that adopted by the USPTO to preserve a patent's validity. However, that approach is only available where the claims are ambiguous:

> While we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, and we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.  *See Nazomi Communications,* 403 F.3d at 1368–69. Instead, we have limited the maxim to cases in which "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous."  *Liebel–Flarsheim,* 358 F.3d at 911; *see also Generation II Orthotics Inc. v. Med. Tech. Inc.,* 263 F.3d 1356, 1365 (Fed. Cir. 2001) ("[C]laims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

principles, and does not revise or ignore the explicit language of the claims."); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1309 (Fed. Cir. 2000) ("having concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity"); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1434 (Fed. Cir. 1988) (rejecting argument that limitations should be added to claims to preserve the validity of the claims). In such cases, we have looked to whether it is reasonable to infer that the PTO would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005).[4]

B.    **Application**

In exercising its independent obligation to perform claim construction, *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995), the Court has determined that several of the claims require constructions different than those to which the parties agreed, that several of the terms should be construed, notwithstanding the parties' agreement that such constructions were unnecessary, and that no construction is required of several terms for which the parties requested it.

1.    "support base element" (Claims 1 and 4)

The parties agree that "[t]he term 'support base element' means "a body portion. For example, identified as element 39 in the patent figures." The Court declines to accept this stipulated construction. Although "support base element" is not particularly descriptive on its own, the claims themselves provide considerable context that is instructive as to interpretation. For example, in claim 1, the "support base element" is part of the comb, the comb teeth are attached to it at the front edge, and the spring clip is attached to it at the rear edge. The parties' proposed construction does not clarify the term, and in this case, preserving the existing claim language will assist in understanding how the various elements of the claims work together. The Court finds that no construction of this term is necessary. To the extent that the parties' agreement was motivated by a desire to clarify that the "support base element" is part of the comb, as opposed to the "base member" that is part of the cutting head, the Court reaches that issue in its construction of "base member."

**Construction**: none.

---

[4]  In discussing the applicable claim construction standard, Laube claims that Wahl is seeking to use the claim construction process to sidestep the rule that a party cannot bring a civil action to invalidate a patent on grounds that were, or could have been asserted, in a reexamination that has reached a final decision favorable to patentability of any claim. Laube Reply Markman Brief, Dkt. No. 165 at 3, citing 37 C.F.R. § 1.907. That rule is not applicable to the present analysis for two reasons: (i) the reexamination result is not final; and (ii) at this time it is not favorable to the patentability of any claim. Even if the reexamination had reached a final result favorable to the patentability of a claim, it is unclear how Wahl would be violating the governing rule on invalidation.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

      2.     <u>"front base edge" (Claims 1, 3, 4 and 7)</u>

The parties agree that no construction is necessary. The Court agrees.

**Construction**: none.

      3.     <u>"groove notch" (Claims 1 and 4) and "for engagement with a front edge of a plurality of upper teeth of a cutting head" (Claims 1 and 4)</u>

The parties separated the term "groove notch" from the phrase "for engagement with a front edge of a plurality of upper teeth of a cutting head" in their claim construction presentations. This caused confusion. Whether or not "for engagement with a front edge of a plurality of upper teeth of a cutting head" denotes structure, as Laube contends, or does not, as Wahl contends, the two phrases can be construed together. And, doing so will better address the parties' dispute. Therefore, the Court construes the phrase: "groove notch for engagement with a front edge of a plurality of upper teeth of a cutting head."

In Laube's appeal of the examiner's decision in the reexamination, The Board of Patent Appeals and Interferences ("BPAI") construed "groove notch" and "for engagement with a front edge of a plurality of upper teeth of a cutting head" together as follows: "A channel of V-shaped indentations that are configured generally in a manner regarded as appropriately 'working together' with the upper teeth of a cutting head." Wahl's Evidence in Support of its Opening Claim Construction Brief, Dkt. No. 160, Ex. 9, at 1317. The BPAI did "not discern that either the Examiner or the Requester [Wahl] disagreed with that meaning." *Id.* Both parties now seek a different construction.

Laube argues that "groove notch" should be given its plain meaning or defined as "the structure formed for engagement with a front edge of upper teeth of a cutting blade; identified as element 34 in the specification." Laube's Opening Markman Brief, Dkt. No. 161, at 8. It is noteworthy that Laube seeks to support this position by citing to an unsuccessful argument it made in support of a new claim during the reexamination: "New claim 8 further defines the structure of claim 1 relative to the structure of the groove notch to engage with upper teeth. The use of the term engagement is a structural feature as the structure of the groove notch is such that the groove notch coordinates closely to fit or work together properly with the upper teeth." *Id.* The examiner handling the reexamination did not allow new claim 8. Therefore, it is difficult to see how the patentee's own argument, not made in the course of obtaining the claims in question, is persuasive in determining the proper construction. With respect to "for engagement with a front edge of a plurality of upper teeth of a cutting head," Laube argues that the phrase "should be given its plain meaning" or defined as "a relationship between the structural elements, 'groove notch' and 'upper teeth of a cutting head.'" Laube's Opening Markman Brief, Dkt. No. 161, at 8-9. To support this argument, Laube again relies on its own recent statements during the reexamination, where it maintained that the structural engagement between the groove notch and upper teeth of a cutting head would be "'to work together properly: coordinate' as understood in general (Webster's Dictionary) or by any mechanically knowledgeable person. It is not a structure for attachment to an upper oscillating blade." *Id.* at 9.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

Wahl argues that a "groove notch" as shown in the '973 patent and prior art is "a channel of indentations to receive the front edge of the clipper cutting head."  Wahl's Opening Claim Construction Brief, Dkt. No. 159, at 13.  Wahl cites Merriam-Webster's Collegiate Dictionary for definitions: "groove" means "a long narrow channel or depression" and "notch" means "a V-shaped indentation."  *Id.*  Wahl argues that "Laube's false assertion that the prior art lacked a groove notch overcame the Examiner's rejection and led to the allowance of the '973 Patent."  *Id.* at 12.  Wahl notes that, in the '973 patent, the "lower blade teeth are shown as the longest and outwardly extending cutting teeth that would contact or 'engage' the 'groove notch' of the claimed comb elements."[5]  *Id.* at 14.  Wahl then argues that Laube's construction "interject[s] a claim element for which no subject matter is disclosed in the application," and is, therefore, invalid because it fails to provide the written description required by 35 U.S.C. § 112.[6]  With respect to "for engagement with a front edge of a plurality of upper teeth of a cutting head," Wahl notes that, in the prosecution of the '973 patent, Laube overcame a rejection over a prior art Wahl patent by arguing that "this groove notch engages the front edge of a plurality of upper teeth 16 of a cutting head to retain the comb element on the cutting head" and that the prior art patent "illustrates no groove notch for engagement of teeth elements 20 or 22.  There is no illustrated means for retention of the comb . . . . This patent as well as the other art such as Andis does not disclose nor anticipate the use of a groove notch . . . for retention of the comb to a cutting head."  Wahl's Opening Claim Construction Brief, Dkt. No. 159, at 6 (emphasis added).

The Court has considered the BPAI's construction of the claims.  It is not, however, bound by them because claim construction is a question of law.  *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998).  It is also important that, during examination proceedings, including reexamination, the USPTO applies a different claim construction standard than the one that governs in this proceeding.  *See In re Hiniker Co.*, 150 F.3d 1362, 1368 (Fed. Cir. 1998) (in examination proceedings, including reexamination, the Court applies the "broadest reasonable interpretation" standard)[7]  The Court declines to adopt the BPAI's construction of these terms for the reasons discussed below.

Laube seeks a construction of "engagement" that is structural, but without any concrete detail about that structure.  Laube's proposed construction is "the structure formed for engagement with a front edge

---

[5]  The parties appear to agree that the apparatus would break if the groove notch were in contact with the moving blade.  Because the patent discloses an upper moving blade and a lower blade that is longer, it is natural to expect that the groove notch would contact the lower blade.  What is problematic for Laube, however, is that the claims recite "engagement" with the upper blade.  That is part of the reason that Laube seeks—and obtained in the reexamination—a vague meaning of the term "engage."  It is noteworthy that '973's *claims* do not require that the *upper* blade with which the comb "engages" be the *moving* blade.  But, the parties have stipulated that the upper blade is the moving blade, which is entirely consistent with the specification.

[6]  Wahl's argument assumes that the claim term "engage" requires contact.  However, Laube avoided that construction in the reexamination proceeding.

[7]  *But see Flo Healthcare Solutions, LLC v. Kappos*, 2011-1476, 2012 WL 5200330 (Fed. Cir. Oct. 23, 2012) (Plager, J., and Newman, J., additional views, calling for reconsideration of the standards applicable to claim construction by the USPTO).

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

of upper teeth of a cutting blade," with "engagement" "describ[ing] a relationship between the structural elements, 'groove notch' and 'upper teeth of a cutting head.'"  Such a construction is circular.  At best it would render the claim language "intended use" language, as Wahl contends in response to Laube's proposed construction.

The specification and prosecution history provide an important context for interpreting the disputed terms.  The specification says that "FIG. 14 illustrates an example of a thin comb element (32) with comb teeth (33) having groove notch (34) to **receive the front edge** (36) of the disposable cutting head (1) and spring clip (35) back edge to engage and retain the thin comb."  '973 at 5:54-56 (emphasis added).  And, in describing the back plate embodiment, the specification says that "[w]hen thus mounted the groove notch (34) will **engage** the front edge (36) of the cutting teeth and when the plate (53) is released the extension (56) will **engage** the slot."  '973 at 6:27-30 (emphasis added).  The specification teaches that the "engagement" is of the type that works to retain the comb on the cutting head.[8]  Further, Laube made this very argument in overcoming a claim rejection in the original prosecution of the '973 patent.  Thus, Laube argued that the "groove notch engages the front edge of a plurality of upper teeth 16 of a cutting head **to retain** the comb element on the cutting head," and that the prior art lacked that feature.  Dkt. No. 160, Ex. 6 at 361 (emphasis added).  For these reasons, both the specification and prosecution history teach that "engagement" is what holds the comb onto the cutting head.  The specification uses "engage" consistently to require physical contact; the usage is not just limited to the comb/cutting head interaction.  The cutting head includes "an elongated runner (28) to engage the upper cutting blade (15) groove (18)."  '973 at 4:67-5:1.  Figure 23, which is set forth above, clearly shows the "runner" (28) in physical contact with the upper cutting blade.

The generality of the BPAI construction, which does not require physical contact between the comb and the upper teeth, avoids an issue raised by Laube.  Laube has argued, and thereby admitted, that contact with the moving device would render it inoperable.  To be sure, Laude did not expressly contend that that such inoperability would render the claims invalid.  Laube also has used the claimed inoperability under Wahl's construction to argue for a construction that does not require contact with the upper blades.  The potential invalidity argument has not been adequately developed or presented, and in any event, "[w]e do not reach the issue of invalidity, and we note that the record is unclear as to whether such a device would be inoperative.  Moreover, having concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity (upon which we do not opine)."  *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1309 (Fed. Cir. 2000).  "This court has repeatedly held that

---

[8]  In the embodiments described in the specification, the "front edge" of the cutting head is formed by the lower teeth, but the claims recite engagement with the front edge of the upper teeth.  *See, e.g*, '937 Figs. 14, 15, 17.  The Court will not re-write the claims to conform to a particular embodiment in the specification that is contrary to the clear claim language.  If Laube were correct that physical contact with the upper, moving teeth would break the device, it is possible that "engagement with a front edge of a plurality of *upper* teeth of a cutting head" was a drafting error, as Wahl has suggested.  Laube disagrees with that suggestion, and did not take the opportunity to change the claim language during the in the reexamination.  Moreover, courts "do not redraft claims to contradict their plain language in order to avoid a nonsensical result."  *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 782 (Fed. Cir. 2010).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity." *Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008).

Further, it is unclear that adopting the less concrete "engagement" construction sought by Laube would help sustain validity of the claims over the prior art. Thus, all functional prior art combs must have "worked appropriately with" the moving teeth with which they were not in physical contact. And, although this Court has not yet reached the issue of invalidity, the BPAI upheld all of the 74 prior art objections adopted by the examiner using Laube's less concrete construction. Consequently, even if the Court were to apply the maxim that claims should be construed to preserve their validity, it is unclear which construction would result.

**Construction**: "groove notch for engagement with a front edge of a plurality of upper teeth of a cutting head" means "a channel of indentations to receive the front edge of a plurality of upper teeth of a cutting head, which works together with the comb element with to retain the comb element on the cutting head."

        4.      "for engagement with" (Claims 1, 3, 4 and 7)

The parties stipulated that no construction is necessary for the term "engagement" in claims 1, 3, 4, and 7. However, the meaning of "engagement" is a major point of contention between the parties. Although that dispute is currently focused on "engagement" in the phrase construed above related to the groove notch, the Court will construe the other instances in which the term is used to prevent further disputes in later phases of the case. Rather than just the word "engagement," the Court construes the phrase "for engagement with."

"Engagement" appears in claim 1 in the phrase construed above, and the Court will not re-construe it here. It appears in claim 3 in the phrase "wherein the front base edge having a mounting tab and a support front edge of a base member having a mounting notch for engagement with the mounting tab." It appears in claim 4 as in claim 1, and also in the phrase "with the back plate having a slot therein for engagement with the cutting head." It appears in claim 7 in the same additional phrase as in claim 3. All of these additional uses of the term "engagement" are consistent with the construction the Court gives to the term in the phrase "groove notch for engagement with a front edge of a plurality of upper teeth of a cutting head": they indicate holding two pieces together. "Indeed, we have recognized that 'claim terms are normally used consistently throughout the patent.'" *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010), quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

In claims 3 and 7, the "engagement" is between a mounting notch and a mounting tab. The specification provides that the comb element "may include one or more mounting tabs (76) under which the base member (2) support front edge (37) may be placed when attaching a comb (31, 32). Mounting notches (75) may be formed in the support front edge (37) to mate with the mounting tabs (76)." '973 at 5:57-62. The descriptions of the drawings also support the construction of "engagement" in the context of attachment: "Fig. 14 illustrates a perspective view of the head assembly with blades attachable to a modified tooth comb mounting apparatus. Fig. 15 illustrates a perspective view of the head assembly

A 100

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

with blades attachable to an alternate tooth comb mounting apparatus." '973 at 3:12-18, 6:67-5:1 and Fig. 23 (using "engage" to denote physical contact).

The Court is mindful that it is not appropriate to import limitations from the specification into the claims, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc); it is not doing so here.  Rather, the Court is using the description in the specification to understand how people of ordinary skill in the art would understand "engagement" in the context of the claims.  *See id.*  Although the Court's construction is narrower than what Laube has proposed, that is not because the Court has imported a limitation from the specification.  Instead, it is because the Court has formed an understanding based on how a particular word was used in the context of the specification and prosecution history.  Claims "must be read in view of the specification, of which they are a part." . . . [T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* at 1315, quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996), *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

**Construction**: "for engagement with" means "to work together to retain."  The Court already has given a consistent, but more specific construction to the phrase when used in the loner phrase "groove notch for engagement with a front edge of a plurality of upper teeth of a cutting head."  This construction does not apply to those instances of the phrase.

>    5.    "upper teeth" (Claims 1 and 4)

The parties agree that "the term 'upper teeth' means the toothed front edge of the upper, movable blade of a cutting head."  The Court accepts that stipulation.

**Construction**: "upper teeth" means "the toothed front edge of the upper, movable blade of a cutting head."

>    6.    "cutting head" (Claims 1 and 4)

The parties agree that "the term 'cutting head' means an assembly including lower and upper cutting blades."  The Court accepts that stipulation.

**Construction**: "cutting head" means "an assembly including lower and upper cutting blades."

>    7.    "spring clip" (Claim 1)

The parties agree that the term does not require construction.  The Court agrees.

**Construction**: none.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

    8.    <u>"rear base edge" (Claims 1 and 4)</u>

The parties agree that the term does not require construction.  The Court agrees.

**Construction**: none.

    9.    <u>"coated with a low friction substance" (Claims 2 and 5)</u>

The parties agree that the term does not require construction.  The Court agrees.

**Construction**: none.

    10.    <u>"mounting tab" (Claims 3 and 7)</u>

The parties agree that the term "mounting tab" means "a projection shaped to cooperate with a mounting notch on the clipper head base member.  For example, element 76 in the patent specification and drawings."  That construction does not clarify the issues.  "For example, element 76" merely directs the Court to a portion of a drawing that is referred to as a mounting tab in the specification.  Although the drawing is helpful to understand the concept, the "for example" language does not define the scope of the claim.  Further, the claims themselves recite the interaction described in the parties' construction.  Claim 3 states that the mounting notch is for engagement with the mounting tab.  The parties substitute the word "cooperate" for "engagement," which would deprive the parties of the clarity given by the Court's construction of "engagement."  The parties have not drawn the Court's attention to any dispute concerning infringement or validity concerning this term.  For these reasons, the Court finds that the claim itself provides the necessary context.

**Construction**: none.

    11.    <u>"base member" (Claims 3 and 7)</u>

The parties agree that "the term 'base member' means a supporting body portion for a disposable cutting head assembly.  For example, element 2 in the patent specification and drawings."  Again, the "for example" language is not helpful in defining the scope of the claim in this context.  Further, it is important to clarify in the construction that the cutting head is separate from the comb element due to the use of the word "base" in the claims to describe both portions of the comb and cutting head.

**Construction**: "base member" means "the bottom supporting element of a disposable cutting head assembly."  The disposable cutting head assembly is separate from the comb element.

    12.    <u>"support front edge" (Claims 3 and 7)</u>

The parties agree that the term does not require construction.  The Court agrees.

**Construction**: none.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|----------|--------------------------|------|------------------|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

      13.    "mounting notch" (Claims 3 and 7)

The parties agree that "mounting notch" means "an indentation to receive and mate with the mounting tab on the comb. For example, element 75 of the patent specification and drawings." The Court notes that the engagement with the mounting notch on the clipper base member is already described in the claim. Moreover, the Court already has construed "engagement" in this context, and the parties' "receive and mate" language differs from the language of that construction without good reason. The Court finds that no construction of this term is necessary.

**Construction**: none.

      14.    "for engagement with the mounting tab" (Claims 3 and 7)

The parties agree that no construction is necessary. The Court notes that it already has construed the components of this phrase and that their combination does not lead to a different construction.

**Construction**: see above.

      15.    "back plate" (Claims 4 and 6)

Wahl argues that the term should mean "a substantially flat, thin structure rigidly fixed to the comb body." Wahl's Opening Claim Construction Brief, Dkt. No. 159, at 18. Wahl notes that, in the '973 embodiment describing the "back plate," "the cutting head includes a spring-loaded plate (53) attached to base member (2). The embodiment having a 'back plate' is thus the reverse of the first embodiment – the movable/spring loaded mechanism is found on the cutting head and the comb does not have any moving parts. Indeed, the comb includes a slot that the spring-loaded plate (53) will extend through after compressed and fitted with the comb." Id. at 19. Wahl argues that Laube's construction does not explain what a back plate is, and that the location of the plate is already described in the claim. Thus, it recites that the back plate is "attached at a rear base edge." Wahl's Responsive Claim Construction Brief, Dkt. No. 162, at 10. Wahl notes that Laube proposes "element 51 in the patent specification" as an alternate construction, and that Wahl's construction accurately describes element 51. Id. at 12.

Laube argues that the term should be given its plain meaning or defined as "a projection from the rear base edge, identified as element 51 in the patent specification." Laube's Opening Markman Brief, Dkt. No. 161, at 10. Laube contends that Wahl's proposed construction ignores the part of the term that describes the element's location, and objects to Wahl's additional limitations that the plate needs to be "substantially flat," "thin," and "rigidly fixed." Id. Laube argues that a plate that was not "substantially flat," "thin," or "rigidly fixed" would still be a plate, and nothing in the specification requires such additional characteristics. Laube's Responsive Markman Brief, Dkt. No. 163, at 8.

Laube's construction is too broad: any projection, including a spring clip, would satisfy the claim. However, the specification, and even the claims themselves, distinguish between back plates and spring clips and nowhere indicate that the two overlap. Wahl's construction does not specify the relative location of the plate, and uses the word "body," which is an unnecessary term. The use of different words in different claims raises a rebuttable presumption that the claims have differing scope --

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 30, 2012 |
|----------|-------------------------|---|------|------------------|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

a doctrine known as claim differentiation. *See Seachange Intern., Inc. v. C-COR*, 413 F.3d 1361, 1368-69 (Fed. Cir. 2005). The specification makes clear that the spring clip and back plate embodiments are different.[9] Compare '973 Fig. 14, which illustrates a modified tooth comb mounting apparatus (with a spring clip) and Fig. 15, which illustrates an "alternate" tooth comb mounting apparatus (with a back plate). *See also* '973 at 5:45-68 (describing the spring clip embodiment) with '973 at 6:9-34 (describing the back plate embodiment: "A variation of this spring force attachment is illustrated in FIGS. 15 through 18. In this case a back plate (51) replaces the spring clip (35) and side elements (65) are added").

In the spring clip embodiment the clip itself supplies the force that retains the comb element. '973 at 5:55. In the back plate embodiment, the back plate itself is not spring-loaded; instead it has a slot to receive an extension, which receives spring force from a separate spring ("Pressure on push tabs (42) compresses the spring (50) as the plate (53) is pushed against the force of the spring (50). This moves extension (56) to allow comb element (32) to be removed from or mounted on the cutting head (1)."). '973 at 6:23-28. Therefore, the Court will construe "back plate" to reflect the difference between a spring clip and back plate.

**Construction**: "back plate" means "a substantially flat rigid projection from the rear base edge."

16. "two side elements attached there between" (Claim 4)

Of the terms in dispute, this phrase may be the most difficult to construe. The claim language itself provides very little guidance.

Laube argues that the phrase should be given its plain meaning or defined as "two projections from a side of the base located between the front and back of the base, identified as element 65 in the patent specification." Laube's Opening Markman Brief, Dkt. No. 161, at 10. Laube argues that the construction should not require that the side elements be attached to the back plate, and instead, should allow for them to be at any location between the back plate and the comb teeth. *Id.* at 11. Laube argues that there is no basis for Wahl's construction to require attachment to the back plate but not to the comb because the claim term says only that the side elements are attached "there between" the back plate and comb. *Id.*[10] In support of its position, Laube cites to arguments it recently made in the reexamination rather than material from the original prosecution history. *Id.*

---

[9]  This is not a finding as to whether a product that used both a back plate and a spring clip could infringe. Thus, the Court notes that: (i) Laube attempted to add claims requiring both a spring clip and back plate during the reexamination; (ii) the examiner rejected those amended claims as lacking written description in the specification, and expressed concern that such an embodiment might be inoperable; and (iii) the Board of Patent Appeals and Interferences affirmed the written description rejection. Evidence In Support of Wahl's Claim Construction Brief, Dkt. No. 160, Ex. 8 at 729, Ex. 9 at 1306-24. Because the infringement question is not before the Court, the Court expresses no opinion on the issue.

[10]  Wahl would not object to a construction requiring the side elements to be attached both to the back plate and comb. Wahl Reply Claim Construction Brief, Dkt. No. 164, at 12-13.

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

Wahl argues that the construction should be "the comb element includes two upwardly extending structures connected directly with the back plate and each located generally on separate lateral sides of the comb body." Wahl's Opening Claim Construction Brief, Dkt. No. 159, at 20. Wahl notes that its accused product "includes side walls to limit lateral movement of the comb relative to the cutting head. The side walls are separate and apart from the movable, spring-loaded clamp that provides attachment of the comb to a rear portion of a clipper cutting head opposite the comb teeth." *Id.* at 19-20. Wahl notes that the only embodiment of the '973 patent containing "side elements" shows them attached to the back plate. *Id.* at 20. Wahl also notes that the patent examiner conducting the reexamination, giving the term its broadest reasonable interpretation, construed the term to require attachment to the back plate. *Id.* at 20-21.

The parties' dispute as to this phrase distills to this: Laube seeks a construction that does not require that the side elements be attached to the back plate: "two projections from a side of the base located between the front and back of the base." Wahl seeks a construction that requires that the side elements be attached to the back plate: "two upwardly extending structures connected directly with the back plate and each located generally on separate lateral sides of the comb body."

There are two back plate embodiments disclosed in the specification: one with, and one without, a tapered section above the slot. *See* '973 Figs. 15 and 25. Both have side elements attached to the back plate, as required by Wahl's construction. But, that fact alone does not compel a narrow construction. Given the absence of conclusive evidence, the following guidance from the Federal Circuit has particular significance: "In the end, there will still remain some cases in which it will be hard to determine whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature. While that task may present difficulties in some cases, we nonetheless believe that attempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification." *Phillips*, 415 F.3d at 1324.

In "attempting to resolve that problem in the context of the particular patent," Wahl's proposal is supported by the statements in the specification about the use of various materials for a thin comb. "Where a relatively flat comb attachment is desired, a metal or other strong structural material may be used as compared to the typical plastic comb (31)," *i.e.*, generally, thin combs should be something other than plastic for increased structural integrity. '973 at 5:49-52. But, if plastic is the desired material, the specification also provides that "a variation of this spring force attachment is illustrated in FIGS. 15 through 18. In this case a back plate (51) replaces the spring clip (35) and side elements (65) are added. **This provides a structure for the comb element (32) when a thin comb made of plastic or similar material is desired.**" '973 at 6:9-13. Thus, in the specification, side elements are intended to add structural integrity to plastic or similar material that would otherwise lack the necessary structural integrity. That supports a construction requiring attachment to the back plate because the connection would reinforce the other elements of the comb and provide additional integrity and rigidity. However, the claims do not *require* a plastic comb. Thus, although this portion of the specification favors Wahl's construction, it is not conclusive.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

Additional, but not conclusive, support for Wahl's construction is that a full side wall as shown in the drawings could shield the clipper cavity to reduce the amount of hair that enters, which is one of the purposes of the invention. '973 at 2:29-32. However the specification only describes another element -- a deflector plate -- as providing that function. '973 at 5:19-21.

Wahl's proposal was also adopted by the PTO in the reexamination -- in which Wahl proposed a different construction. The examiner declined to adopt certain of Wahl's proposed prior art rejections because the side elements were not attached to the back plate. Dkt. No. 160, Ex. 8 at 2943. Although the PTO's actions are not binding on a district court, it may consider the basis for the PTO's findings when considering the totality of the evidence. *Pfizer Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007). Although the examiner's reasoning is not entirely clear, it appears that the examiner found that the grammar of the claim requires that the side elements be attached to the back plate. The examiner seems to infer that "slot **therein**," written in the singular, refers to a back plate / side element combination. Wahl's Evidence in Support of its Opening Claim Construction Brief, Dkt. No. 160, Ex. 8 at 1117.

In sum, the examiner found that the prior art lacked a slot within the back plate. *Id.* The examiner made that determination in the course of deciding not to adopt a prior art rejection for which there was an independent distinction. Therefore the examiner's conclusion that the '973 claims require the side elements to be attached to the back plate was not essential to the examiner's decision not to adopt the prior art rejection. In light of the foregoing, this aspect of the determination can be viewed as dicta. *Id.* With respect to a second prior art non-rejection, the examiner's parsing of the claim language is not compelling. The examiner found that the prior art did not include side elements "attached there between with the back plate" (apparently interpreted to mean "attached there **to** the back plate"). But the phrase does not end there: "attached there between with the back plate having a slot therein for engagement with the cutting head." *Id.*, '973 claim 4. At bottom, the claim is drafted imprecisely. However, because the examiner's construction avoided a ground for invalidity, and because of the continuing ambiguity after considering all the available evidence, this matter presents the unusual situation in which the preservation of validity should be taken into account for purposes of interpretation and construction. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008), citing *Phillips*, 415 F.3d at 1327 ("we have limited application of the maxim that claims should be construed to preserve their validity to situations in which we conclude, after reviewing all the intrinsic evidence, that the claim language is ambiguous."). Construing the term to require attachment avoids a prior-art driven invalidity problem, and is more consistent with the meaning of the term discernable from the specification.

**Construction**: "two side elements attached there between" means "two projections from the back plate that extend toward the comb teeth. The side elements are attached to both the back plate and the support base element."

**Construction**: none.

A 106

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 30, 2012 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

17.    "slot therein"/"slot" (Claims 4 and 6)

The parties agree that the term does not require construction.  The Court agrees.

**Construction**: none.

18.    "for engagement with the cutting head" (Claim 4)

The parties agree that the term does not require construction.  The Court agrees as to "the cutting head," but will construe "for engagement with" as described above.

**Construction**: see above.

19.    "tapered above the slot" (Claim 6)

The parties agree that the term does not require construction.  The Court agrees.

**Construction**: none.


**IV.    FURTHER PROCEEDINGS**

A scheduling conference has previously been set for November 19, 2012 at 1:30 p.m.  The Court directs the parties to be prepared at that time to discuss with the Court an appropriate approach to, and schedule for, further proceedings in this matter.  In this regard, the parties shall complete the scheduling portion of this Court's standing Order Setting Rule 16(b) Scheduling Conference, available at the "Judges' Procedures and Schedules section" of http://www.cacd.uscourts.gov/.  The parties shall also be prepared to discuss with the Court whether some procedure for potential settlement discussions in this matter would be productive.


**IT IS SO ORDERED.**

_____        :  _____

                                          Initials of Preparer        _____

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV09-00914 JAK (JCx) | Date | February 25, 2013 |
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Alex Joko |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Kent A. Rowald | Levi W. Heath
Joan Long |

| Proceedings: | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (DKT. 200)** |
|---|---|
| | **PLAINTIFFS' MOTION FOR ENTRY OF PARTIAL JUDGMENT IN FAVOR OF WAHL AND FOR DISMISSAL OF CERTAIN WAHL'S COUNTERCLAIMS AS MOOT (DKT. 204)** |
| | **PLAINTIFFS'/COUNTER-DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 205)** |

The motion hearing is held. The Court states its tentative views with respect to the parties' cross-motions for summary judgment and is inclined to grant in part Defendant's Motion for Summary Judgment, Or in the Alternative, Partial Summary Judgment , Plaintiffs' Motion for Entry of Partial Summary Judgment and for Dismissal of Certain Counterclaims as Moot, and Plaintiffs'/Counter-Defendant's Motion for Partial Summary Judgment. Counsel address the Court. The Court takes the Motions UNDER SUBMISSION and will issue a written ruling.

Plaintiff shall submit a one page brief no later than February 26, 2013, which shall identify where in the docket the document bates numbered as KLC000340 is presented and where evidence was submitted that Defendant directed Plaintiffs to produce the replaceable tip technology to Defendant. Defendants may file a one page response no later than February 27, 2013.

The parties are open to participating in a second settlement conference with Magistrate Judge Chooljian. Counsel shall confer and notify the Court's Clerk by email on February 27, 2013 whether: (i) the parties agree to the matter proceeding by way of a jury or bench trial; (ii) the parties have agreed to meet with Magistrate Judge Chooljian or this Court, and if so, what dates all parties are available for the settlement conference; and (iii) how early can settlement briefs be submitted.

In light of the parties desire to participate in a second settlement conference, the Court continues the Jury Trial to April 23, 2013 at 9:00 a.m. The Final Pretrial Conference and Motions in Limine (Dkt. 236 – 244, 246) are continued to April 8, 2013 at 3:00 p.m., with all pretrial documents to be filed consistent with this

A 108

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | February 25, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

Court's Orders no later than April 1, 2013. The March 8, 2013 Exhibit Conference is vacated and will be rescheduled, if necessary, at the time of the Final Pretrial Conference.

**IT IS SO ORDERED.**

|  | 1 | : | 17 |
|---|---|---|---|
| Initials of Preparer | ak | | |

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|----------|-------------------------|------|---------------|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|------------------------|--------------------------------------------------|

| Andrea Keifer | Not Reported |
|---------------|--------------|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
| Not Present | Not Present |

**Proceedings:**      **(IN CHAMBERS) ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (DKT. 200) AND GRANTING IN PART PLAINTIFFS'/COUNTER-DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 205)**

I.      **Introduction**

Kim Laube & Co. ("KLC") and Kim Laube ("Laube") (collectively, "Plaintiffs") have brought this action against Defendant Wahl Clipper Corp. ("Wahl" or "Defendant") advancing the following claims: (i) infringement of U.S. Patent No. 6,473,973 (the "'973 patent"); (ii) misappropriation of trade secrets in violation of California Civil Code §§ 3426 *et seq.*; (iii) breach of contract; and (iv) fraud and deceit. Second Amended Complaint ("SAC"), Dkt. 50. Wahl brought a counterclaim against Kim Laube and Jacqueline Laube ("Counter-Defendants") advancing the following claims: (i) declaratory judgment of noninfringement, invalidity, and unenforceability of the patent; (ii) breach of a stock purchase agreement; (iii) breach of a buy/sell agreement; (iv) breach of an employment agreement; (v) breach of a consulting agreement; (vi) breach of a stock transfer agreement; (vii) breach of fiduciary duty; and (viii) fraud. Amended Counterclaims, Dkt. 127.

Wahl moved for summary judgment on all of the claims advanced in the SAC (the "Wahl Motion"). Dkt. 200. In the alternative, Wahl identified 12 issues that it seeks to have adjudicated through partial summary judgment. *Id.* The first issue relates to the patent claim; the second through tenth issues relate to the misappropriation of trade secrets claims; the eleventh issue relates to the breach of contract claim; and the twelfth issue relates to the fraud claim. *Id.*

Plaintiffs filed two motions for summary judgment. The first addressed Plaintiffs' patent claim and Defendant's parallel patent counterclaim ("Plaintiffs' Patent Motion"). Dkt. 204. The second addressed Plaintiffs' trade secret misappropriation and breach of contract claims as well as Defendant's other counterclaims, but did not seek summary judgment on the issue of Plaintiffs' fraud claim or the amount of damages for any of Plaintiffs' claims ("Plaintiffs' Non-Patent Motion"). Dkt. 205.

The Court heard oral argument on all of these matters on February 25, 2013, and took them under submission. Dkt. 308. This Order addresses Plaintiffs' Non-Patent Motion and the Wahl Motion, with the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |

exception of the first issue related to the patent claim, only. A separate Order has been issued (Dkt. 314) on Plaintiffs' Patent Motion and on the patent claim in the Wahl Motion. For the reasons stated in this Order, the Court GRANTS, in part, the Wahl Motion and GRANTS, in part, Plaintiffs' Non-Patent Motion.

**II.      Factual Background**

On September 17, 1998, Wahl purchased a 75 percent interest in KLC pursuant to a Stock Purchase Agreement. Defendant's Statement of Uncontroverted Facts ("DSUF") ¶ 1, Dkt. 218. At the same time, the parties executed a Buy/Sell Agreement, an Employment Agreement and a Consulting Agreement (collectively, the "1998 Agreements"). *Id.* In 2002, Kim Laube brought an action in California Superior Court (the "Superior Court Action") in which both Wahl and KLC were named as defendants. In that action, Laube advanced claims for breach of contract and of the implied covenant of good faith and fair dealing, intentional and negligent infliction of emotional distress, and breach of fiduciary duty. *Id.* at ¶ 9.

On December 24, 2002, the parties signed a Stock Transfer Agreement ("STA"). *Id.* at ¶ 10. The STA transferred to Laube all of the stock in KLC then held by Wahl. *Id.* at ¶ 11. Pursuant to the STA, Wahl forgave the nearly $1 million in debt Plaintiffs owed to Wahl. *Id.* at ¶ 12. In exchange, Plaintiffs agreed to dismiss the Superior Court Action. Before September 17, 1998 and after December 24, 2002, Laube was the sole shareholder, director and officer of KLC. Plaintiffs' Statement of Uncontroverted Facts ("PSUF") at ¶ 1, Dkt. 205-3. Since December 24, 2002, Plaintiffs and Wahl have competed in the market for animal care products. *Id.* at ¶ 22. This market includes pet hair clippers, blades, guide combs, shampoos and other grooming products. *Id.*

Approximately three years after the STA was entered, Wahl began selling the Switchblade animal clipper. DSUF ¶ 13, Dkt. 218.[1] The Switchblade clipper contains a removable drive tip that allows a user to replace it without disassembling the clipper. *Id.* at ¶ 14. Wahl applied for a patent on the removable drive tip technology. *Id.* at ¶ 15. The Switchblade clipper also contains a variable speed feature. *Id.* at ¶ 16. At some time in 2006, Wahl began selling Stainless Steel Attachment Guide Combs, the product accused of infringing the '973 patent in this case. *Id.* at ¶ 18.[2] The '973 patent issued in November 2002. *Id.* at ¶ 72.

**III.      Analysis**

    **A.      Summary Judgment Legal Standard**

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party seeking summary judgment bears the initial burden of informing the court of the basis

---

[1]  The parties contest the date of the product releases, but that issue is not material to the present Motions.
[2]  Again, although the parties dispute the timing of this event, that issue is not material.

A 111

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |

for its motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party will have the burden of proof on an issue at trial, that party must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *See Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail if there is an absence of evidence to support the nonmoving party's claims. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

Evidence presented by the parties at the summary judgment stage must be admissible. *See* Fed. R. Civ. P. 56(c)(2). In reviewing the record, a court does not make credibility determinations or weigh conflicting evidence. *Anderson*, 477 U.S. at 255. Rather, it draws all inferences in the light most favorable to the nonmoving party. *Id.*; *see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

"If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact -- including an item of damages or other relief -- that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

**B.  Uncontroverted Facts**

Under Local Rule 56-2, "Any party who opposes the motion shall serve and file with the opposing papers a separate document containing a concise 'Statement of Genuine Disputes' setting forth all material facts as to which it is contended there exists a genuine dispute necessary to be litigated." Under Local Rule 56-3, "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the "Statement of Genuine Disputes" and (b) controverted by declaration or other written evidence filed in opposition to the motion." A failure to specifically challenge the facts identified in a statement of undisputed facts means a party is deemed to have admitted the validity of the facts contained in the statement. *Beard v. Banks*, 548 U.S. 521, 527 (2006).

**C.  The Wahl Motion**

      1.   Misappropriation of Trade Secrets

            a)   Legal Standard

"[A] prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

Under California Civil Code § 3426.1, a trade secret is defined as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
>> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>>
>> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Such definitions necessarily compel the conclusion that a trade secret is protectible only so long as it is kept secret by the party creating it." *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 50 (1992). "Public disclosure, that is the absence of secrecy, is fatal to the existence of a trade secret. 'If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.'" *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 304 (2002).

"It is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain. . . Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and 'the patentee's only protection is that afforded under the patent law.'" *Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) *aff'd*, 113 F.3d 1258 (Fed. Cir. 1997).

> A plaintiff seeking relief for misappropriation of trade secrets "must identify the trade secrets and carry the burden of showing that they exist." . . . The plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade."

*Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (citation omitted, italics in original). "[W]hen asserting methods and techniques and know-how to be trade secrets, a reasonable degree of precision and specificity is appropriate." *In re Providian Credit Card Cases*, 96 Cal. App. 4th at 309.

> b) Application

Plaintiffs claim three distinct trade secrets: (i) their comb design; (ii) their variable speed technology; and (iii) their lever mechanism aka replaceable tip technology. Only the claimed replaceable tip trade secret survives the Wahl Motion.

> (1) Comb Design

The only trade secrets identified in the SAC as having been misappropriated are those relating to "lever

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

mechanism technology" and "variable speed technology." SAC ¶¶ 26-28. Previous versions of the complaint included allegations of misappropriation of trade secrets in Wahl's comb product. Compl. ¶ 37, Dkt. 1, and FAC ¶ 31, Dkt. 8.

Plaintiff first raised the contention that the comb design was still part of the misappropriation claim through a reference in the damages report submitted by Plaintiff's expert. Heath Decl., Exh. V ("Report of Charles J. Hart"), Dkt. 219. Defendants do not contest these facts. Compare DSUF ¶¶ 69-70, Dkt. 218 with Plaintiff's Statement of Contested Facts ("PSCF"), Dkt. 245-1. Plaintiffs' Supplemental Answer to Defendant's First Set of Interrogatories No. 4(c), Rowald Decl., Exh. 4, Dkt. 245-2, states that, with respect to Plaintiffs' breach of contract claim, their proprietary inventions and ideas included comb designs that attach to a clipper cutting head on four sides. Notably, the preceding subsection (b) addressing the misappropriation of trade secrets claim does not include anything except the "lever mechanism technology" and "variable speed technology." For these reasons, Plaintiffs' second cause of action does not encompass any alleged trade secrets relating to the comb.

Even if Plaintiff had properly presented this claim through the operative complaint, it would not survive summary judgment. The only specific statement Plaintiffs have identified in the record regarding the nature of the alleged trade secret as to the comb is their interrogatory response, which is cited above. It states that the comb is attached on four sides. This basis for a trade secret fails because this feature of the comb was disclosed; the '973 patent diagrams show a four-sided comb. See '973 Patent Figs.15, 24, Exh. A, Dkt. 50. No other aspect of the comb has been identified as a trade secret with the required particularity.

(2)    Variable Speed

Plaintiffs do not contest Wahl's Statement of Uncontroverted Facts with respect to the manner in which the trade secret relating to variable speed technology was described in the SAC and in the course of discovery. Compare DSUF ¶¶ 73-78, Dkt. 218, with PSCF, Dkt. 245-1. Plaintiffs also do not contest: (i) Wahl's Statement of Uncontroverted Facts regarding both parties' prior knowledge and use of the pulse width modulation concept; (ii) that Plaintiffs advertised their use of pulse technology; and (iii) that the technology is fully disclosed during a simple examination of the product by someone knowledgeable about pulse width modulation. Compare DSUF ¶¶ 80-93, Dkt. 218 with PSCF, Dkt. 245-1.

The uncontroverted descriptions of the claimed variable speed trade secret do not clearly show that Plaintiffs contend that this alleged trade secret is anything more than use of electric current pulses rather than a resistor method. See DSUF ¶¶ 74-76. It is uncontroverted that a description of the trade secret at this level of generality was fully disclosed by Plaintiffs' own advertisements in 1996. DSUF ¶ 92. Accordingly, the technology so described cannot be a trade secret.

In its memoranda presented in connection with the present Motions, and at the February 25, 2013 hearing, Plaintiffs took the position that some feature of the circuitry itself is a trade secret. Plaintiffs based this argument on the claim that they had discovered a means of making this generally-known technological concept of pulse width modulation work on a smaller scale. However, it is uncontroverted that at his deposition, Laube did not testify that the size of the implementation of the pulse width modulation was relevant to Plaintiffs' trade secret allegations. Thus, when asked, he did not identify any

A 114

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

specific aspect of the technology or circuitry as being the trade secret, but merely stated that the pulse technology was the trade secret. DSUF ¶ 77. Further, in their memoranda and at the hearing, Plaintiffs argued that the masking of the chip numbers in the circuitry was evidence that Plaintiffs had made reasonable efforts to maintain the secrecy of the circuitry notwithstanding that the product was publicly available. However, Plaintiffs conceded at the hearing that masking of the chip numbers would be irrelevant if it were already known that Plaintiffs were using pulse width modulation technology. As noted, use of this technology was already disclosed by Plaintiffs in their advertisements. Finally, Plaintiffs do not contest that their expert admitted that there was nothing about Plaintiffs' variable speed technology, as described in his expert report, that differed from commonly-known pulse width modulation prior to the year 2000. DSUF ¶ 84.

For these reasons, this aspect of Plaintiffs' trade secret claim fails. Thus, Plaintiff has not described with the required specificity any aspect of the variable speed technology that has not been publicly disclosed. Instead, the undisputed evidence shows that the essence of the alleged trade secret Plaintiffs have described was publicly disclosed.

(3)     Replaceable Tip

Defendant moves for summary judgment as to the replaceable tip technology on six grounds: (i) Plaintiffs have not described the tip technology in a way that separates it from matters of general knowledge of persons skilled in the trade (Issue 3); (ii) the tip cannot be a trade secret because it would be fully disclosed by the product itself (Issue 6); (iii) Plaintiffs did not derive economic value from the tip technology not being generally known (Issue 7); (iv) Plaintiffs did not make reasonable efforts to maintain the secrecy of their alleged trade secrets (Issue 8); (v) Plaintiffs cannot establish that Wahl misappropriated any trade secrets because any acquisition or use, even if it occurred, was not improper (Issue 9); and (vi) Plaintiffs cannot establish that any alleged misappropriation by Wahl caused damages (Issue 10).

None of these grounds warrants summary judgment. Issue 3 is not sufficient because Plaintiffs have identified the replaceable tip itself as a trade secret. DSUF ¶ 74. Issue 6 is not sufficient because the fact that an element of a product would be fully disclosed once the product is made publicly available does not mean that, prior to any such disclosure, there can never have been a trade secret as to that aspect of the product.[3] Issue 10 is not sufficient because by showing that KLC's sales dropped after Defendant introduced its product, Plaintiffs have identified a basis in the record from which a jury could conclude that Plaintiffs suffered damages caused by Defendant's actions. Plaintiffs do not need affirmatively to

---

[3] The cases cited by Defendant -- *Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1019 (E.D. Cal. 2011) and *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221-22 (2010) -- do not support its contrary position. These cases involve software programs and material regarding aspects of the operation of that software that was evident to the user in using the finished program. They do not stand for the proposition that these materials were never trade secrets, *e.g.*, prior to their disclosure as part of the release of the software programs. Accepting Defendant's position would mean that a company could never have a trade secret in a product or feature that the company had developed, but had not disclosed publicly because it had determined that a later release was in its best interest. It is routine for companies to set the timing for the release, and corresponding disclosure, of new products and features.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|----------|-------------------------|------|---------------|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

disprove other potential causes for the decline in sales to survive summary judgment; that is a matter that Defendant may present as a defense at trial. And, as noted, on a motion for summary judgment, a court is not to consider the weight of evidence, as opposed to its admissibility.

(a)    Issue 7

"When information has no independent economic value, a claim for misappropriation lacks merit." *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1263 (2002); *Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*, 869 F.2d 1306, 1309 (9th Cir. 1989) (California law does not recognize information as a trade secret unless it confers an actual economic advantage over competitors on its owner).

Plaintiffs have the "burden" of showing that an alleged trade secret "is sufficiently valuable and secret to afford an actual or potential economic advantage over others" which "'need not be great,' but must be 'more than trivial.'" *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007) (quoting Restatement (Third) of Unfair Competition § 39). "The factfinder is entitled to expect evidence from which it can form some solid sense" of the value of the information, at least that the value is more than trivial. *Id.* However, a grant of summary judgment is improper where, even though "[n]either party submitted adequate references to evidence supporting their arguments and statements of undisputed fact," a court can "readily infer" from the evidence in the record a genuine issue of material fact as to an alleged trade secret's economic value from being kept secret from competitors. *San Jose Const., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1537-38, 1543 (2007).

Plaintiffs' Opposition does not identify any evidence in the record showing that there was some economic value to Plaintiffs because the replaceable tip was not generally known. *See* Opp'n at 13-14, Dkt. 245. Plaintiffs merely contend that they derived value when KLC's competitors did not know of the replaceable tip because KLC's clippers, even without the replaceable tip, were superior to those of its competitors. *Id.* at 14. None of the evidence submitted with Plaintiff's Opposition supports that contention.

Plaintiffs do not contest any of Defendant's uncontroverted facts on this issue. *Compare* DSUF ¶¶ 101-103, Dkt. 218 *with* PSCF, Dkt. 245-1. That evidence included that the only value Laube identified was the patentability of the concept and that Laube claimed that clippers with advanced technology were worth millions of dollars in sales. *Id.* Plaintiffs did not present evidence as to the precise size of the market for clippers with advanced technology, the specific value of the replaceable tip technology, or the time or expense incurred in creating the idea. *Id.* However, this case bears a substantial similarity to *San Jose Construction*, 155 Cal. App. 4th at 1537-43. Thus, taking the evidence in the record as a whole, it is appropriate to infer that there is at least a genuine issue of material fact as to a more than trivial value of the replaceable tip technology. Wahl produced a clipper with a removable drive tip and applied for a patent for the removable drive tip technology. DSUF ¶¶ 14-15. This conduct is consistent with, and provides evidence in support of, the claim that this product feature had value.

(b)    Issue 8

Defendant moves for summary judgment on the ground that Plaintiffs failed to protect the secrecy of the matters that underlie their claims. Thus, Defendant argues that Plaintiffs did not take reasonable steps to

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

protect this secrecy because they did not require *Defendant's* employees to sign confidentiality agreements or otherwise designate their material as confidential during the time that Defendant was the majority shareholder in KLC and when the two companies were cooperating in business operations. Defendants make a similar claim in light of Plaintiffs' failure to insist on the return of all allegedly confidential materials when the parties terminated their cooperative business relationship. These arguments are unpersuasive.

As the majority shareholder in KLC, Wahl owed KLC and the minority shareholder Laube a duty not to take actions that would harm KLC or usurp its business opportunities. This obligation included that Wahl was not permitted to exploit KLC's trade secrets without authorization. Indeed, when Wahl ceased to be the majority shareholder of KLC, the STA obligated Wahl not to use Plaintiffs' trade secrets. If the prior disclosure of such secrets to Wahl had eliminated their secrecy, there would have been no need or purpose for this provision. Moreover, in the context of the parties' prior business relationship, in which Wahl was the majority shareholder in KLC, it would not have been indisputably realistic to have expected that Laube would have had the authority to direct the majority shareholder as to the entry of confidentiality agreements with its own employees. Accordingly, although a fact finder presented with all the evidence might conclude that Plaintiffs did not take reasonable steps to ensure and maintain the secrecy of the replaceable tip technology, a reasonable fact finder could also conclude that Plaintiffs did not waive the secrecy of the replaceable tip technology by sharing the technology with Wahl while the parties were cooperating in business ventures through their co-ownership of KLC.

(c)     Issue 9

Defendant argues that it could not have made an improper use of the trade secret because: (i) it did not acquire the alleged information under a duty to keep it confidential for the reasons addressed in Issue 8; and (ii) although it denies ever receiving the technology from Laube, Wahl contends that Laube has conceded that he developed this technology during the period when he was acting under a Consulting Agreement with Wahl, whose terms provided that anything developed by Laube during this time would be owned by Wahl. The first argument fails for the same reasons discussed above with respect to Issue 8.

Plaintiffs' Opposition does not address the second argument. However, Defendant did not make a sufficient showing that summary judgment should be granted on this issue. There is a genuine issue of material fact as to when the replaceable tip was created. However, even assuming that Laube did not develop a product containing a replaceable tip until 2000 or 2001 based on Plaintiffs' failure to contest DSUF ¶ 113, the language of the Consulting Agreement does not support Defendant's position as to ownership. The Consulting Agreement does not provide that everything developed by Laube during that time belonged to Wahl. *See* Amended Counterclaim, Exh. 4, Dkt. 127. The Consulting Agreement merely states that materials relating to Wahl's business, whether or not prepared by Laube, shall remain the exclusive property of Wahl. Amended Counterclaim, Exh. 4 ¶ 5(c), Dkt. 127. The Employment Agreement between Laube and KLC -- executed at the same time as the Consulting Agreement -- contains an identical provision regarding KLC material. Amended Counterclaim, Exh. 3 ¶ 10(c), Dkt. 127. Accordingly, a sufficient showing that the material was developed by Laube *for Wahl* would be required to demonstrate that it belonged to Wahl. Further, to the extent that there is an issue as to which company owns material created by Laube when these contracts were in place, the presumption is that KLC owned the material. Thus, the Employment Agreement states that "During the term of this Agreement and with the exception

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|----------|--------------------------|------|---------------|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

of that certain Consulting Agreement, of even date herewith, between Employee and Wahl, Employee shall devote his entire working time and efforts to the business and affairs of Employer and do his utmost to promote Employer's interests." *Id.* at ¶ 6. In light of the language of these agreements, the creation of the replaceable tip while Laube was subject to the Consulting Agreement does not show, as a matter of law, that Wahl owned the replaceable tip technology. Defendant has made no showing that the replaceable tip was created for Wahl under the Consulting Agreement or that Laube has admitted that it was. Accordingly, that Plaintiffs did not contest that Laube did not develop a product containing the replaceable tip until 2000 or 2001 is not sufficient to show the absence of a genuine, triable issue of fact as to ownership. Therefore, summary judgment is not warranted on this issue.

        2.    <u>Breach of Contract</u>

            a)    Contractual Language

Section 8.1 of the STA provides:

> Transferor [Wahl] agrees not to divulge, communicate, use to the detriment of the Corporation [KLC] or Transferee [Laube] or for the benefit of any other person or entity, or misuse in any way, any confidential information or trade secrets of the Corporation or Transferee including, without limitation, personnel information, secret processes, know-how, customer lists and requirements, sales data, pricing information, or other technical data. Transferor acknowledge[s] and agrees that any information or data acquired by it on any of these matters or items was received in confidence and as a fiduciary of Transferee and Corporation. . .

> As used in this Section 8, confidential information and trade secrets do not include information which is readily available or known to the public, or information which has been acquired outside the fiduciary relationship.

SAC, Exh. B, Dkt. 50. Section 8.2 states that "Transferor agrees that it has no interest in or right to any of the trade names, trademarks, service marks, copyrights, patents or applications, therefore, of Corporation or Transferee, as listed in Schedule 5" except for one listed exception not at issue here and by subsequent agreement. *Id.* As described by section 2.7, Schedule 5 lists "Patents, Copyrights, Trade Names, Trademarks, and Service Marks and related goodwill, owned, licensed, or used by Corporation or Transferee . . . ." *Id.* Section 2.7 also notes that "Schedule 5 identifies trade secrets and/or confidential information of Company or Transferee." *Id.* Schedule 5 includes the '973 patent as well as other patents, trademarks, and various formulas for what appear to be liquid products such as shampoos, colognes, and dips. *Id.*

            b)    Application

This claim survives regarding the replaceable tip technology. It does not, however, survive as to the comb design or variable speed technology, because each was publicly disclosed or otherwise made readily available to the public, as discussed above in connection with the misappropriation claims. *See* § III A. 1) b) (1) and (2), *supra.* Accordingly, neither is subject to the STA provision because these technologies are

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

neither a trade secret nor confidential information as defined by the STA. This claim does not survive as to any breach based on alleged infringement of the '973 patent because summary judgment has been granted to Defendant on the patent claims. Dkt. 314.

Defendant's contention that Schedule 5 does not expressly identify the replaceable tip technology is not a basis for finding that Section 8.1 of the STA only covered the items on Schedule 5. Section 8.1 specifically mentions several types of confidential information and trade secrets not on Schedule 5. Further, the language in Section 2.7 shows that Schedule 5 does not purport to be a list of trade secrets. Instead it states that Schedule 5 identifies trade secrets or confidential information; this is not the same as a statement that it is a comprehensive list of trade secrets.

      3.    <u>Fraud</u>

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996). "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." *Id.*

Plaintiffs contend that Defendant entered into the STA while intending not to honor its terms. Thus, they claim that Defendant's conduct constituted the false promise form of fraud. The breach of contract claim survives summary judgment as to the replaceable tip technology. Therefore, Defendant's argument that there was no misrepresentation because there was no breach of the provisions of the contract is not a basis for summary judgment. However, summary judgment is appropriate based on Defendant's second argument: Plaintiffs have failed to present admissible evidence to show that there is a genuine issue of material fact as to whether Defendant entered the contract with the intent not to honor its terms.

The only evidence Plaintiffs have offered in support of their fraud claim is an email, which is dated some two weeks after the STA was executed. Rowald Decl., Exh. 8, Dkt. 262. In this email, an employee of Defendant wrote that Defendant needed a new clipper product promptly because its relationship with Plaintiffs had ended. The email went on to inquire about the status of the development of the product. This email alone is not sufficient to create a genuine issue of material fact as to the Defendant's alleged fraudulent intent when it signed the STA. Further, this is not sufficient evidence to create a triable issue of fact as to whether Defendant intended to use Plaintiffs' trade secrets. Finally, that Defendant released a product allegedly using Plaintiffs' trade secrets or confidential information in violation of the STA approximately three years after the STA was signed in December 2002, is not sufficient, circumstantial evidence of a future intent to do so at the time that the contract was signed. No other evidence is advanced by Plaintiffs in support of their fraud claim, and it is not the Court's obligation to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

    **D.**    **Plaintiffs' Non-Patent Motion**

      1.    <u>Claims from Plaintiffs' Complaint</u>

There are genuine issues of material fact as to whether any replaceable tip trade secret was

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

misappropriated and whether there was a breach of contract based on any such misappropriation or use of confidential information. Plaintiffs' Motion not does meet its burden of showing that no reasonable finder of fact could find for Defendant on these claims.

    2.    <u>Wahl's Counterclaims</u>

The second through fifth counterclaims are for alleged breaches of the 1998 Agreements. The second counterclaim arises out of the representations made in the Stock Purchase Agreement regarding KLC's ownership (as opposed to Laube's individual ownership) of certain intellectual property. The third through fifth counterclaims allege that Laube breached agreements relating to his conduct at a time when he was subject to agreements between parties made in 1998. The sixth counterclaim alleges a breach of the STA based on two theories: (i) attaching the STA to the SAC when it was filed with the Court breached the confidentiality provisions of the STA; and (ii) the Counter-Defendants misrepresented certain assets on Schedule 5 as being assets to which KLC had good and marketable title when they were actually assets owned by Laube. The seventh (breach of fiduciary duty) and eighth (fraud) counterclaims are based on this same alleged conduct that underlies the four counterclaims alleging breach of the 1998 Agreements and the second part of the sixth counterclaim for breach of the STA (relating to the alleged misrepresentations).

    a)    Counterclaims Allegedly Barred by Wahl Release (Second through Fifth Counterclaims and the related portions of the Seventh and Eighth Counterclaims)

    (1)    The Parties' Positions

Plaintiffs' argument as to these claims is based entirely on the contention that they are barred by the release signed by Wahl as part of the STA (the "Release"). SAC, Exh. B, Dkt. 50. The Release states that Wahl releases, acquits, and forever discharges Laube, KLC, and Jacqueline Laube "from any and all liability, actions, claims, demands or suits whatsoever which the undersigned *may now or hereafter have* on account of or arising out of damages . . . sustained by or accruing to the undersigned [Wahl] as a result of or relating to Wahl Clipper Corporation's ownership interest in, and involvement with, Kim Laube & Company, Inc; [and] the employment, consulting or any other agreements by and between Kim E. Laube and Wahl Clipper Corporation. . . ." *Id.* (emphasis added). Defendant responds that this Release cannot be a waiver of future or unknown claims because the language of the Release does not mention future or unknown claims and does not expressly waive the protections of California Civil Code § 1542.

    (2)    Legal Standard

"Contract principles apply when interpreting a release, and 'normally the meaning of contract language, including a release, is a legal question. . . Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, construction of the instrument is a question of law . . . ." *Cohen v. Five Brooks Stable*, 159 Cal. App. 4th 1476, 1483 (2008) (internal citations omitted); *see also Winet v. Price*, 4 Cal. App. 4th 1159, 1171-73, (1992) (no ambiguity present where "entire agreement was designed and tailored to release the specifically named actors from liability for claims arising from their own conduct occurring during their relationship").

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." Cal. Civ. Code § 1542. "Nothing in that statute requires that it be designated in the release or that a party specifically waive its provisions." *Perez v. Uline, Inc.*, 157 Cal. App. 4th 953, 959 (2007).

A release that is general only in that it waives all future and unknown claims as to a specific issue is a specific release not subject to § 1542. *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1444-45 (9th Cir. 1986); *Sime v. Malouf*, 95 Cal. App. 2d 82, 109-10 (1949) (release was special as to all claims having origin in joint venture relationship but general as to claim at issue unrelated to joint venture and therefore § 1542 applied to that claim).

(3)    Application

The plain language of the Release shows that it included a waiver of future or unknown claims. The Release refers to claims Wahl "may now or hereafter have." "May" indicates that the Release includes claims about which there may be some uncertainty and, therefore, includes unknown claims; "hereafter" indicates an intent to include future claims. If the Release had been designed to include only claims known to Wahl at the time that the Release was signed, this language would have been unnecessary. Notably, Defendants have not proposed an alternative construction of the meaning of these words and have not identified any parol evidence that suggests another interpretation to which the contract is reasonably susceptible. Further, the Release is not a general release subject to § 1542 because it only releases claims based on the parties' business relationship. Accordingly, it is a specific release that is not subject to § 1542.[4]

b)    Sixth Counterclaim (and the aspects of Seventh and Eighth Counterclaims that are derivative to the second part of the Sixth Counterclaim)

(1)    Confidentiality

Wahl contends in its sixth counterclaim that the Counter-Defendants breached the confidentiality provisions of the STA by attaching the STA to the SAC. The Counter-Defendants argue that summary judgment is appropriate because the confidentiality restrictions did not survive the closing of the agreement.

(a)    Contractual Language

---

[4]  Even if § 1542 applied, the Release would still bar these claims based on the Court's construction of the language of the Release. There is no requirement that there be a finding of fact as to subjective intent for releases in a commercial rather than personal injury context (*see Brae*, 790 F.2d at 1445 and *Winet*, 4 Cal. App. 4th at 1170) and there is no requirement of express reference to § 1542 to determine that its protections have been waived. *Perez*, 157 Cal. App. 4th at 959. The language of the Release would constitute waiver of future or unknown claims.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|----------|-------------------------|------|---------------|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

Section 1.4 of the STA states that "No party will make any public disclosure or publicity release pertaining to the settlement of the Lawsuit, the existence of this transfer, or of the information contained herein without having first obtained the written consent of the other party." SAC, Exh. B, Dkt. 50. Section 9.14 of the STA provides that "All representations, warranties covenants, and agreements of this parties contained in this Agreement . . . shall survive the Closing." *Id.* Exhibit A to the STA is a Mutual Non-Disclosure and Confidentiality Agreement that addresses specifically-defined confidential information shared between parties during negotiations and the confidentiality of the negotiations themselves prior to the closing. *Id.*

(b)     Application

The plain language of Section 1.4 includes the STA itself; section 9.14 states that all requirements in the agreement survived the closing. Exhibit A does not implicate the STA itself unless it contains confidential information as defined by the Non-Disclosure Agreement. Accordingly, there is no basis for granting summary judgment on the ground that the restrictions on the disclosure of the STA cannot have been breached because the restrictions on its disclosure ended once the closing occurred.[5]

(2)     Alleged Misrepresentations as to Marketable Title

The plain language of the STA shows that these alleged misrepresentations are not part of the contract. Section 2.7 of the STA states that Schedule 5 lists intangible property owned by KLC or Laube. SAC, Exh. B, Dkt. 50. Accordingly, material listed on Schedule 5 is not necessarily represented as something owned by KLC. Section 3.3 of the STA states only that KLC had good and marketable title to all of its real, personal, and mixed properties free of any encumbrances. *Id.* There is no statement that these provisions are related. Thus, on its face, no representation was made in the STA that KLC owned the '973 patent or had marketable title to the '973 patent. Summary judgment is warranted as to this part of the sixth counterclaim and the related aspects of the seventh and eighth counterclaims.

**IV.     Conclusion**

For the foregoing reasons, the Court GRANTS, in part, the Wahl Motion and GRANTS, in part, Plaintiffs' Non-Patent Motion. The misappropriation of trade secrets and the breach of contract causes of action in Plaintiff's SAC survive as to the replaceable tip technology only. The sixth cause of action in the Amended Counterclaim survives as to the alleged breach of the confidentiality provisions of the STA.

**IT IS SO ORDERED.**

_____     :   _____

Initials of Preparer     ak

---

[5] The moving party has not raised any other grounds for summary judgment. Accordingly, the Court's determination does not address other considerations, including whether any damages were caused by the alleged improper disclosure or whether the Court would have ordered that the STA remain under seal throughout the proceedings.

A 122

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |


| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| Not Present | Not Reported |

**Proceedings:**     **(IN CHAMBERS) ORDER GRANTING PATENT PORTIONS OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 200) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ENTRY OF PARTIAL JUDGMENT IN FAVOR OF WAHL AND FOR DISMISSAL OF CERTAIN OF WAHL'S COUNTERCLAIMS AS MOOT (DKT. 204)**


**I.     Introduction**

This suit involves both patent and non-patent claims. Plaintiff Kim Laube & Co. ("Laube" or "Plaintiff") brought four claims against Defendant Wahl Clipper Corp. ("Wahl" or "Defendant"): (1) patent infringement; (2) misappropriation of trade secrets (Cal. Civ. C. §§ 3426 et seq.); (3) breach of contract; and (4) fraud and deceit. Second Amended Complaint, Dkt. No. 50. Wahl brought seven counterclaims: (1) declaratory judgment of noninfringement, invalidity, and unenforceability of the patent; (2) breach of a stock purchase agreement; (3) breach of a buy/sell agreement; (4) breach of an employment agreement; (5) breach of a consulting agreement; (6) breach of a stock transfer agreement; (7) breach of fiduciary duty; and (8) fraud. Amended Counterclaims, Dkt. No. 127. The Court conducted a hearing on the parties' cross-motions for summary judgment on February 25, 2013 at which it stated its tentative views, heard argument and took the matter under submission. This order addresses only the patent claims. A companion order addresses the other issues raised by the parties in their summary judgment papers.[1] For the reasons stated in this Order, Wahl's Motion for Partial Summary Judgment ("Defendant's Motion") is GRANTED as to the patent issues, and Plaintiff's Motion for Entry of Partial Judgment in Favor of Wahl and For Dismissal of Certain of Wahl's Counterclaims as Moot ("Plaintiff's Motion") is GRANTED, in part, only insofar as the Court grants summary judgment of noninfringement in Wahl's favor, and is otherwise DENIED.

The patent-in-suit, U.S. No. 6,473,973 ("the '973 Patent" or "'973") is titled "Disposable Cutting Head for Clippers." The abstract, summary of the invention, and majority of the drawings and specification are directed to the cutting head. However, part of the specification describes a comb element, which sits on top of the cutting head and functions to guide hair to the blades and control the length of hair remaining.

---
[1] That Order is entered as Dkt. 313. It discusses certain additional factual and legal issues, all of which are incorporated here by this reference.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

The '973 Patent's seven claims are all directed to the comb element.

After Laube sued, Wahl initiated an *inter partes* reexamination of claims 1-5, which were the claims that Laube had asserted in the litigation (Laube later asserted claims 6-7 as well). The reexamination resulted in the rejection of claims 1-5. The Board of Patent Appeals and Interferences ("BPAI") affirmed that rejection. Laube's appeal is pending before the Federal Circuit. Case No. 13-1048 (filed Oct. 31, 2012). In the appeal, the USPTO recently requested that the time for filing its brief be extended to April 11, 2013.

The Court issued its claim construction order on October 30, 2012. Dkt. 172. Laube admits that it cannot prove infringement of the "groove notch" limitation under the Court's construction. Thus, Wahl's request for summary judgment of noninfringement is not only unopposed, but Laube also seeks summary judgment of noninfringement in favor of Wahl on the ground that the "groove notch" limitation is not found in Wahl's product. Wahl, however, asks the Court to enter summary judgment of noninfringement based on the absence of a number of additional limitations. Laube asks the Court to decline to address the other missing limitations.

Wahl also seeks summary judgment with respect to its contention that the '973 Patent is invalid under 35 U.S.C. § 112 due to lack of written description, lack of enablement, and inoperability; Laube seeks dismissal of that invalidity counterclaim as moot. Neither party has moved for summary judgment on the substance of Wahl's counterclaim for declaratory judgment of unenforceability based on Laube's alleged inequitable conduct during the prosecution of the patent-in-suit. Wahl contends that inequitable conduct issue should be tried; Laube believes it should be dismissed as moot.

Laube's only substantive opposition to any of Wahl's noninfringement or invalidity arguments for partial summary judgment on the patent issues was to present what the Court regards as an inaccurate interpretation of its *Markman* ruling.

## II.    Factual Background

The abstract, summary of the invention, and majority of the drawings and specification of the '973 Patent, are directed to a cutting head for hair clippers, *i.e.*, the portion of the clippers that contains the cutting blades. However, part of the specification describes a comb element, which sits on top of the cutting head. Its function is to guide hair to the blades and control the length of the uncut hair that remains. The '973 Patent's seven claims are all directed to the comb element. An example of a comb element is illustrated in dashed lines below the cutting head in figure 13:[2]

---
[2]  The Court has annotated the drawings with the descriptions from the specification corresponding to the numbers shown in the drawings.

Case 2:09-cv-00914-JAK-JC   Document 314   Filed 03/08/13   Page 3 of 11   Page ID #:9421

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |



The claims cover two basic types of comb elements. Claims 1-3 cover a comb element with a spring clip in the back to hold the comb element onto the cutting head. Claim 1 is independent, and claims 2 and 3 depend from claim 1. Claim 1 recites:

> A comb element for attachment to a clipper cutting head comprising:
> a support base element with a plurality of comb teeth attached at a front base edge and
>     the comb teeth having a groove notch formed therein for engagement with a front
>     edge of a plurality of upper teeth of a cutting head; and
> a spring clip attached at a rear base edge of the support base element opposite the
> comb teeth.

Figure 14 shows an example of a comb element with a spring clip:



In the spring clip embodiment, the spring force from the spring clip (35) works to hold the comb in place

Case 2:09-cv-00914-JAK-JC   Document 314   Filed 03/08/13   Page 4 of 11   Page ID #:9422

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

on the cutting head.

Claims 4-7 cover a comb element using a back plate with a slot, rather than a spring clip as in claims 1-3. Claim 4 is independent, and claims 5-7 depend from claim 4. Claim 4 recites:

> A comb element for attachment to a clipper cutting head comprising:
> a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and
> a back plate attached at a rear base edge of the support base element opposite the comb teeth and two side elements attached there between with the back plate having a slot therein for engagement with the cutting head.

Figure 15 shows example of a comb element with a back plate and slot:



FIG. 15

In the back plate embodiment, the spring force from the leaf spring (81) works to hold the comb in place on the cutting head. This pushes the spring extension (82) into the slot. *See* '973 Figs. 22 and 23:

A 126

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |



Claim 6 requires the back plate to be tapered above the slot, and claim 7 requires the front base edge to have a mounting tab. Figure 24 shows a comb element with a tapered portion of the back plate above the slot:



Figure 24A, a side view of the comb tooth portion of the comb, shows a mounting tab:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |



The claims require "engagement" with the upper teeth of the cutting head. Figure 12A shows that the lower blade teeth protrude farther than the upper blade teeth; this configuration is relevant to Wahl's theories of noninfringement and invalidity.

### III.   <u>Analysis</u>

####    A.   **Legal Standard**

A grant of "summary judgment under Rule 56, Fed.R.Civ.P., is entirely appropriate, in a patent as in any other case, where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).

#####       1.   <u>Noninfringement</u>

To obtain summary judgment of noninfringement, "nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006).

#####       2.   <u>Invalidity</u>

"Because a patent is presumed to be valid, the evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence." *Auto. Tech. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007).

######          a)   Lack of Written Description

The 35 U.S.C. § 112, ¶ 1 written description requirement requires that the specification, viewed from the perspective of a person of ordinary skill, must show that the inventor actually invented the claimed invention. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Compliance with the written description requirement is a question of fact. *Id.*

######          b)   Lack of Enablement

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |

The "enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Auto. Tech.*, 501 F.3d at 1282 (quoting *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003)). "Whether the subject matter of a patent claim satisfies the enablement requirement under 35 U.S.C. § 112, ¶ 1 is a question of law reviewed de novo, based on underlying facts, reviewed for clear error." *Id.* at 1281.

      c)      Lack of Utility (Inoperability)

"If the claimed subject matter is inoperable, the patent may indeed be invalid for failure to meet the utility requirement of § 101 and the enablement requirement of § 112. To violate § 101, the claimed device must be totally incapable of achieving a useful result." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1571 (Fed. Cir. 1992) (citing *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 956, *cert. denied*, 469 U.S. 835 (1984)). Utility is a factual issue, reviewed for clear error. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1359 (Fed. Cir. 1999).

      3.      <u>Inequitable Conduct</u>

To prevail on an inequitable conduct defense, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011). "[A] court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.* While indirect and circumstantial evidence can provide the necessary proof, "to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence. Indeed, the evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Id.* (internal quotations and citations omitted).

Inequitable conduct is equitable in nature, with no right to a jury, and the trial court has the obligation to resolve the underlying facts of materiality and intent. *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1333 (Fed. Cir. 2011).

    **B.**    **Application**

Laube concedes that the Court's construction of "engagement" precludes a finding of infringement, and agrees that Wahl's motion for summary judgment should be granted. Dkt. 204 at 2. However, Laube requests that the Court decline to consider Wahl's other asserted bases for noninfringement, and dismiss Wahl's invalidity counterclaims as moot. *Id.* Although it argued that it would be more efficient for the Court not to reach these additional patent issues, Laube did not otherwise oppose Wahl's motion for partial summary judgment. Dkt. 245. Thus, in its statement of disputed facts in opposition, Laube did not provide any evidence in response to that presented by Wahl in support of its motion for summary judgment on the patent issues. Instead, Laube's response to such facts and evidence was as follows:

      14. So Called "Undisputed Facts 45-47" are in fact contested. The only basis for finding

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

noninfringement which are not contested are set forth in Plaintiff's Motion for Entry of Judgment in Favor of Wahl on the Patent issues.

15. So Called "Undisputed Facts 31-44" are in fact contested. If the Court's interpretation of the claims or Plaintiff's proposed interpretation are adopted by the appellate court, then each of these UF 31-44 are simply wrong as a matter of law.

Dkt. 245-1 at 8. These responses are insufficient to show a genuine issue of material fact as to a matter raised by a motion for summary judgment brought by an opposing party. "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). As explained below, Wahl has pointed to the absence of any genuine issues of material fact preventing entry of partial summary judgment on the patent issues. And, Laube has failed to demonstrate the existence of any genuine issues of material fact that would prevent the entry of this requested judgment.

Laube argues that it is not necessary to reach all of Wahl's claims, because their outcome might be different if, on appeal, the Federal Circuit were to disagree with, and reverse, some or all of the elements of the Court's claim construction. This argument is unpersuasive. Indeed, it contradicts Laube's own request for entry of judgment against it, because that request is also based on the Court's claim construction. And, Laube's assertion that Wahl's undisputed facts are "simply wrong as a matter of law" counsels in favor of deciding at this time all of the grounds advanced by Wahl so that all of them can be reviewed together by the Federal Circuit. That is the most efficient means of proceeding in this litigation. Otherwise, there would be the possibility of a second appellate process should the Federal Circuit reverse the claim construction determination, with that result followed by this Court's making decisions on the alternate grounds of invalidity advanced by Wahl with which Laube disagrees. The fact that a legal determination might be reversed on appeal is no basis for not reaching the ultimate conclusion mandated by that legal determination. Indeed, fully applying the claim construction to concrete infringement disputes may assist the Federal Circuit's review of claim construction. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006) (reviewing a judgment in which the parties agreed that the trial Court's construction rendered the accused device noninfringing, and noting that without "the full context of this infringement action" "this court cannot fully and confidently review the infringement judgment, including its claim construction component.")

Laube's argument that a district court should stop once it reaches a single ground for resolving a claim invites extended relitigation and violates "the historic federal policy against piecemeal appeals." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980). Further, in the Rule 54(b) context, many courts have held that when the facts or legal issues underlying both the adjudicated and the unadjudicated claims significantly overlap, or where the correctness of the judgment might be mooted by a later decision of the unadjudicated claims, a substantial risk of duplicative appellate review is created, and that therefore the district court abused its discretion in entering judgment on fewer than all issues. James Wm. Moore et al., Moore's Federal Practice § 54.23 (3d ed. 2012). The same concerns are present here, and counsel that the Court reject Laube's request to reach Wahl's additional grounds for judgment only in the event of an appellate reversal. Laube's argument is also contrary to judicial

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |

economy: the issues have been fully developed, and the Court has expended the necessary effort to evaluate them. It would be wasteful to re-create that effort in the future.

    1.    <u>Noninfringement</u>

Wahl sets forth competent evidence, including the testimony of experts for both sides, demonstrating that the accused Wahl products do not include any of the following: (1) a "groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head" as required by claims 1-7; (2) comb teeth "coated with a low friction substance" as required by claims 2 and 5; (3) a "base member" as required by claims 3 and 7; (4) a "mounting notch" as required by claims 3 and 7; (5) a "mounting tab" as required by claims 3 and 7; and (6) "two side elements attached there between" as required by claims 4-7. Wahl's Statement of Uncontroverted Facts and Conclusions of Law, Dkt. 218 at ¶¶ 45-67. Wahl then argues that its products do not infringe because they do not satisfy those claim limitations. Dkt. 200 at 5.

Laube offers no substantive argument in opposition. Dkt. 245. In its statement of contested facts in opposition to Wahl's motion, Laube did not set forth specific facts controverting Wahl's facts. Instead, it merely argued that "So [c]alled 'Undisputed Facts 45-47' are in fact contested. The only basis for finding noninfringement which are not contested are set forth in Plaintiff's Motion for Entry of Judgment in Favor of Wahl on the Patent issues."[3] Dkt. 245-1 at 8. That response does not demonstrate a genuine issue of material fact in dispute. "Mere denials or conclusory statements are insufficient." *Barmag,* 731 F.2d at 836. Therefore, the Court grants Wahl's motion for partial summary judgment of noninfringement on all the grounds urged by Wahl, and finds that the accused Wahl products do not include:

        (1) a "groove notch formed therein for engagement with a front edge of a plurality of
        (2) comb teeth "coated with a low friction substance" as required by claims 2 and 5;
        (3) a "base member" as required by claims 3 and 7;
        (4) a "mounting notch" as required by claims 3 and 7;
        (5) a "mounting tab" as required by claims 3 and 7;
        (6) "two side elements attached there between" as required by claims 4-7.

    2.    <u>Invalidity</u>

        a)        Lack of Written Description

Wahl argues that "[t]he '973 Patent fails to describe or illustrate a channel of indentations in the comb teeth to receive the front edge of upper (moving) teeth of a cutting head, which then works with (contacts) the comb element to retain the comb element on the clipper as required by the 'groove notch for engagement . . . upper teeth.'" Dkt. 200 at 5-6. Wahl supports this argument with citation to competent evidence. *Id.* (citing Wahl's Statement of Uncontroverted Facts and Conclusions of Law, Dkt. 218 at ¶¶ 31-44).

---

[3] The Court assumes that Laube meant to refer to Wahl's undisputed facts 45-67, i.e., the facts Wahl relied upon in its moving papers.

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

#### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

In opposition, Wahl presents an argument that misstates the Court's claim construction order and contradicts the argument Laube made in its own motion for summary judgment. Laube argues that "contact [between the groove notch and the upper, moving teeth of the cutting blade] is **_not_** required under the Court's Markman interpretation." Dkt. 245-1. In fact, the Court's claim construction order is to the contrary. Dkt. 245 at 7. And, Laube correctly stated the Court's claim construction in its own motion for summary judgment, writing that "under the Court's interpretation, there must be physical contact between the groove notch and the upper teeth in order to retain the comb on the clipper head." Dkt. 204-1 at 2.

Laube also fails to present any facts in opposition, instead merely asserting that "'Undisputed Facts 31-44' are in fact contested. If the Court's interpretation of the claims or Plaintiff's proposed interpretation are adopted by the appellate court, then each of these UF 31-44 are simply wrong as a matter of law." Dkt. 245-1. Conclusory assertions are not sufficient to show the existence of a genuine dispute as to a material fact. Therefore, the Court grants Wahl's motion for partial summary judgment of invalidity for failure to comply with the written description requirement.

> b) Lack of Enablement

Wahl argues that "[t]he '973 Patent does not describe or enable someone skilled in the art to build an operable device having a groove notch that contacts the upper (moving) blade of a cutting head to retain the comb." Dkt. 200 at 6. Wahl supports this argument with citations to competent, admissible evidence. *Id.* (citing Wahl's Statement of Uncontroverted Facts and Conclusions of Law, Dkt. 218 at ¶¶ 37-40). Laube again fails to offer any substantive response or any specific disputed facts. Once again, the Court grants Wahl's motion for partial summary judgment of invalidity for failure to comply with the enablement requirement.

> c) Lack of Utility (Inoperability)

Wahl argues that "[a] device that incorporates comb teeth that contact the moving blade teeth is inoperable as Laube concedes." Dkt. 200 at 6. Wahl supports this argument with citation to competent and admissible evidence. *Id.* (citing Wahl's Statement of Uncontroverted Facts and Conclusions of Law, Dkt. 218 at ¶¶ 41-44). Laube again fails to offer any substantive response or any specific disputed facts. Indeed, Laube has admitted that comb teeth that contact the moving blade would be inoperable. Laube's Responsive Markman Br., Dkt. 163 at 7. Therefore, the Court grants Wahl's motion for partial summary judgment of invalidity for failure to comply with the utility requirement.

> 3.  Inequitable Conduct

Wahl did not move for summary judgment on its inequitable conduct counterclaim. Laube only moved to dismiss it in the generic sense that it sought dismissal of all of the patent counterclaims in light of the noninfringement claim. In support of its inequitable conduct claim, Wahl argues that in the '973 Patent's prosecution, Laube concealed its knowledge of its own prior art attachment combs. Further, Wahl contends that Laube falsely told the patent examiner that the prior art patent he cited lacked a groove notch for engagement with the front edge of the cutting teeth of the clipper and a spring clip for

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |

snap attachment at the rear edge of a base element. Dkt. 226 at 3. Wahl notes that in the reexamination that it initiated in 2009, Wahl submitted Laube's own 1997 brochure to the PTO, and the PTO found that it raised a substantial new question of patentability, thereby confirming the materiality of that withheld material. *Id.* at 4-6. The reexamination examiner rejected the claims, and the Board of Patent Appeals and Interferences affirmed all of the rejections. *Id.* at 7. Wahl argues that it also has uncovered physical prior art combs sold by Laube that are even more relevant than the prior art it submitted in the reexamination, but could not submit it in the reexamination because the PTO only considers printed publications in such proceedings. *Id.* at 8. Wahl argues that Laube concealed those prior art combs during prosecution, and that they clearly anticipate the spring clip-groove notch claims. *Id.* at 9.

Wahl argues that Laube's deceptive intent is shown by the fact that it knew of the prior art, knew that it was material, and told the PTO that the prior art did not have a groove notch for retention of the comb to the cutting head. *Id.* at 16. The alleged inequitable conduct could support Wahl's fee request, and case law supports adjudicating the question for that purpose even after a finding of noninfringement. *Id.* at 17 (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed. Cir. 1983) (holding that "the inequitable conduct issues . . . remain alive as to the claim for attorney fees" even after invalidity had been established)).

Judicial economy weighs against Laube's request for dismissal of the counterclaims. The Court is now very familiar with the technical details of the case, and is in a position efficiently to resolve all claims and counterclaims so that they can be presented together on appeal. *See SkinMedica, Inc. v. Histogen Inc.*, 2012 U.S. Dist. LEXIS 56659 (S.D. Cal. Apr. 23, 2012) (declining to dismiss counterclaims where it would introduce the potential for two separate appeals and two separate trials, and would not aid the efficient resolution of the case).

## IV.    Conclusion

Defendant's Motion is GRANTED as to the patent issues, and Plaintiff's Motion is GRANTED in part only insofar as the Court grants summary judgment of noninfringement in Wahl's favor, and is otherwise DENIED.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    ak

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - TRIAL

| | | | |
|---|---|---|---|
| Case No. | LA CV09-00914 JAK (Jcx) | Date | June 18, 2013 |
| Title: | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

Present: The Honorable   John A. Kronstadt, United States District Judge

| Andrea Keifer | Alex Joko |
|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendants: |
|---|---|
| Kent A. Rowald | Mark A. Hagedorn |

____1st____ Day Court Trial     _____ Day Jury Trial

__X__ One day trial:   Begun (1st day);   ____ Held & Continued;   __X__ Completed and submitted to Court.

____ The Jury is impaneled and sworn.

__X__ Opening statements made by   Plaintiff and Defendant

__X__ Witnesses called, sworn and testified.        __X__ Exhibits Identified   __X__ Exhibits admitted.

__X__ Plaintiff(s) rest.        __X__ Defendant(s) rest.

__X__ Closing arguments        __X__ plaintiff(s)   __X__ defendant(s).   ____ Court instructs jury.

____ Bailiff(s) sworn.        ____ Jury retires to deliberate.   ____ Jury resumes

____ Jury Verdict in favor of        ____ plaintiff(s)   ____ defendant(s) is read and filed.

____ Jury polled.        ____ Polling waived.

__X__ Filed Witness & Exhibit Lists        ____ Filed jury notes.   ____ Filed jury instructions.

____ Judgment by Court   _____   ____ plaintiff(s)   ____ defendant(s).

____ Findings, Conclusions of Law & Judgment to be prepared   ____ plaintiff(s)   ____ defendant(s).

____ Case submitted.   ____ Briefs to be filed

____ Motion to dismiss by   _____   is   ____ granted.   ____ denied.   ____ submitted.

____ Motion for mistrial        is   ____ granted.   ____ denied.   ____ submitted.

__X__ Motion for Judgment/Directed Verdict   by Plaintiff   is   ____ granted.   __X__ denied.   ____ submitted.

____ Settlement reached and placed on the record.

__X__ Clerk reviewed admitted exhibits with counsel to be submitted to the Court for findings.

____ Counsel stipulate to the return of exhibits upon the conclusion of trial. Exhibit Release Form prepared and filed.

____ Trial subpoenaed documents returned to subpoenaing party.

____ Case continued   _____   for further trial/further jury deliberation.

__X__ Other:   Plaintiff shall file the finalized and signed declaration of Dennis Beech no later than June 19, 2013.

> The Court admits provisionally Exhibit 2262 subject to a showing that the document was requested through the discovery process and/or during the exchange of exhibits in preparation for trial. Counsel may submit a brief and any supporting documentation with respect to Exhibit 2262 no later than 12:00 p.m. on June 21, 2013.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - TRIAL

The Court accepts the declaration of Mr. Scott Melton and Mr. Kim Laube's deposition. Defendant may file any objections to Plaintiffs' Objections to Deposition Designations (Dkt. 408) no later than 12:00 p.m. on June 21, 2013.

The parties are permitted, but not required, to file no later than June 21, 2013, a closing statement brief, not to exceed 5 pages. The brief may also address the issue raised with respect to the burden of proof and whether it is deemed an affirmative defense or part of the case-in-chief.

The Clerk will return the exhibits to counsel upon the issuance of the Court's ruling.

**IT IS SO ORDERED.**

|  |  |  |
|---|---|---|
| 4 | : | 20 |

Initials of Deputy Clerk   ak

cc:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) DECISION FOLLOWING BENCH TRIAL ON INEQUITABLE CONDUCT**

## I.  Introduction

Plaintiffs Kim Laube & Co. and Kim Laube (collectively, "KLC" or "Plaintiffs") brought this action against Defendant Wahl Clipper Corp. ("Wahl" or "Defendant") for, *inter alia*, infringement of U.S. Patent No. 6,473,973 ("the '973 Patent"), titled "Disposable Cutting Head for Clippers." Subsequently, Wahl brought a counterclaim for inequitable conduct in the prosecution of the '973 Patent. A bench trial on the counterclaim was conducted on June 18, 2013. This Order sets forth the decisions on the issues raised at that trial.

## II.  Procedural Background

After Laube brought its claims, Wahl requested *inter partes* reexamination of claims 1-5 on the basis of prior art references that were not considered during the prosecution of the '973 Patent. The United States Patent and Trademark Office ("PTO") granted reexamination, and the examiner issued a final rejection of claims 1-5. The Board of Patent Appeals and Interferences ("BPAI") affirmed that rejection. Laube's appeal from the BPAI's affirmance is currently pending before the Federal Circuit. Case No. 13-1048 (filed Oct. 31, 2012).

On October 15, 2012, the Court held a *Markman* hearing to construe certain terms and phrases from the '973 Patent's claims. On March 8, 2013, the Court granted Wahl's motion for partial summary judgment of non-infringement and invalidity of the '973 Patent. Order Granting Patent

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

Portions of Mot. for Summ. J., Dkt. No. 314 at 1.

The case proceeded to a jury trial on certain non-patent claims; the trial concluded on May 2, 2013. The jury rendered a verdict adverse to Plaintiffs.

On May 7, 2013, the Court set the procedure for the bench trial on Wahl's counterclaim. Order Setting Inequitable Conduct Trial Procedure ("Bench Trial Procedure Order"), Dkt. No. 369. During the one-day bench trial, Wahl called as witnesses the patentee, Kim Laube ("Laube"), and the patent prosecutor, Dennis Beech ("Beech"). KLC called Scott Melton ("Melton"), whose direct testimony Wahl submitted in declaration form pursuant to the Court's instructions. Notice of Prior Test. Designation and Direct Test. for Inequitable Conduct Trial ("Wahl Designation"), Dkt. No. 371.

### III.   Resolution of Disputed Evidentiary Issues

#### A.   The Certified Prosecution History

KLC objects to the admission of the certified prosecution history from the reexamination of the '973 Patent (""973 Reexam"), Trial Exhibit 2262, on the ground that it was not filed by Wahl before the December 29, 2012 discovery deadline. June 18, 2013 Bench Trial Tr. ("Bench Trial Tr."), Dkt. No. 417 at 120:2-8; Def.'s Br. in Supp. of Admis. of Trial Ex. 2262, Dkt. No. 415-6 at 1. KLC's objection is Overruled.

On April 19, 2012, Wahl served requests for production on KLC. Dkt. No. 415 at 2. Request No. 8 sought "[a]ll documents relating to the reexamination of the '973 patent." Dkt. No. 415-1 at 7. On June 6, 2012, KLC responded, referring Wahl to "the publicly available patent office records which reflect the prosecution of the '973 reexamination." Dkt. No. 415-2 at 8. Subsequently, Wahl obtained the "PTO database downloaded file for the reexamination prosecution history of the '973 Patent," Bates-labeled WAHL_PAT002208-3120. Dkt. No. 415 at 3. Wahl served that copy of the reexamination prosecution history with its Invalidity Contentions on June 20, 2012, and filed it in connection with the claim construction proceedings on September 17, 2012. *Id.*; Dkt. No. 415-3 at 1. In addition, Wahl listed the reexamination prosecution history, Bates-labeled WAHL_PAT002208-3120, on the Joint Exhibit List on April 1, 2013. Dkt. No. 415 at 3; Dkt No. 326 at 34-35.

On April 16, 2013, KLC "objected to and would not stipulate to [the] admissibility" of the version of the reexamination prosecution history that had been used in this litigation up until that date. Dkt. No. 415 at 3. KLC raised the following question: "Are these certified copies? If so, we will stipulate to them. If they are not certified, we will NOT stipulate to them." Dkt. No. 415-4 at 1 (emphasis in original). KLC reiterated this objection in an April 22, 2013 email to Defendant's

A 193

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

counsel: "ALL government documents must be certified to be in, regardless of who offers them." Dkt. No. 415-5 at 1 (emphasis in original).

After Wahl obtained the certified copy of the '973 reexamination prosecution history (Trial Exhibit 2262), it forwarded that copy to KLC on May 30, 2013 with a proposed exhibit list for use at the bench trial. Dkt. No. 415-6 at 3. KLC objected to this list on June 5, 2013. *Id.* at 1. On June 12, 2013, Wahl filed its Notice of Disputed Exhibits and Request for Judicial Notice, in which it asked for judicial notice of Trial Exhibit 2262 pursuant to Fed. R. Evid. 201 and 902. Dkt. No. 402 at 3. At trial, the Court provisionally overruled KLC's objection and admitted Trial Exhibit 2262 subject to further briefing; that briefing has now been submitted. Bench Trial Tr., Dkt. No. 417 at 122:5-8.

The Court overrules KLC's objection to Trial Exhibit 2262. The requirements for judicial notice are satisfied. *See e.g.*, *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) ("We may take judicial notice of records and reports of administrative bodies."); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 514 n.3 (Fed. Cir. 1990) (taking judicial notice of a PTO Office Action) (citing 37 C.F.R. § 1.11(d) (1989) ("All papers or copies thereof relating to a reexamination proceeding which have been entered of record in the patent or reexamination file are open to inspection by the general public . . . .")). Further, the Court overrules KLC's objection based on Wahl's late production of the document for two reasons. First, Wahl produced the document in discovery in the non-certified form Wahl then possessed. Dkt. No. 160-9 through 106-12. Thus, there was no prejudice to KLC when a certified copy, which was identical in all material respects, was produced at a later time; KLC had ample opportunity to consider the document and prepare for its potential admission as a trial exhibit. Second, KLC represented that it would withdraw the objection if Wahl used a certified copy. Dkt. No. 415-4 at 1. It now attempts to retract that representation without any good or sufficient reason. For the reasons just stated, there is no justification for this change in position. Thus, there is no dispute as to the authenticity of the document, and KLC has articulated no reason that it would be prejudiced by its admission.

**B. Wahl's Deposition Designations**

KLC objects to Wahl's designation of deposition testimony of both Laube and Beech for the inequitable conduct bench trial. Pls.' Objections to Dep. Designations, Dkt. No. 408 at 2-4; Bench Trial Tr., Dkt. No. 417 at 177:3-12. KLC objects to Laube's deposition testimony, on the ground that Wahl failed to follow the Bench Trial Procedure Order, which directed that direct testimony be presented in the form of a declaration, *i.e.,* not through deposition testimony. Pls.' Objections to Dep. Designations, Dkt. No. 408 at 2. KLC objects to Beech's deposition testimony, on the ground that he is a non-party witness who is available to provide live testimony, and that no exceptions to Fed. R. Civ. P. 32(a) apply. *Id.* at 3.

On May 7, 2013, the Court ordered Wahl to "file a designation of the prior testimony upon which

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

it relies" by May 17, 2013. Bench Trial Procedure Order, Dkt. No. 369 at 1. The Court also ordered that, by May 24, 2013, KLC was to "submit declarations of the direct testimony it will present, objections to the consideration of any prior testimony of non-party witnesses who are available to testify at trial . . . [and] any cross designations of any prior testimony that has been designated by Wahl, to the extent it is not stricken as being a non-party, available witness's testimony." *Id.* On May 17, 2013, Wahl designated specific portions of Laube's and Beech's depositions. Wahl Designation, Dkt. No. 371 at 1-6. KLC failed to file its declarations, objections or cross-designations by May 24, 2013. On June 6, 2013, in an order requiring Wahl to file marked compilations of the testimony it designated by June 10, 2013, the Court provided that "[s]hould any other party elect to make a designation prior to the time of trial, it shall be presented in this same format." Order re Submission of Highlighted Test. Excerpts for Bench Trial on Inequitable Conduct, Dkt. No. 395. On June 17, 2013 -- more than three weeks after the deadline and the day before trial -- KLC filed its objections and cross-designations to Wahl's designations. Pls.' Objections to Dep. Designations, Dkt. No. 408.

The Court overrules KLC's objections to Laube's prior deposition testimony. Fed. R. Civ. P. 32(a)(1) provides that a deposition may be used against a party at trial if:

> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
> (C) the use is allowed by Rule 32(a)(2) through (8).

Pursuant to Fed. R. Civ. P. 32(a)(3), Wahl may use, "for any purpose[,]" the deposition of a party or anyone who, "when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)." Laube is the President of Kim Laube & Co., and is himself a party to the action. Decl. of Kim Laube In Supp. of Mot. To Disqualify, Dkt No. 32-2 at 1.

The Court sustains KLC's objections to the admission of Beech's deposition testimony. Its use is not allowed by Fed. R. Civ. P. 32(a)(2)-(8).

### C. KLC's Cross-Designations

Wahl objected to KLC's cross-designations under Fed. R. Civ. P. 32, as untimely, vague and irrelevant. Notice of Wahl's Objections to Pls.' Belated Cross-Designations, Dkt. No. 413 at 2-3. The Court sustains Wahl's objection and strikes KLC's cross-designations. Because they do not provide context for Wahl's designations, they are improper cross-designations. KLC designated the balance of the depositions in their entirety and made no attempt to limit the cross-designations to the relevant issues. Pls.' Objections to Dep. Designations, Dkt. No. 408 at 2-4.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

IV. <u>Factual Background</u>

    A. **The '973 Patent**

The '973 Patent is titled "Disposable Cutting Head for Clippers." It has a total of seven claims (two independent and five dependent), all of which are directed to a comb element. However, the abstract, summary of the invention, and majority of the drawings and specification of the '973 Patent are directed to the cutting head, not the comb element. A comb element is illustrated in dashed lines below in Figure 13:[1]



*FIG. 13*

The '973 Patent claims two categories of comb elements: Claims 1-3 cover a comb element with a spring clip in the back, whereas Claims 4-7 cover a comb element using a back plate with a slot instead of a spring clip.

Claim 1 is independent, and Claims 2-3 depend from Claim 1. Claim 1 recites:

    A comb element for attachment to a clipper cutting head comprising:

    a support base element with a plurality of comb teeth attached at a front base edge
        and the comb teeth having a groove notch formed therein for engagement
        with a front edge of a plurality of upper teeth of a cutting head; and

---

[1] The Court has annotated the drawings with the descriptions from the specification.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

a spring clip attached at a rear base edge of the support base element opposite the comb teeth.

Figure 14 below shows a comb element with a spring clip:



In this embodiment, the spring force from the spring clip (35) holds the comb in place on the cutting head (1).

Claim 4 is independent, and Claims 5-7 depend from Claim 4. Claim 4 recites:

A comb element for attachment to a clipper cutting head comprising:

a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and

a back plate attached at a rear base edge of the support base element opposite the comb teeth and two side elements attached there between with the back plate having a slot therein for engagement with the cutting head.

A 197

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

Figure 15 shows an example of a comb element with a back plate and slot:



FIG. 15

Figures 22 and 23 further illustrate the back plate embodiment, in which the spring force from the leaf spring (81) works to hold the comb in place on the cutting head. This pushes the spring extension (82) into the slot (52).

///

///

///

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |



Figure 12A shows that the lower, or stationary, blade teeth protrude farther than the upper, or moving, blade teeth:



### B.    The Prosecution History of the '973 Patent

U.S. Patent Application Serial No. 09/222,049 ("the '049 Application"), the original application in the chain that eventually yielded the '973 Patent, was filed on December 29, 1998. Dkt. No. 402-4, Trial Ex. 2257 at 0005. In the '049 Application, claim 8 was the only claim regarding a comb element. It read as follows:

> 8.    A thin comb element for attachment to a clipper cutting head comprising a support base element with comb teeth having a groove notch therein attached at an edge of the support base element and a spring clip attached at an edge of the support base element opposite the comb teeth.

*Id.* at 0016. The examiner rejected claim 8 under 35 U.S.C. § 102(b) as being anticipated by U.S.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

Patent No. 4,328,616, to Andis ("Andis '616"). *Id.* at 0027. Andis '616 discloses a blade carrier with a front portion resembling a comb and "means for securing together said blade carrier with said blade member in assembled relation." Andis '616 at 10:26-27. The blade carrier is depicted in Figures 5 and 6 of Andis '616 as being attached with screws.

Instead of responding to the Office Action in the '049 Application, Laube filed a continuation-in-part application, No. 09/457,454, on December 8, 1999 ("the '454 Application"). Dkt. No. 402-5, Trial Ex. 2258 at 0004. Claims 20 and 21, which read as follows, were added in the '454 Application:

20.     A comb element for attachment to a clipper cutting head comprising:

a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and

a spring clip attached at a rear base edge of the support base element opposite the comb teeth.

21.     A comb element for attachment to a clipper cutting head comprising:

a support base element with a plurality of comb teeth attached at a front base edge and the comb teeth having a groove notch formed therein for engagement with a front edge of a plurality of upper teeth of a cutting head; and

a back plate attached at a rear base edge of the support base element opposite the comb teeth and two side elements attached there between with the back plate having a slot therein for engagement with the cutting head.

*Id.* at 0022-23. Claims 20 and 21 in the '454 Application ultimately issued as claims 1 and 4 of the '973 Patent. Laube also filed an Information Disclosure Statement with the '454 Application, disclosing seven U.S. patents "related to disposable shaver heads." *Id.* at 0036. KLC's publicly-sold combs were not among the prior art disclosed, and were not previously or subsequently disclosed during prosecution of the family of applications leading to the '973 Patent.

In an Office Action dated January 31, 2001, the Examiner rejected claim 20 under 35 U.S.C. § 102(b) as being anticipated by Andis '616. *Id.* at 0084. Laube responded to the Office Action on April 25, 2001, attempting to distinguish Andis '616 as lacking a groove notch and spring clip. *Id.* at 0105. A subsequent Office Action was issued on July 10, 2001, rejecting claim 20 again as anticipated by Andis '616 pursuant to 35 U.S.C. § 102(b). *Id.* at 0113. The Examiner stated:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

"Note that as broadly as claimed the spring clip is shown by Andis." *Id.*

Laube did not substantively respond to the July 10, 2001 Office Action, and instead pursued another continuation-in-part application, No. 09/610,645, that it had previously filed on June 27, 2000 ("the '645 Application"). Dkt. No. 402-7, Trial Ex. 2259 at 0003. Claims 20-26 and 33-35 of the '645 Application were directed to comb elements for attachment to a clipper cutting head. *Id.* at 0024-27. In an October 11, 2001 Office Action, the examiner provisionally rejected claims 1-20, 21, and 23 for double patenting in view of the earlier-filed '454 Application. *Id.* at 0050.

Laube responded on January 8, 2002, canceling, *inter alia*, claims 20-26 in the '645 Application, *id.* at 0066, and incorporating claims 20-26 into a new divisional application, No. 10/042,547 ("the '547 Application"). Dkt. No. 402-11 and -12, Trial Ex. 2261 at 0044-45. On March 1, 2002, the PTO issued a non-final Office Action, rejecting, *inter alia*, claim 20 (issued claim 1) as anticipated by or as obvious over U.S. Patent No. 5,970,616, to Wahl ("Wahl '616"), noting that Wahl '616 disclosed a comb having "a spring portion on the end opposite from the teeth which is used fo[r] attaching the assembly to the clipper." Dkt. No. 402-13, Trial Ex. 2261 at 0081.

On May 30, 2002, Laube responded to the March 1, 2002 Office Action. *Id.* at 0086. There, Laube argued that Wahl '616 did not "illustrate in the Figures nor describe in the specification the use of a groove notch in the comb teeth." *Id.* at 0084. In addition, Laube argued that Wahl '616 and other prior art, such as Andis '616, did not "disclose [or] anticipate the use of a groove notch 34 as illustrated in the instant application, Figures 24, 24A and 27, for retention of the comb to a cutting head."[2] *Id.* Subsequently, the '973 F

Figure 7 of Wahl '616 is shown below:



---

[2] The meaning of the phrase "groove notch for engagement" was the subject of controversy in this case and was construed by the Court. However, that controversy and construction do not control the inquiry here, which focuses on the applicant's representation that the prior art did not disclose the use of a groove notch "for retention of the comb to a cutting head."

A 201

Case 2:09-cv-00914-JAK-JC   Document 425   Filed 07/18/13   Page 11 of 27   Page ID #:15557

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

### C.    The Withheld Prior Art

Wahl presented the direct testimony of Scott Melton by declaration ("Melton Decl."). Dkt. No. 371-2. Melton has been the Manager of Wahl's Innovation Center since October 2007, and has been employed by Wahl since January 1986. *Id.* at 2. He received an Associate's Degree in Mechanical Design from Morrison Institute of Technology in 1986 and has at least 25 years of cumulative working experience in the hair trimmer/clipper and accessories field. *Id.* Melton is also the named inventor on twenty-eight utility and design patents directed to hair clipper technology and accessories. *Id.* at 2-3.

Melton testified that, after reviewing the withheld prior art references -- the Laube Brochure, "Deluxe," "Big K," or "Laube Snap-On Combs" products or Laube and/or KLC's sales and offers for sale of those products (collectively, "Laube Prior Art") -- he determined that the Laube Prior Art was more relevant to the '973 Patent than the Wahl '616 patent was. The examiner had relied on the Wahl '616 patent during the course of prosecution, Dkt. No. 402-13, Trial Ex. 2261 at 0081; Laube distinguished that patent by pointing out that it did not "disclose a groove notch for engagement of teeth." Melton Decl., Dkt. No. 371-2 at 9. Melton stated that "[u]nlike Wahl '616, the Laube prior art combs include notches that engage with the cutting teeth of typical clipper cutting heads . . . for retention of the comb element to the clipper" and that "retention requires contact." *Id.*

In addition, Melton found that in the Laube Prior Art, the notch in the comb teeth and the way it engaged the clipper cutting head was "substantially identical" to the notch in the '973 Patent. *Id.* He pointed to Figures 12, 12A, 17, 20, and 23 of the '973 Patent, which disclosed that the lower (fixed) blade extended further than the upper (moving) blade. *Id.* at 5. Melton concluded that a person of ordinary skill would understand that lower blade teeth would come in contact with the groove notch and the upper blade teeth would "work together with the comb in a non-contacting fashion as found in the prior art combs." *Id.* Melton testified that the '973 Patent does not disclose, describe or teach to one skilled in the art how to construct a "groove notch" distinguishable from the Laube Prior Art. *Id.* at 6.

Because Figure 7 of Wahl '616, reproduced above, does not demonstrate that the front edge of the comb is in contact with the cutting teeth, the Laube Prior Art was more pertinent than Wahl '616 to the prosecution of the '973 Patent.

//

//

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|----------|--------------------------|------|---------------|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

The Laube Big K Comb, which is part of the Laube Prior Art, is shown below in Figures 1 and 2, together with Melton's annotations.



**Figure 1: Angled side view of the Laube Big K Comb**

A 203

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |



**Figure 2: Angled top view of the Laube Big K Comb**.

The groove notches depicted in Figures 1 and 2 above appear to be very similar to the groove notch (34) depicted in Figures 24A and 27 of the '973 Patent, and Laube himself cannot distinguish them via visual inspection. Bench Trial Tr., Dkt. No. 417 at 42:17-24.

///

///

///

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

### D.    Overview of the Testimony Presented

#### 1.    Laube Deposition

Laube testified at a deposition on November 27, 2010. Dkt. No. 196. During his testimony, he distinguished the '973 Patent from the Laube Prior Art by stating that the '973 Patent claimed a "four-sided comb" (with side elements), rather than a two-sided one.[3] *Id.* at 68:16-22. Laube testified that there was a difference in size and material between the prior art Laube comb and the comb claimed in the '973 Patent.[4] *Id.* at 169:13-19. Laube also testified that the prior art Laube comb "was designed for the groove notch to clamp onto the lower blade without consideration of the relationship to the upper cutting blade," whereas the groove notch in claim 1 needed "a close working relationship" that "allow[ed] the upper blade to work in combination with the hair being fed through the comb teeth to the upper blade . . . ."[5] *Id.* at 127:1-4, 10-11, 128:7-9. Laube was unable to distinguish the '973 Patent from the prior art by describing any differences in size and dimensions. Laube confirmed that his comb attachments did not touch the upper (moving) blade, and conceded that there was no difference with respect to the manner in which the '973 Patent and the prior art Laube comb touched the lower fixed blade. *Id.* at 123:8-9, 174:7-13.

#### 2.    Beech Declaration

KLC filed an unsigned draft of the Declaration of Dennis W. Beech, Esq. as an attachment to Plaintiffs' Objections to Wahl's Proffer and Plaintiffs' Provisional Tender. Dkt. No. 387-2. At the beginning of the bench trial, Wahl objected to the unsigned declaration. Bench Trial Tr., Dkt. No. 417 at 7:3-9. At that point, Beech then amended and executed the declaration ("Beech Declaration"). The Beech Declaration states that Beech has written and prosecuted "hundreds, if not thousands of patent applications" as a patent attorney. Beech Decl., Dkt. No. 412 at 2. Beech also declared that Laube would provide him with "information regarding clipper combs" so that he "could prepare and prosecute the application." *Id.* Beech also declares that it was his intention throughout the prosecution of the '973 Patent and reexamination "to provide the Patent office with full disclosure of all pertinent and prior art that was pertinent to the prosecution without being duplicative." *Id.*

---

[3]  This distinction does not apply to claim 1, which does not include side elements.

[4]  These distinctions do not appear relevant to any of the claims of the '973 Patent.

[5]  Laube first presented the argument that "engagement" referred to something other than retaining the comb on the cutting head after the '973 Patent issued. '973 Reexam, Dkt. No. 422-2, Trial Ex. 2262 at 0681. There is no reference to this position in the specification or original prosecution history.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | July 18, 2013 |
|----------|-------------------------|--|------|---------------|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | | |

        3.     <u>Laube's Live Testimony</u>

During cross-examination, Laube testified that he would have shown Beech everything relevant to the '973 Patent application in his possession because "[t]hat's the way [he] worked with Mr. Beech for years." Bench Trial Tr., Dkt. No. 417 at 27:7-10, 5-6. Laube testified that he would have provided to Beech a Laube blade comb advertisement (Trial Exhibit 39), the KLC 1996 brochure (Trial Exhibit 40), the KLC 1997 brochure (Trial Exhibit 41), and the KLC January 1996 distributor price schedule (Trial Exhibit 42) prior to December 29, 1998, when the original application was filed. *Id.* at 27:21-29:11. Laube conceded that he had no documents showing what prior art he had actually provided Beech, but asserted that the presence of the ghosted comb in Figure 13 of the '973 Patent indicated that Beech must have seen the prior art Laube provided. *Id.* at 34:25-35:4, 41:1-10. Although he could not specifically recall his first meeting with Beech with respect to the '973 Patent, Laube maintained that he gave physical exemplars to, and had discussions about his invention with, Beech. *Id.* at 35:5-36:1. When pressed about the differences between his prior art combs and his patented invention, Laube stated that there was "a deeper[]groove notch" which allowed the "upper[]moveable blade to engage closer with the fixed-comb teeth to provide a better feed for the hair to go into the cutter blade." *Id.* at 38:2-15. Laube also pointed to the side elements as a distinguishing feature. *Id.* at 38:16-21. When asked to compare the groove notch of his prior art Laube comb and his patented invention, Laube admitted that he would not be able to distinguish them dimensionally without calipers. *Id.* at 42:17-24.

Laube testified that the '973 Patent differed from Wahl '616 because the latter is "a little beard trimmer" and that there is a gap in Wahl '616 between the notch and the two blades and no side elements. *Id.* at 55:1-10. When asked whether the prior art Laube combs were closer to the '973 Patent claims than Andis '616, Laube did not answer directly, but admitted that Andis '616 did not disclose a spring clip (which was present in the Laube Prior Art) and claimed that he could not be sure whether Andis '616 disclosed a groove notch without reading the entire patent. *Id.* at 59:21-60:16.

On redirect, Laube stated a position, which is discussed below in greater detail, that the withheld prior art was cumulative because U.S. Patent No. 2,718,696 to Green ("Green '696"),[6] although

---

[6] The examiner considered Green '696 for the first time after Wahl filed for reexamination, not during the prosecution of the '973 Patent. Dkt. No. 420-2, Trial Ex. 2262 at 0116. In the reexamination, claim 1 was rejected under 35 U.S.C. § 102(b) as being anticipated by Green '696. Dkt. No. 421-1, Trial Ex. 2262 at 0272. The examiner noted that the Green '696 comb is "capable of engaging with a clipper head having a cutter blade that is substantially as blade 19, but further having teeth and being somewhat longer so as to be within the inclined notches 17." *Id.* at 0272-73. Laube momentarily overcame this rejection in the reexamination by amending claim 1 to include side elements. Dkt. No. 421-2, Trial Ex. 2262 at 0390.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

not cited by either the applicant or examiner in the original prosecution, was within the relevant search subclass and disclosed a spring clip and groove notch, like the Millers Forge and Dubl Duck combs.[7] *Id.* at 68:10-18. Further, Laube maintained that none of Green '696, the Millers Forge comb, the ghosted comb in Figure 13 or any of the Laube Prior Art "engaged" with the upper teeth of a cutting head in the way that he intends "engaged" to be understood. *Id.* at 70:9-25. Laube testified that the term "engagement" means "a close interaction" and stated that the interaction is derived from having either the side elements or a deeper groove notch. *Id.* at 71:4-6, 73:11-14.[8] He also testified that the Dubl Duck, Millers Forge, Green '696 and his own prior art "did not have the extension of the teeth over the upper blade[] [a]nd they did not have the side elements." *Id.* at 73:18-74:3.

On re-cross, Laube admitted that a groove notch was not specifically labeled in Figure 13 of the '973 Patent, *i.e.*, KLC's position was that Figure 13 was itself an adequate disclosure of the prior art to the PTO, although Figure 13 did not, in fact, specifically disclose the feature of primary concern. *Id.* at 79:23-80:1. Laube maintained that Figure 13 disclosed a spring clip because the mention of "standard comb attachments" in the '973 Patent in reference to Figure 13 was intended to identify, for instance, the Laube Prior Art and the Dubl Duck comb, both of which had a "spring clip style mechanism." *Id.* at 82:13-83:4.[9]

        3.    <u>Beech's Live Testimony</u>

On cross-examination, Beech testified that he did not remember whether Laube provided him with prior art Laube combs. He also testified that he did not have any documents that might refresh his recollection on this issue. *Id.* at 97:21-98:2. However, he admitted that if Laube told him that "engagement with the upper teeth" and side elements were distinguishing features of his invention, he "would have put that in the specification and described it . . . ." *Id.* at 104:17-22. Beech also confirmed that there was no visual difference between the notches of the patented comb and the prior art Laube comb. *Id.* at 111:13-15. When asked whether he recalled Laube ever being upset with him for not disclosing "critical features[,]" Beech replied: "No." *Id.* at

---

[7]  Millers Forge and Dubl Duck are prior art combs that existed at the time of the invention of Laube's patented comb. Laube was aware of them at the time of invention. Laube Dep., Dkt. No. 196 at 149:20-22.

[8]  This is a different meaning than that which Laube used to support the argument in the original prosecution that "groove notch 34 as illustrated in the instant application, Figures 24, 24A and 27 [is] for retention of the comb to a cutting head." Dkt. No. 402-13, Trial Ex. 2261 at 0084.

[9]  It is very significant that Laube disclosed neither the Laube Prior Art nor the Dubl Duck comb to the PTO during the prosecution of the '973 Patent. Therefore, it is of no help for Plaintiffs to argue that the PTO should have known that Figure 13 was intended to convey a spring clip simply because it referred to "standard comb attachments" such as the Dubl Duck, because the Dubl Duck was not provided. This is particularly so where, as was the case, Laube was arguing to the PTO that prior art **lacked** a spring clip. As explained below, this testimony substantially undermined Plaintiffs' overall position.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

114:10-13.

On redirect, Beech said that he would withhold information from the PTO that he felt was not necessary for the prosecution of the application and "look for what needs to be really included in the application . . . ." *Id.* at 130:12-14, 136:19-21. On re-cross, Beech confirmed that Green '696 was never mentioned during prosecution of the '973 Patent. *Id.* at 147:15-21.

**V.      Analysis**

    **A.      Legal Standard**

        **1.      Duty to Disclose**

Every person who is associated with the prosecution of a patent application "has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability . . . ." 37 C.F.R. § 1.56; *See Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1351 (Fed. Cir. 2005).

        **2.      Inequitable Conduct**

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). The question of inequitable conduct in the procurement of the patent is relevant even after a patent is found invalid, because it bears on the question whether the case is "exceptional" for purposes of attorney fees under 35 U.S.C. § 285. *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1466 (Fed. Cir. 1988) (remanding for a redetermination of inequitable conduct and for consideration of attorney fees). In response to its concern about the overuse of inequitable conduct allegations, the Federal Circuit in *Therasense* restricted the availability of an inequitable conduct charge. Thus, it held that the intent and materiality prongs of the defense must each be separately proven by clear and convincing evidence. *Therasense*, 649 F.3d at 1288-90.

To prove intent, the accuser must show that the patentee acted with the specific intent to deceive the PTO by proving that the patentee: (1) knew of the reference; (2) knew the reference was material; and (3) made a deliberate decision to withhold the reference from the PTO. *Id.* at 1290. A district court may only infer intent from indirect and circumstantial evidence if it is "the single most reasonable inference able to be drawn from the evidence" and is "sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Id.* (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008); *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed. Cir. 1988)) (emphasis in *Therasense*).

A 208

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

To prove materiality, the accuser must show that, but for the omission of the prior art, the patent would not have issued. *Id.* at 1291. Thus, a patentee's misrepresentation to the PTO that does not affect the issuance of the patent does not satisfy the materiality requirement. *Id.* at 1292. An exception to this standard is made for affirmative acts of egregious misconduct. Actions such as filing "an unmistakably false affidavit" would be considered material misconduct, whether or not but-for materiality can be shown. *Id.*

3.  <u>Attorney Fees Under § 285 of the Patent Act</u>

35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The purpose of § 285 is "to defend the court and the judicial system against abuse" by rectifying "the injustice done to the defendant caused by litigation brought in bad faith." *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir. 1988); *ICU Med., Inc., v. Alaris Med. Sys., Inc.*, 2007 U.S. Dist. LEXIS 34467, at *4-*5 (C.D. Cal., Apr. 16, 2007), *aff'd*, 558 F.3d 1368, 1380 (Fed. Cir. 2009). "Such fees are awarded when: 1) a court finds that there is clear and convincing evidence that the case is exceptional; and 2) the court then exercises its discretion to award fees to the prevailing party." *ICU Med.*, 2007 U.S. Dist. LEXIS 34467, at *3. "A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or **inequitable conduct in procuring the patent**, misconduct during litigation, vexatious or unjustified litigation, conduct that violates [Fed. R. Civ. P.] 11, or like infractions." *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (emphasis added). "Absent misconduct in conduct of the litigation or **in securing the patent**, sanctions may be imposed against the patentee only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Id.* (citing *Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60-61 (1993)) (emphasis added).

Whether a case is exceptional is "a factual determination reviewed for clear error[,]" and a district court's determination of whether attorney fees are warranted is reviewed for abuse of discretion. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc). "Once the court finds a case exceptional, it may award fees based on 'the relevant considerations, such as the closeness of the case, the tactics of counsel, the flagrant or good faith character of the parties' conduct, and any other factors contributing to imposition of punitive sanctions or to fair allocation of the burdens of litigation.'" *ICU Med.*, 2007 U.S. Dist. LEXIS 34467, at *8 (quoting *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1380-81 (Fed. Cir. 2005)). Should an exceptional case be found, the prevailing party is entitled to "the portion of its attorney fees which related to the vexatious litigation strategy and other misconduct." *Id.* (quoting *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1553 (Fed. Cir. 1989)).

A 209

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | July 18, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | | |

**B.     Application**

    1.     <u>Inequitable Conduct - Intent</u>

        a.     *Laube Knew of the Reference; Beech Did Not*

Wahl has established Laube's knowledge of the Laube Prior Art. Laube admitted his familiarity with it, and it originated from Laube and KLC. Laube Dep., Dkt. No. 196 at 86:7-92:9. Laube also testified that he gave Beech the prior art Laube combs, along with the Laube brochure. *Id.* at 154:6-11, 163:3-6.

Beech declared that he did not specifically remember what relevant art he had in his possession other than the art cited in the patent application file and issued patent. Beech Decl., Dkt. No. 412 at 3. Beech further testified that he did not include references that he determined to be duplicative, in accordance with his understanding of PTO practices and procedures and Federal Circuit cases. *Id.* at 2.

Based on its observation of Beech's demeanor and testimony at trial, the Court finds him credible and draws the reasonable inference from his testimony that Beech would have provided the Laube Prior Art to the PTO if Laube had given it to him. Thus, the Court is persuaded by Beech's overall presentation that he would have acted in conformance with his professional obligations. The Laube Prior Art bore directly on the question of whether prior art combs had spring clips and groove notches for retaining the comb on the cutting head. Again, nothing in Beech's demeanor or testimony suggested that he would have knowingly withheld that art from the PTO, with the attendant professional consequences such withholding could entail. To the contrary, the proper inference to be drawn from his testimony is that he would have disclosed such information. The Court, therefore, concludes that Beech did not have knowledge of the reference. KLC's contention that Beech must have known about the Laube Prior Art because Figure 13 was included in the patent is unpersuasive, because neither Figure 13 nor the corresponding text illustrates or otherwise discloses the relevant aspects of the spring clip and groove notch. These are features that were central to the prosecution; Beech argued to the PTO that they were not contained in the prior art.

        b.     *Laube Knew that the Reference was Material and Made a Deliberate Decision to Withhold It*

Conversely, the Court concludes, based on the content of Laube's testimony as well as his demeanor and the tone and manner in which it was presented, that Laube deliberately withheld the Laube Prior Art from Beech. Thus, unlike Beech, Laube was not a credible witness on this issue. Indeed, throughout his testimony, Laube sought to provide evasive answers to direct

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

questions by referring to his unfamiliarity with, and lack of understanding of, patents and the prosecution process. This was unconvincing both in its substance and in the manner in which it was stated. Thus, at other times Laube demonstrated a substantial knowledge of patents and presented sophisticated arguments about disclosure and materiality based, *inter alia*, on PTO search practices. This testimony included assertions about what prior art the examiner reviewed based on the content of the PTO sub-classifications listed on the patent.

At many times throughout his testimony, Laube professed a lack of sophistication concerning patents. This was unconvincing. Together with the Court's observation of Laube's demeanor during his examination, these assertions appeared to have been an attempt to evade questions. Some examples follow:

> 1. When asked whether he had any record of providing the Laube Prior Art to Beech, Laube said, "I don't know what you mean, 'Record'," and then launched into his explanation for why he believes that he provided the prior art to Beech."[10] Bench Trial Tr., Dkt. No. 417 at 26:22-27:5.

> 2. When asked whether there was anything that would confirm that he provided his prior art to Beech, *id.* at 34:9-11, Laube responded: "The patent itself," referring to the convoluted and unpersuasive argument that Figure 13 was an adequate disclosure of the Laube Prior Art.[11] *Id.* at 34:12.

> 3. When asked why the "important distinctions" of his invention were not found in the patent if he had met and explained these distinctions to Beech, Laube replied that he was not a patent attorney and that patent attorneys have "very different

---

[10] Laube also expressed confusion about the word "interpret" when asked how he understood claims 1-7 of the '973 Patent. Laube Dep., Dkt. No. 196 at 54:5-14. He asked, "Are you saying do I understand, do I understand law or do I understand what a judge defines it as or do I understand it the way the patent office defines it as? I don't understand those things. I'm not an attorney." *Id.* at 54:9-14. Even when the question was re-framed to ask how he interpreted the claims from the perspective of a person of ordinary skill in the art, Laube continued to evade question by saying that it was legal language. *Id.* at 54:19-56:2.

[11] Similarly, when asked during his deposition to describe the differences between the prior art Laube comb and his patented comb, Laube answered, "It's listed in the patent itself. The differences would be in the patent itself." Laube Dep., Dkt. No. 196 at 45:4-9. Laube was also asked to distinguish between the way the comb attached to the front edge of the cutting head in the prior art Laube combs and his patented invention. *Id.* at 85:11-14. He responded, "Well, it's defined in my patent. It's defined in my patent for you." *Id.* at 85:15-16. When asked where specifically, Laube said, "You have to look in the claims. You're the patent attorney. You are the patent expert. You know what that says. I'm not an attorney." *Id.* at 85:23-86:3.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|----------|--------------------------|------|---------------|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

ways of thinking and different language . . . that [they] utilize."[12] *Id.* at 47:2-11.

4. When asked whether he expected the important distinctions of his invention over the prior art to appear in the claims, Laube replied, "I'm sure I had expectations about things; but . . . the patent office . . . makes up their mind about what's inventive or what's not, and then they let you have it or they don't let you have it." *Id.* at 49:18-50:1. He further noted that he was not "involved"[13] in the communications between his patent attorney and the USPTO. *Id.* at 50:3.

5. When asked whether he intended the PTO to believe the statements made in response to the Office Actions, Laube evaded the question, instead answering that his attorney puts what Laube tells him about his invention into "the legal language that comports with what the patent rules are." *Id.* at 64:24-65:9.

6. When asked whether, if "engagement with the upper teeth was an important feature," Laube "would have clearly described [it] in the patent specification to distinguish over the prior art," Laube said that "the patent attorney writes that for you." *Id.* at 88:16-89:5.

7. In response to the question of whether he believed that the claims outlined his invention, Laube said, "I don't write claim language, so I don't really understand all of the finite definitions that patent attorneys and the courts put on claim language." Laube Dep., Dkt No. 196 at 50:22-51:5. He further stated that Beech explained what those claims meant 15 years ago and "understood exactly what was . . . explained to [him] at the time[,]" but did not "recall the specificity of it." *Id.* at 53:11-20.

All of these statements reflect only one aspect of Laube's testimony. At other times, it was clear that Laube possessed a greater degree of sophistication with regard to patents. This

---

[12] Laube also demurred on the ground that claim language was "big language" and that he "didn't get [a] privileged education . . . ." Laube Dep., Dkt. No. 196 at 55:3-6. When asked whether he was prepared to testify to any terms in claims 1-7, he stated, "That's not within my scope, no. I wouldn't do that." *Id.* at 61:14-18. In response to being asked what his definition of a spring clip was, Laube said, "I don't have a definition of a spring clip. The definition would be what's put in my patent by my patent attorneys." *Id.* at 62:16-19. Although he admitted that he did have an understanding of what a spring clip was, Laube stated that "as an inventor, I would go to a patent attorney, to help put that in the proper format and the proper language. That's the American way." *Id.* at 62:20-63:8. Laube also refused to characterize the notch in his prior art Laube comb as a groove notch because he did not know that "the legal definitions and what [his] understanding would necessarily be aligned the same way." *Id.* at 121:1-15.

[13] Laube was here apparently using a narrow meaning of the word "involved," since both he and Beech testified that they would work through the Office Actions together. Laube Dep., Dkt. No. 196 at 176:10-177:9; Bench Trial Tr., Dkt. No. 417 at 116:23-117:8.

A 212

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

inconsistency had a significant, adverse effect on Laube's overall credibility.

For example, Laube was asked whether the examiner would have found "means for retention of the comb using a notch" in the Laube Prior Art if the examiner had it before him. *Id.* at 55:19-22. Instead of answering the question, Laube delivered what looked and sounded like a rehearsed argument: that the examiner had seen prior art equivalent to the Laube combs because the examiner listed the same class and subclass in his field of search as Green '696, which Laube considers to be similar to the prior art Laube combs, Millers Forge combs, and Dubl Duck combs. *Id.* at 55:23-56:3. Therefore, Laube argued, the examiner had seen his invention as an improvement "over the two side clamp on combs" represented by that prior art and "issued [the '973 patent] over that prior art." *Id.* at 56:3-5.

Laube was then asked whether listing a class and subclass in the field of search meant that the examiner considered every patent within the class and subclass. *Id.* at 56:20-23. Laube responded, "Well, he listed the field of search[] [a]nd I can't imagine that a person working in that capacity would be deceptive and say that he searched that and then not do that." *Id.* at 56:24-57:2. He further testified that the examiner "picked out the [patents] that he felt were relevant . . . [and] would have had [an] impact on my patent." *Id.* at 58:3-5. Laube even specifically opined that Green '696 was not cited by the examiner because "[the examiner] looked at that field, and then he picked out the ones that he felt that he wanted to have comments about and send back to my attorney saying, you know, you need to look at this patent here and how does this interact or how does this differ from what you have."[14] *Id.* at 58:13-18. Further, Laube advanced the argument that anyone who thought the Laube Prior Art was material would be "disagreeing, **obviously**, with the examiner who issued over the exhibit 37 [a prior art Laube comb] with the Green ['696] patent." *Id.* at 86:2-3 (emphasis added).

In short, when advantageous, Laube was savvy enough about patent prosecution to articulate the argument that: (1) the Laube Prior Art is equivalent to the Green '696 patent, (2) while never cited anywhere in the '973 Patent prosecution history, the Green '696 patent must have been considered by the examiner because it is in the subclass that the examiner searched, so, (3) the Laube Prior Art was cumulative and Laube need not have submitted it. That argument requires not only at least a professed knowledge about how examiners conduct searches, but also a comparison of Green '696 to Laube's own prior art, which is a bit of a surprising comparison to be made by Laube, who professes to be unable to compare his own prior art to the claims of his own patent.

---

[14] Laube made similar arguments in his deposition testimony, where he directed the deposing attorney to the field of search to prove that the examiner had examined expired patents as prior art. Laube Dep., Dkt. No. 196 at 161:12-162:1. In addition, he authoritatively stated that "[t]he examiner that issued the patent looked at [Wahl '616] and said, it means nothing." *Id.* at 186:7-9.

A 213

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

Beech's amended paragraph 5 of his draft declaration by hand at the bench trial as follows:

> 5. As has always been my practice, once the patent application has been filed, I returned the ~~duplicative art~~ *and the patent has issued the provided art was* to my client since there would be no need to refer to it further ~~during prosecution of the patent~~. Therefore, it is not possible for me to determine precisely what ~~prior art~~ *relevant art* I determined was duplicative.

Beech Decl., Dkt. No. 412 at 2. The changes highlight an important distinction that provides further support for the inference that Laube did not disclose the Laube Prior Art to Beech. Thus, it could be deemed reasonable for Beech to have made a determination early in the prosecution -- before the prosecution turned specifically to the question of how the claimed combs were distinguishable from the prior art combs -- that, because the Laube Prior Art was duplicative, he would return it to Laube. In contrast, if Beech had the Laube Prior Art in front of him later in the prosecution, when he was making arguments that were directly contrary to that prior art, it would not have been reasonable or ethical for him to have done so. Based on the testimony of Beech, which as noted above was very credible, the Court finds it extremely unlikely that Beech would have acted improperly in the prosecution process. Thus, the Court finds that the evidence shows that, if Beech had the prior art before him during that process, he would have disclosed it to the PTO and would have attempted to make different arguments, if possible, to overcome the prior art. *Id.* Therefore, the Court concludes that Laube withheld the Laube Prior Art.

Even assuming, contrary to the Court's finding, that Laube initially provided his prior art combs to Beech and that Beech evaluated them, determined that they were cumulative, returned them, and forgot about them, the result would be the same. Thus, it is difficult to fathom how Laube, collaborating with Beech to distinguish the Wahl reference by arguing that it lacked a groove notch to retain the comb on the clipper head, Dkt. No. 402-13, Trial Ex. 2261 at 0084, at a time that Laube knew of the Laube Prior Art, which contained that precise feature, did something other than deliberately withhold it from the PTO.

Beech testified that he informed Laube of his duty of disclosure to the PTO. Bench Trial Tr., Dkt. No. 417 at 98:9-11. Furthermore, both Beech and Laube confirmed that they would work through the Office Actions together. Laube Dep., Dkt. No. 196 at 176:10-177:9; Bench Trial Tr., Dkt. No. 417 at 116:23-117:8. Laube would review the prior art cited by the PTO and provide Beech with his technical input. Laube Dep., Dkt. No. 196 at 176:10-177:9; Bench Trial Tr., Dkt. No. 417 at 116:23-117:8. There were at least three occasions during the prosecution of the '973 Patent when Laube should have been reminded to disclose his own prior art: when Laube was collaborating with Beech regarding their responses to the PTO's Office Actions of January 31, 2001, July 10, 2001, and March 1, 2002. In considering these events, it is relevant that Laube

A 214

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|----------|-------------------------|------|---------------|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

had continuing involvement in responding to each Office Action. Laube Dep., Dkt. No. 196 at 176:10-177:9; Bench Trial Tr., Dkt. No. 417 at 116:23-117:8. The details of these three actions are as follows:

***January 31, 2001 Office Action:*** On January 31, 2001, the PTO issued an Office Action in the '454 Application, rejecting claim 20 (issued claim 1) under 35 U.S.C. § 102(b) as anticipated by Andis '616.[15] Dkt. No. 402-6, Trial Ex. 2258 at 0084. Laube's response was to distinguish Andis '616 by arguing that it lacked a groove notch and spring clip. *Id.* at 0105. Because the Laube Prior Art does have a groove notch and spring clip, Laube should have been reminded to disclose the Laube Prior Art to Beech when preparing the response that distinguished claim 20 over Andis '616. Instead, Laube pointed out that, instead of a spring clip, the blade carrier in Andis '616 "is attached by means of screws and is intended to support the cutting teeth." *Id.* Laube's response did not disclose that the Laube Prior Art had a spring clip for attachment. In addition, Laube's response stated that "the [Andis '616] blade carrier does not have a notch that engages the blade cutting teeth to retain the blade carrier on the blades." *Id.* Laube's response did not disclose that the Laube Prior Art had such a notch.

***July 10, 2001 Office Action:*** On July 10, 2001, the examiner issued a second Office Action in the '454 Application that again rejected claim 20 pursuant to 35 U.S.C. § 102(b) as anticipated by Andis '616. *Id.* at 0113. The examiner stated "that as broadly as claimed[,] the spring clip is shown by Andis." *Id.* Laube did not substantively respond to this Office Action. In working with Beech to determine how they would respond, and given his later-professed belief that the ghosted comb in Figure 13 disclosed a spring clip, Bench Trial Tr., Dkt. No. 417 at 82:16-83:4, Laube again had a clear opportunity to disclose the Laube Prior Art, even if the disclosure were as limited as "Andis does not have a spring clip, but that is immaterial, because Figure 13, which applicant intends as a disclosure of the prior art, itself has a spring clip (even though the specification does not say so) and is intended to be a disclosure equivalent to the Laube Prior Art, Dubl Duck comb, and Millers Forge comb (which applicant has not disclosed)." Laube made

---

[15] The examiner had previously relied on Andis '616 to reject Laube's original comb claim. That action, however, did not as clearly require Laube to disclose the Laube Prior Art. Thus, the details of that prior action are as follows: On September 9, 2009, the examiner issued an Office Action in the original application in the chain, the '049 Application. Dkt. No. 402-4, Trial Ex. 2257 at 0024. That Office Action, *inter alia*, rejected original claim 8, which was the only claim directed to a comb element. *Id.* at 0027. The rejection was made pursuant to 35 U.S.C. § 102(b) on the grounds that "Andis ['616] shows the claimed thin blade." *Id.* Although the rejection of the comb claim might have focused Laube on his own prior art combs, the claims were mostly directed to the clipper blades. Claim 8 did not describe the interaction of the clipper head with the comb other than to say that they were to be attached to each other. *Id.* at 0016. Laube did not respond to the Office Action and instead filed a continuation-in-part application (the '454 Application) that did not use the language of claim 8. Dkt. No. 402-5, Trial Ex. 2258 at 0004. Although the rejection provided an opportunity to reflect on how the comb claims differed from the Laube Prior Art, the path pursued -- redrafting of the claims for the '454 Application -- did not place that question into the same sharp relief that resulted from later developments.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

no such disclosure.

***March 1, 2002 Office Action:*** Instead of responding to the July 10, 2001 Office Action in the '454 Application, Laube pursued another continuation-in-part application -- the '645 Application -- that he had previously filed on June 27, 2000. Dkt. No. 402-7, Trial Ex. 2259 at 0003. The comb claims in that application were eventually pursued in a divisional application -- the '547 Application -- which led directly to the issuance of the '973 Patent. Dkt. No. 402-11 and -12, Trial Ex. 2261 at 0044-45. On March 1, 2002, the examiner issued an Office Action rejecting claim 20 (issued claim 1) over Wahl '616. Dkt. No. 402-13, Trial Ex. 2261 at 0081. The examiner found that Wahl '616 disclosed a comb having "a spring portion on the end opposite from the teeth which is used fo[r] attaching the assembly to the clipper." *Id.*

Laube's response to this Office Action argued that "[Wahl '616] as well as the **other art** such as Andis ['616] does not disclose nor anticipate the use of a groove notch 34 as illustrated in the instant application, Figures 24, 24A and 27, for retention of the comb to a cutting head." *Id.* at 0084 (emphasis added). Of course, the Laube Prior Art does have a groove notch for retention of the comb to a cutting head, so it is hard to see how Laube could have overlooked that there was an obligation to disclose it at that time.[16]

## 2.  Inequitable Conduct - Materiality

The Laube Prior Art fulfills the materiality requirement. It demonstrates the precise feature that Laube argued was missing from the Wahl reference (groove notch for retention of the comb to a cutting head), the absence of which convinced the examiner to issue the '973 Patent. Dkt. No. 421-1, Trial Ex. 2262 at 0280.

Laube argues that the Laube Prior Art is not material because Green '696, although not cited by the examiner, disclosed by the applicant, or discussed in the prosecution history, is within one of the subclasses searched by the examiner. Pl.'s Addendum to Proposed Findings of Fact and Conclusions of Law, Dkt. 407 at 2. Therefore it should be presumed to have been reviewed.[17] *Id.*

---

[16] Wahl also urged additional bases for finding inequitable conduct, such as the nondisclosure of the Laube "Dr. Slick" lubricant in relation to claim 2 of the '973 Patent. Def.'s Post-Trial Br. on Inequitable Conduct, Dkt. No. 416 at 2. However, it is unnecessary to reach such issues.

[17] Much of the case law on the question of the effect of an examiner's consideration of a reference concerns the presumption of validity and predates the Supreme Court's clarification of that question in *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011) (holding that the presumption of validity and the clear and convincing evidence standard applies regardless of whether the PTO considered a reference, but noting that a challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain where the PTO has not considered a reference). The Federal Circuit has held that it "treat[s] the issued patent as having a presumption of validity that must be overcome by clear and convincing evidence" but declines to defer to the examiner's findings, stating that there is no additional burden "to overcome PTO findings in district court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

In the context of inequitable conduct, an examiner's "search of an art class containing a certain reference," does not "as a matter of law, [lead] to the presumption that the reference was discarded by the examiner as irrelevant." *Driscoll v. Cebalo*, 731 F.2d 878, 885 (Fed. Cir. 1984), disapproved of on other grounds by *Kingsdown*, 863 F.2d at 867, and abrogated as to the applicable standard by *Therasense*, 649 F.3d at 1276. "It cannot be presumed, where fraud or other egregious conduct is alleged, that the PTO considered prior art of particular relevance if it was not cited." *Id.*; *see also FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 526 (Fed. Cir. 1987) (holding that where examiner conducted a search of the class and subclass which contained the omitted prior art, "[t]hat indication of a generalized search would not of itself relieve [the patentee] from the duty of candor.")

2. <u>Attorney Fees Under § 285 of the Patent Act</u>

When a party has engaged in "inequitable conduct in procuring the patent," the matter may be deemed exceptional. *Brooks*, 393 F.3d at 1381. Here, the trial evidence showed that Laube deliberately withheld the Laube Prior Art from the PTO in order to obtain the '973 Patent. Laube's testimony revealed that he knew a great deal more about patents and patent prosecution than he was willing to admit in response to straightforward questions. For this reason, and those stated earlier, Laube's testimony -- that he provided the Laube Prior Art to Beech -- was not credible. As noted above, both Laube and Beech testified that they would review Office Actions together. This shows that Laube should have been reminded to disclose the Laube Prior Art at least three times throughout the prosecution of the '973 Patent.

Because Laube engaged in inequitable conduct, this case is exceptional, and the Court may award "reasonable attorney fees" to Wahl, the prevailing party. *Brooks*, 393 F.3d at 1381; 35 U.S.C. § 285. Thus, Wahl is entitled to "the portion of its attorney fees which related to the . . . misconduct." *ICU Med.*, 2007 U.S. Dist. LEXIS 34467, at *8 (C.D. Cal., Apr. 16, 2007).

**VI.  <u>Conclusion</u>**

For the foregoing reasons, Wahl is entitled to the recovery of attorney fees. Therefore, Wahl is ordered to submit a request for the award of its relevant attorney fees. They are to be limited to the patent aspect of the case and must be identified with specificity for ease of review. Wahl's attorney fees request shall be submitted on or before July 29, 2013. Laube's objections to the general request and to any particular fee items shall be submitted by August 12, 2013. Wahl's reply to Laube's objections shall be submitted by August 19, 2013. Thereafter, the Court will determine whether a hearing is necessary as to the request and objections. Upon the completion

infringement proceedings . . . ." *Novo Nordisk A/S v. Caraco Pharm.*, No. 2011-1223, 2013 U.S. App. LEXIS 12251, at *26, *27 (Fed. Cir. June 18, 2013). In addition, "[n]either [is the Federal Circuit] persuaded that the presence or absence of PTO findings on particular issues affects the basic presumption of validity." *Id.* at *27.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | July 18, 2013 |
|----------|--------------------------|------|---------------|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

of the process, Wahl shall submit a proposed judgment, with any objections to its substantive content to be filed by Plaintiffs within 10 days of service of the proposed judgment.

Counsel shall contact the Court's Clerk by July 19, 2013 to make arrangements to have all exhibits returned.

**IT IS SO ORDERED.**

                                                    :

Initials of Preparer     ak

A 218

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV09-00914 JAK (JCx) | Date | August 19, 2013 |
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
| Not Present | Not Present |

**Proceedings:**   **(IN CHAMBERS) ORDER DENYING PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW (JNOV) OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (DKT. 391)**

**I.      Introduction**

Kim Laube & Co. ("KLC") and Kim Laube ("Laube") (collectively, "Plaintiffs") brought this action against Defendant Wahl Clipper Corp. ("Wahl" or "Defendant"). Plaintiffs contend, *inter alia*, that Defendant misappropriated an alleged trade secret of Plaintiffs' – a replaceable tip on a clipper. Plaintiffs also allege that, as a result, Defendant breached a contract between parties. A jury trial was held on Plaintiffs' claims. The jury returned a defense verdict on the two causes of action advanced by Plaintiffs at trial: (i) misappropriation of trade secrets in violation of California Civil Code §§ 3426 *et seq.*; and (ii) breach of contract.[1] Dkt. 362.[2] Plaintiffs have moved for judgment as a matter of law under Civil Rule 50, or in the alternative, for a new trial under Civil Rule 59 with respect to these two claims (the "Motion"). Dkt. 391. For the reasons stated in the Order, the Motion is DENIED.

**II.      Analysis**

**A.      Rule 50 Motion**

During the trial process, Plaintiffs never moved under Civil Rule 50(a) as to their own claims, only as to those of Defendant. Dkt. 359. Because such a motion is a condition precedent for seeking relief under

---

[1] This action involved additional claims advanced by Plaintiffs as well as counterclaims advanced by Defendant. However, only these two claims advanced by Plaintiffs are at issue in this Motion.

[2] With respect to the breach of contract claim, in response to the question "Did Wahl do something that the Stock Transfer Agreement prohibited it from doing?" the jury answered, "No." Dkt. 362. With respect to the misappropriation of trade secrets claim, in response to the question "Did Kim Laube & Company and Kim Laube prove by a preponderance of the evidence that Kim Laube created the replaceable tip?" the jury answered, "No." *Id.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | August 19, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

Civil Rule 50(b), Plaintiffs' Motion on this ground necessarily fails. *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009) ("failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law").

**B.    Rule 59 Motion**

1.    Legal Standard

Federal Rule of Civil Procedure 59 provides that a trial court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Thus, a court may grant a motion for a new trial "if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). "A new trial is only warranted on the basis of an incorrect evidentiary ruling if the ruling substantially prejudiced a party." *United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992). "A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008). As the Ninth Circuit has explained:

> A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion. We must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor. A jury verdict should be set aside only when the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.

*DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010) (footnotes and quotation marks omitted).

"A trial court is not required to 'parse through transcripts' in an effort to identify the grounds of a post-trial motion." *Warren v. Thompson*, 224 F.R.D. 236, 240 n.7 (D.D.C. 2004), *aff'd sub nom. Warren v. Leavitt*, 264 F. App'x 9 (D.C. Cir. 2008) (denying motion for new trial where, *inter alia*, plaintiff failed to cite to the trial record in contending the evidence was insufficient to support the verdict, to cite to authority in contending there had been an error of law, or to identify the purported error in evidentiary rulings).

2.    Application

Plaintiffs present several arguments in support of their Motion: (i) the evidence does not support the verdict rendered by the jury; (ii) the jury was misled into believing that misappropriation required the designs of the parties' respective products to be identical; (iii) the Court erred in excluding trial exhibit 12; (iv) the Court prevented Plaintiffs from exploring Defendant's disclosures of the technology at issue in Defendant's many international subsidiaries; and (v) the Court prevented Plaintiffs from introducing and explaining the significance of Laube's prototype lever. Dkt. 391, 392.[3] The Court will address each of

---

[3] Plaintiffs submitted a supplemental filing that added the fifth argument, stating that it had inadvertently been

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | Date | August 19, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

these arguments in sequence. There is, however, one matter that is significant to a consideration of all five arguments. The portion of Plaintiffs' Motion seeking a new trial does not include any citations to the trial record or to any legal authority. Dkt. 391. The Plaintiffs' supplement to the Motion contains a single citation to the trial record and no citations to authority. Dkt. 392. Such a presentation is both unhelpful and insufficient to meet the Plaintiffs' burden on their Motion.

First, as to Plaintiffs' argument that the evidence does not support the jury's verdict, the portion of the Motion seeking a new trial does not mention this argument. Further, no part of Plaintiffs' Motion identifies the evidence that would support a finding by a preponderance of the evidence that Plaintiffs created the replaceable tip.[4] A fortiori, there has been no showing that the evidence mandates a finding contrary to that made by the jury, *i.e.,* Plaintiffs have not shown that the evidence supports only that finding. Accordingly, Plaintiffs have not made an adequate showing on this ground. In addition, as amply shown in Defendant's opposition, which includes extensive citations to the trial record (Dkt. 397 at 6-15), there was sufficient evidence in the trial record to support a conclusion that Plaintiffs did not create the replaceable tip and very little credible evidence to the contrary.

Second, as to Plaintiffs' two-sentence contention – that the jury was misled into believing that a finding of misappropriation required the designs of the parties' respective products to be identical – it fails because it is neither explained nor supported. There is no citation to any material that would explain the basis for Plaintiffs' contention. Further, this argument is not persuasive because the jury did not reach the issue whether there was misappropriation. Thus, the jury concluded that Plaintiffs had not proved by a preponderance of the evidence that they created the replaceable tip at all. Finally, a review of the jury instructions (Dkt. 361) and the verdict form (Dkt. 362) does not provide any plausible basis for Plaintiffs' contention.

Third, as to Plaintiffs' one-paragraph discussion of the exclusion of trial exhibit 12 – which was a 2002 letter from a trial witness – Plaintiffs neither identify the Court's purported error in its evidentiary ruling nor discuss the basis for the Court's original ruling. Further, Plaintiffs fail to identify the specific times at trial when Plaintiffs claim that Defendant purportedly "opened the door to questioning" on this issue. Dkt. 391 at 11. Nor do Plaintiffs explain with any specificity how the exclusion of this evidence substantially prejudiced them. Finally, the Court's own review of the matter confirms that there is no basis for granting the Motion on this ground. The Court addressed the admissibility of trial exhibit 12 several times. The Court originally stated its tentative view that the exhibit, even if authenticated and shown to be an exception to the hearsay rule, would not be admitted under Rule 403 because "[i]t is from a long time ago,

---

omitted from the prior filing.

[4] Plaintiffs' Reply – which contains less than two pages of substantive material – acknowledges that its Motion does not do so. Dkt. 406. The reason they provide for this omission is not persuasive. Plaintiffs seem to contend that there was no issue at trial as to whether Laube created the replaceable tip, only as to whether Defendant had access to Laube's tip and whether the two tips were substantially similar. *Id.* Despite Plaintiffs' contention that "[t]he jury was NOT asked whether Laube designed or created his own replaceable tip" (*id.*), the verdict form clearly presented the jury with that threshold question, to which they answered in the negative (Dkt. 362). Further, the jury instructions included the statement that "Plaintiffs claim that they created a replaceable tip" and that "Defendant denies that Plaintiffs created a replaceable tip." Dkt. 361. The first of the five necessary elements of the misappropriation claim was "[t]hat plaintiffs created the replaceable tip." *Id.* There is no basis for Plaintiffs' argument to the contrary.

A 221

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | August 19, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | | |

and addresses many matters not relevant to the trial issues." Dkt. 333 at 3. The Court then took the matter under submission. *Id.* The Court received supplemental briefing from Plaintiffs regarding what portions of the letter they believed relevant. Dkt. 338. This position statement, and the Court's subsequent, independent review of the exhibit (Dkt. 245-2, Exh. 13), does not suggest that the letter would have provided any direct, relevant evidence on the issue of whether Laube created the replaceable tip. Further, a review of the testimony of the author of the letter shows that he was questioned about certain purportedly relevant issues presented in the letter, such as the fact that he and Laube recognized that driver wear was a problem but a necessary result of high-speed clippers. *See* Dkt. 372 at 61:17-62:16. Further, on cross-examination, the author of the letter testified that: (i) he had no knowledge as to whether Laube created a replaceable tip or shared that information with Wahl; (ii) he believed he would have had such knowledge if Laube had created a replaceable tip; and (iii) he remembered and believed that Wahl employees had created the replaceable tip. *Id.* at 74:1-75:4; 76:8-19. In light of all of the foregoing, there is no basis to conclude that the Court erred or that, if there were an error, it had a substantial, prejudicial effect on the jury's consideration of whether Laube created the replaceable tip.

Fourth, the same analysis applies to Plaintiffs' one-paragraph discussion of the exclusion of evidence about disclosure to Defendant's subsidiaries. Plaintiffs do not identify the purported error in the Court's evidentiary ruling or discuss the basis for the original ruling. Further, they do not explain why this information – which they contend prevented them from showing "some of Defendant's improper uses" of the trade secret as well as damages (Dkt. 391 at 12) – would have been relevant in light of the jury's conclusion that Plaintiffs had not proved by a preponderance of the evidence that they created the replaceable tip. Thus, Wahl's conduct and sales have no bearing on the issue of whether Laube created the replaceable tip. In sum, because there is neither a showing of error nor of a prejudicial effect of the claimed error, this argument fails to show any substantial, prejudicial effect on the jury's determination that that Laube did not create the replaceable tip.

Fifth, as to Plaintiffs' discussion of the exclusion of Laube's prototype lever, this argument suffers from many of the same deficiencies discussed above as to other claims of error. Although its potential significance to the jury's consideration of issues is more discernible, Plaintiffs do not identify the purported error in the Court's evidentiary ruling or discuss the basis for the Court's original ruling. Both parties brought motions in limine to exclude material not produced in discovery; both were granted by the Court. Dkt. 333. As explained in Defendant's opposition to the Motion, which includes numerous citations to the record (Dkt. 397 at 21-24), this evidence was excluded because it was not timely produced in discovery. Dkt. 340 (minute order); Dkt. 398-10, Exh. J (transcript). Thus, Plaintiffs failed to disclose or produce it prior to the deadline for completing non-expert discovery. Indeed, they did not disclose it until a few days before the expert discovery cut off. Dkt. 398-10, Exh. J. As noted by Defendant at the hearing at which the issue was discussed, Defendant was unable to question Laube about the prototype or test the prototype to see when it was created. *Id.* at 14:24-15:3. Further, in response to the Court's question about the proposed use at trial, Plaintiffs' counsel contended that the prototype "was born to be a demonstrative more than anything. I was listing it simply because it's something that the expert looked at. He didn't rely upon it. I don't know that we're going to be using it for much more than that." *Id.* at 20:6-10. Any contention by Plaintiffs that this evidence would have had a significant impact on the jury's determinations is inconsistent with counsel's pre-trial representations regarding the significance of this evidence. For these reasons, Plaintiffs have failed to establish this evidentiary ruling as a basis upon which relief should be granted.

A 222

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | August 19, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc. et al. v. Wahl Clipper Corporation, et al. | | |

III.    <u>Conclusion</u>

For the foregoing reasons, the Motion is DENIED.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    ak

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 17, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER DENYING PLAINTIFFS' MOTION TO DISMISS ALL PATENT RELATED CLAIMS AND COUNTERCLAIMS BASED ON REEXAMINATION DECISION AND COVENANT NOT TO SUE (Dkt. 448)**

I.    **INTRODUCTION**

Plaintiffs Kim Laube & Co. and Kim Laube (collectively, "Laube" or "Plaintiffs") brought this action against Defendant Wahl Clipper Corp. ("Wahl" or "Defendant") for, *inter alia*, infringement of U.S. Patent No. 6,473,973 ("the '973 Patent"), which is titled "Disposable Cutting Head for Clippers." After the separate jury and bench trials in this matter, Plaintiffs filed this motion to dismiss all patent related claims and counterclaims (the "Motion"). Dkt. 448. Plaintiffs argued that the patent claims and counterclaims should be dismissed because: (i) the Federal Circuit rejected Plaintiffs' challenge to the reexamination's invalidation of claims 1-5 of the '973 Patent; and (ii) in the memorandum and reply in support of the Motion, Plaintiffs granted to Defendant covenants not to sue. The Defendants opposed the Motion. Dkt. 454. The Court determined that, pursuant to Local Rule 7-15 and Civil Rule 78(b), this matter could be decided without a hearing. Dkt. 453. For the reasons stated in this Order, the Motion is DENIED.

II.    **BACKGROUND**

On February 6, 2009, Laube filed its Complaint. Dkt. 1. On December 9, 2009, Wahl requested that the PTO reexamine claims 1-5 of the '973 Patent in light of prior art that was not considered during the initial prosecution of the '973 Patent. Wahl's Mot. to Stay, Dkt. 61, Ex. A at 4-5. On December 18, 2009, the PTO granted Wahl's request to initiate reexamination. *Id.* at 3. On December 28, 2009, Wahl filed a motion to stay this litigation pending the outcome of the reexamination. Dkt. 61. On February 1, 2010, the Court granted that motion. Dkt. 64.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 17, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

On April 1, 2011, the PTO examiner conducting the reexamination issued a final rejection of all five claims at issue. Right of Appeal Notice, Dkt. 90-1. On December 6, 2011, Wahl filed a motion to lift the stay of this action. Dkt. 112. On January 23, 2012, the Court granted that motion. Dkt. 121. On June 17, 2012, the Board of Patent Appeals and Interferences ("BPAI") affirmed the examiner's rejection of the five claims at issue. *Wahl Clipper Corp. v. Laube*, Appeal No. 2012-005338 (BPAI June 17, 2012).

On October 15, 2012, the Court held a *Markman* hearing to construe certain terms and phrases used in the claims of the '973 Patent. On March 8, 2013, the Court granted Wahl's motion for partial summary judgment of non-infringement and invalidity of the '973 Patent. Dkt. No. 314 at 1. The case proceeded to a jury trial on certain non-patent claims; the jury trial concluded on May 2, 2013. Minutes of Jury Trial, Dkt. 360. The jury rendered a verdict adverse to Plaintiffs. *Id.* On June 18, 2013, the Court held a bench trial on Wahl's inequitable conduct counterclaim. Dkt. 410. On July 18, 2013, the Court issued its Decision Following Bench Trial on Inequitable Conduct, in which it found that Laube committed inequitable conduct during the prosecution of the '973 Patent, and that Wahl was entitled to attorney fees on that basis. Dkt. 425.[1] Briefing regarding attorney fees has concluded, and the Court has taken the issue under submission.

On May 30, 2013, Laube filed its Motion for Judgment NOV or in the Alternative, New Trial. Dkt. 391. On August 19, 2013, the Court issued its Order Denying Plaintiffs' Motions. Dkt. 436. On September 16, 2013, in a Rule 36 judgment, the Federal Circuit affirmed the BPAI's decision affirming the examiner's rejection of claims 1-5. *Laube v. Rea*, No. 13-1048 (Fed. Cir. Sept. 16, 2013).

**III.   ANALYSIS**

   **A.   Legal Standard**

      1.   Motion for Voluntary Dismissal After Answer Filed

After an Answer or motion for summary judgment has been filed, a plaintiff cannot unilaterally dismiss an action. Instead, at that stage in a case,

> an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a)(2).

---

[1]  Although this term is often written in the plural and/or possessive form, the relevant statute here, 35 U.S.C. § 285, uses the words "attorney fees." For this reason, that format is used in this Order.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 17, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

2.    <u>Dismissal for Lack of Subject Matter Jurisdiction</u>

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

3.    <u>Reexamination Finality and Effect on Litigation</u>

"A reexamination is complete upon the statutorily mandated issuance of a reexamination certificate." *In re Bass*, 314 F.3d 575, 577 (Fed. Cir. 2002) (citing 35 U.S.C. § 307(a)). Even after the USPTO issues a Notice of Intent to Issue Reexamination Certificate, it retains jurisdiction over the reexamination. *Id.* The reexamination is not complete until the reexamination certificate actually issues. *Id.*

When a claim of a patent asserted in litigation is cancelled in reexamination, "the patentee's cause of action is extinguished and the suit fails." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340 (Fed. Cir. 2013). Although "the cancellation of a patent's claims cannot be used to reopen a final damages judgment ending a suit based on those claims," a district court must give effect to a cancellation that becomes effective before the entry of final judgment in the suit." *Id.* at 1340, 1344 n.10 (citing *Luminous Unit Co. v. Freeman–Sweet Co.*, 3 F.2d 577, 579–80 (7th Cir. 1924); *Translogic Tech., Inc. v. Hitachi, Ltd.*, 250 F. App'x 988 (Fed. Cir. 2007) (nonprecedential)).

4.    <u>Effect of a Covenant Not to Sue Granted After Adjudication on the Merits</u>

"[A] patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer with respect to any of its past, present, or future acts, even when a reissue application covering the same claimed subject matter is then pending." *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995). However, as the Federal Circuit held in *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340 (Fed. Cir. 2005), *Super Sack* must not be applied literally without regard to the procedural posture of the case. Specifically, where a covenant to sue comes after resolution of the underlying infringement claim, it does not divest the court of jurisdiction of invalidity or unenforceability counterclaims. *Id.* at 1348.

5.    <u>The Court's Continuing Jurisdiction over Attorney Fees and Inequitable</u>
<u>Conduct Determinations</u>

35 U.S.C. § 285, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party," provides an independent grant of jurisdiction to consider inequitable conduct, even where a covenant not to sue otherwise divests the court of jurisdiction over a patent case. *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1242 (Fed. Cir. 2008). Thus, "courts will often have the ability to hear an unenforceability claim on a patent regardless of jurisdiction." *MedImmune, Inc. v. Genentech, Inc.*, 535 F. Supp. 2d 1000, 1005 (C.D. Cal. 2008) (citing *Monsanto*, 514 F.3d at 1242-43).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 17, 2013 |
|----------|--------------------------|------|------------------|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

**B.      Application**

1.      <u>The Status and Effect of the Reexamination</u>

Plaintiffs acknowledge, as they must, that the reexamination is "not technically 'final'" until the USPTO issues the reexamination certificate. Mot., Dkt. 448 at 3 n.1. Plaintiffs state that they will "hurry" the finalization of the reexamination by waiving any reconsideration or further appeal, but note that they do not have the power to control the pace of the proceedings before the USPTO. *Id.* Speculating about the course and timing of further action by the USPTO is not appropriate in the context of considering this Motion. Instead, the Motion must be addressed based on the present state of the facts, including the procedural posture of the matters before the USPTO. Under this standard, there has been no relevant change to the legal status of the '973 Patent. Therefore, the status of the reexamination does not provide a basis to dismiss any portion of this case.

Further, for the reasons discussed below, the scope of the Court's judgment would not be materially affected by the issuance of a reexamination certificate.[2]  Although issues of infringement and invalidity as to claims 1-5 would be moot, the Court would still enter judgment on those issues as to claims 6 and 7, and would still enter judgment concerning attorney fees and inequitable conduct.

Should the reexamination become final while this case is on appeal, it will only simplify the review by the Federal Circuit. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1345 (Fed. Cir. 2013) (holding that a final reexamination result shares the feature of a retroactive law that "'an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly'") (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 226 (1995)).

2.      <u>Plaintiffs' Covenant Not To Sue</u>

In the Motion, Plaintiffs issued the following covenant not to sue:

> Laube releases and unconditionally covenants not to sue Wahl for infringement of U.S. Patent No. 6,473,973 (the "Laube Patent") based on Wahl's manufacture, importation, use, sale, and/or offer for sale of products on or before September 17, 2013. Laube unconditionally covenants not to sue Wahl for infringement of the Laube Patent based on Wahl's future manufacture, importation, use, sale, and/or offer for sale of products reflected on the Wahl website www.wahl.com, as of September 17, 2013.

Dkt. 448 at 9. In response to arguments raised in Defendant's opposition (Dkt. 454), Plaintiffs issued a

---

[2]  Plaintiffs' argument assumes that the Court must revisit its claim construction in light of the Federal Circuit's affirmance of the Board of Patent Appeals and Interferences ("BPAI"). This position is unpersuasive because it overlooks the fact that this Court previously considered the BPAI's construction and noted that the "broadest reasonable interpretation" standard applied during reexamination proceedings (including appeals) differs from the standard applied by courts in infringement litigation. Order Construing Claim Terms After *Markman* Hearing, Dkt. 172 at 12 (citing *In re Hiniker Co.*, 150 F.3d 1362, 1368 (Fed. Cir. 1998)).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 17, 2013 |
|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

revised covenant in their Reply:

> Plaintiffs Kim Laube and Kim Laube and Co., Inc. hereby release and unconditionally covenant not to sue Wahl Clipper Corp, Inc. or any of Wahl's customers for infringement of U.S. Patent No. 6,473,973 (the '973 patent) and 7,010,859 (the '859 patent) based on Wahl's manufacture, importation, use, sale and/or offer for sale or Wahl's customer's use, sale and/or offer for sale of products made, used or sold by Wahl on or before September 17, 2013. Plaintiffs Kim Laube and Kim Laube and Co., Inc. further unconditionally covenant not to sue Wahl Clipper Corp, Inc. or any of Wahl's customers for infringement of U.S. Patent No. 6,473,973 (the '973 patent) and 7,010,859 (the '859 patent) based on Wahl's future manufacture, importation, use, sale and/or offer for sale of any and all products being offered for sale on www.Wahl.com, on September 17, 2013.

Dkt. 455 at 15.

Plaintiffs' covenants not to sue, issued after adverse rulings of invalidity and noninfringement, and after a bench trial determined that the '973 Patent is unenforceable for inequitable conduct, come far too late to avoid entry of judgment on those issues. *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1348 (Fed. Cir. 2005). This position is reinforced by a recent decision by the Federal Circuit. *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013) (upholding $8.4 million fee award). *Monolithic Power* held that, even where a party covenants not to sue prior to the merits determination, a pattern of doing so after substantial litigation has taken place was a vexatious litigation strategy that supported an exceptional case finding and award of fees. Although the Court does not have the same level of familiarity with Plaintiffs' prior litigation as the district court in *Monolithic Power* had with respect to the litigation at issue there, *Monolithic Power* makes clear that covenants not to sue do not allow parties to escape the consequences of their litigation choices, and specifically, do not provide a means of voiding adverse findings and precluding attorney fee awards.

        3.      <u>The Court's Independent 35 U.S.C. § 285 Jurisdiction to Determine that the Case is Exceptional due to Inequitable Conduct</u>

Even if the reexamination were final, and even if Plaintiffs' covenant not to sue had come prior to the Court's determinations regarding infringement and invalidity, the Court would still have jurisdiction under 35 U.S.C. § 285 to determine inequitable conduct and make a fee award. *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1242-43 (Fed. Cir. 2008). And, once a court makes that finding in the fee award context, it renders the patent unenforceable. *Id.* at 1243 ("A district court has no discretion to decide whether a patent is unenforceable once it enters a finding of inequitable conduct. To the contrary, this court has long held that the unenforceability of a patent follows automatically once a patent is found to have been obtained via inequitable conduct.") (citing *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988) (en banc in pertinent part) (holding that inequitable conduct as to a single claim renders the entire patent unenforceable)). Thus, jurisdiction pursuant to 35 U.S.C § 285 "to decide whether a patent was obtained through inequitable conduct necessarily includes the jurisdiction to declare a patent unenforceable as a result of that inequitable conduct." *Monsanto*, 514 F.3d at 1243; *see also Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1466 (Fed Cir. 1988) (remanding for determination of inequitable conduct and attorney fees after reversing judgment that patent was not

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | October 17, 2013 |
|----------|--------------------------|------|------------------|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | |

invalid).

Finally, Plaintiffs argue that the reexamination result precludes Wahl from further pursuing its inequitable conduct claim. Mot., Dkt. 448 at 7. Plaintiffs' argument is premised on the following, four-step analysis: (i) Wahl is estopped from pursuing its invalidity challenges to claims 6 and 7 because, pursuant to 35 U.S.C. § 315(c) and 37 C.F.R. § 1.907, a participant in inter partes reexamination cannot seek invalidity based on any ground it raised or could have raised in the reexamination; therefore, (ii) Wahl is precluded from asserting that the allegedly withheld art is "material," and (iii) because an inequitable conduct claim requires a finding of materiality; (iv) the inequitable conduct claim fails as a matter of law. Mot., Dkt. 448 at 7.

Plaintiffs' argument is incorrect. First, even assuming that the reexamination has become final -- which it has not -- the Court already has found inequitable conduct. Therefore, Defendant would not at this point be affirmatively raising any arguments concerning materiality. Second, the Court's decision finding inequitable conduct was based largely on physical prior art combs. Decision Following Bench Trial on Inequitable Conduct, Dkt. 425 at 11-13. Because such physical prior art cannot be considered in a reexamination, reexamination estoppel could not apply to that art.[3] *See* Manual of Patent Examining Procedure § 2609 ("[p]rior art considered during [inter partes] reexamination is limited to prior patents or printed publications applied under the appropriate parts of 35 U.S.C. 102 and 103"). Third, inequitable conduct as to a single claim renders the entire patent unenforceable. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988). Finally, Plaintiffs' argument ignores the fact that the affirmance by the Federal Circuit of the BPAI's holding that claims 1-5 are invalid supports the conclusion that the withheld prior art was material.

   4.   <u>Defendant's Request That Plaintiffs and Their Counsel Be Sanctioned for the Motion</u>

Wahl requests that the Court sanction both Plaintiffs and their counsel for filing this Motion and the preceding motion to stay. Opp'n, Dkt. 454 at 16-17 (citing Dkt. 433). The Court already has ruled that Wahl is entitled to attorney fees for the patent aspect of the case. This Motion and the preceding motion to stay are part of the patent aspect of the case.[4] Therefore, Wahl is entitled to seek its fees incurred in opposing them. Although there was no merit to any portion of the Motion, Wahl has not demonstrated the necessity or propriety of personally sanctioning Plaintiffs' counsel. Therefore, this request is denied.

   5.   <u>Submission of Proposed Judgment</u>

In order to avoid further delay in the entry of judgment in this case, Wahl is **ORDERED** to submit a proposed judgment on or before October 21, 2013. Concurrently with its proposed judgment, Wahl is **ORDERED** to file a supplemental declaration detailing the fees it claims in opposing Plaintiffs' motion to

---

[3]  Plaintiffs' argument assumes that reexamination estoppel would, in theory, apply to claims 6 and 7, for which Defendant did not seek reexamination. The parties did not adequately brief this issue, and the Court need not address it because Plaintiffs' argument fails for the several, independent reasons discussed in this Order.

[4]  The attorney's fees issues will be addressed in a separate order.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | October 17, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Co. v. Wahl Clipper Corp. | | | |

stay, Dkt. 433, and this Motion, providing that information in the format previously required by the Court. Dkt. 456. Plaintiffs are **ORDERED** to file any objections to the form of the proposed judgment and to Wahl's supplemental declaration re fees no later than seven days after Wahl files its proposed judgment.

**VI.** **CONCLUSION**

For the reasons stated in this Order, the Motion is **DENIED**.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer ___ ak ___

A 230

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | November 6, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE AWARD OF ATTORNEY FEES, EXPENSES AND COSTS PURSUANT TO THE COURT'S DECISION FOLLOWING BENCH TRIAL ON INEQUITABLE CONDUCT (DKT. 426)**

## I.    INTRODUCTION

Plaintiffs Kim Laube & Co. and Kim Laube (collectively, "Laube" or "Plaintiffs") brought this action against Defendant Wahl Clipper Corp. ("Wahl" or "Defendant") for, *inter alia*, infringement of U.S. Patent No. 6,473,973 (the "'973 Patent"), titled "Disposable Cutting Head for Clippers." On July 18, 2013, the Court issued its Decision Following Bench Trial on Inequitable Conduct (the "Decision"), holding that Laube committed inequitable conduct during the prosecution of the '973 Patent, and that Wahl was entitled to attorney fees on that basis. Dkt. 425. Pursuant to the Decision, Wahl submitted a Request for Award of Attorney Fees, Expenses, and Costs (the "Request"). Dkt. 426.[1] Laube opposed the Request. Opposition to Request for Attorney Fees ("Opp'n") Dkt. 431. The Decision provided that a hearing would be held only if necessary. Dkt. 425 at 26. The Court has now determined that, pursuant to Local Rule 7-15 and Federal Rule of Civil Procedure 78(b), this matter can be decided without a hearing. For the reasons stated in this Order, the Request is GRANTED IN PART.

## II.    BACKGROUND

On February 6, 2009, Laube filed its Complaint. Dkt. 1. On December 9, 2009, Wahl requested that the PTO reexamine claims 1-5 of the '973 Patent in light of prior art that was not considered during the initial prosecution of the '973 Patent. Wahl's Mot. to Stay, Dkt. 61, Ex. A at 4-5. On December 18, 2009, the PTO granted Wahl's request to initiate reexamination. *Id.* at 3. On December 28, 2009, Wahl filed a motion to stay this litigation pending the outcome of the reexamination. Dkt. 61. On February 1, 2010, the

---

[1] Although this term is often written in the plural and/or possessive form, the relevant statute here, 35 U.S.C. § 285, uses the words "attorney fees." For this reason, that format is used in this Order.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | November 6, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

Court granted that motion. Dkt. 64.

On April 1, 2011, the PTO examiner conducting the reexamination issued a final rejection of all five claims at issue. Right of Appeal Notice, Dkt. 90-1. On December 6, 2011, Wahl filed a motion to lift the stay of this action. Dkt. 112. On January 23, 2012, the Court granted that motion. Dkt. 121. On June 17, 2012, the Board of Patent Appeals and Interferences ("BPAI") affirmed the examiner's rejection of the five claims at issue. *Wahl Clipper Corp. v. Laube*, Appeal No. 2012-005338 (BPAI June 17, 2012).

On October 15, 2012, the Court held a *Markman* hearing to construe certain terms and phrases used in the claims of the '973 Patent. On March 8, 2013, the Court granted Wahl's motion for partial summary judgment of non-infringement and invalidity of the '973 Patent. Dkt. No. 314 at 1. The case proceeded to a jury trial on certain non-patent claims; the jury trial concluded on May 2, 2013. Minutes of Jury Trial, Dkt. 360. The jury rendered a verdict adverse to Plaintiffs. *Id.* On May 30, 2013, Laube filed its Motion for Judgment NOV or in the Alternative, New Trial, which the Court denied on August 19, 2013. Dkts. 391 and 436.

On June 18, 2013, the Court held a bench trial on Wahl's inequitable conduct counterclaim. Dkt. 410. On July 18, 2013, the Court issued its Decision Following Bench Trial on Inequitable Conduct, in which it found that Mr. Laube committed inequitable conduct during the prosecution of the '973 Patent. Dkt. 425. On July 29, 2013, Wahl submitted its Request for Award of Attorney Fees, Expenses, and Costs. Dkt. 426.

On August 18, 2013, Laube filed a motion to stay the case pending the conclusion of the reexamination. Dkt. 433. On September 16, 2013, in a Rule 36 judgment, the Federal Circuit affirmed the BPAI's decision affirming the examiner's rejection of claims 1-5. *Laube v. Rea*, No. 13-1048 (Fed. Cir. Sept. 16, 2013). Accordingly, the Court denied, as moot, Laube's motion to stay. Dkt. 450. On September 17, 2013, Laube moved to dismiss all patent related claims and counterclaims based on the reexamination decision and a newly-issued covenant not to sue. Dkt. 448. On October 17, 2013, the Court denied Laube's motion to dismiss, and ordered Wahl to submit a breakdown of its fees incurred in opposing Laube's motion to stay and motion to dismiss. Dkt. 457. Wahl did so on October 21, 2013. Dkt. 459. On October 25, 2013, Wahl submitted a reorganized version of the billing records submitted in support of its original fee request, as directed by the Court's Order of October 15, 2013. Dkts. 460 and 456.

**III.**   **ANALYSIS**

**A.**   **Legal Standard**

1.   Attorney Fees Under § 285 of the Patent Act

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, *fraud or inequitable conduct in procuring the*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | November 6, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed.R.Civ.P. 11, or like infractions. *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (italics added). In an exceptional case, a party is entitled to "the portion of its attorney fees which related to the . . . misconduct." *ICU Med., Inc., v. Alaris Med. Sys., Inc.*, 2007 U.S. Dist. LEXIS 34467, at *8 (C.D. Cal., Apr. 16, 2007), *aff'd*, 558 F.3d 1368, 1380 (Fed. Cir. 2009) (quotation and citation omitted).

    2.    <u>Fees Under § 285 for Companion Reexamination Proceedings</u>

A court may, under certain circumstances, include fees incurred in a related reexamination in a fee award made pursuant to 35 U.S.C. § 285. In *PPG Indus., Inc. v. Celanese Polymer Specialties Co., Inc.*, 840 F.2d 1565 (Fed. Cir. 1988), the Federal Circuit reversed the district court's denial of fees from a related reissue proceeding where it "virtually replaced the district court litigation." *Id.* at 1569. Likewise, in *Minco, Inc. v. Combustion Eng'g, Inc.*, 903 F. Supp. 1204, 1226 (E.D. Tenn. 1995) *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996), the court awarded reexamination fees "because the Court finds that the re-examination proceedings replaced the district court litigation for a period of time, and that the re-examination proceedings were instituted to shorten or to 'possibly obviate the need for a trial,'" and because "after re-examination, there was no need for this Court to try the issue of infringement . . . ."; *see also Howes v. Med. Components, Inc.*, 761 F. Supp. 1193, 1198 (E.D. Pa. 1990) (fees incurred for reexamination "were reasonably necessary to this litigation, especially considering how important the two reexamination proceedings were to this litigation.")

    3.    <u>Standards Applicable to Determining the Fee Amount</u>

The amount of an attorney fee award pursuant to 35 U.S.C. § 285 "is assessed at the discretion of the district court." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983) (citations omitted). "In determining the reasonableness of the award, there must be some evidence to support the reasonableness of, inter alia, the billing rate charged and the number of hours expended. *Id.* (holding sufficient the submission of hourly time records along with documentation in support of the billing rates, even though the attorneys failed to organize the time records in a manner that would allow the district court to review the reasonableness of the hours expended) (citations omitted). "Section 285's requirement that the fees awarded be 'reasonable' is a safeguard against excessive reimbursement. *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir. 1988). "Where, as here, a prevailing party 'has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation . . . .' " *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). District courts may rely on surveys of billing rates for patent litigation in determining the reasonableness of rates charged. *Id.* at 755-56.

    4.    <u>Expense Awards Under § 285</u>

"The award of expenses [is] properly within the scope of § 285." *Cent. Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983) ("The purpose of § 285 is, in a proper case and in the discretion of the trial judge, to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit."); *see also Takeda Chem. Indus., Ltd. v. Mylan Laboratories, Inc.*, 549 F.3d 1381,

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | November 6, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

1391 (Fed. Cir. 2008) (noting that an expense award is allowed under § 285) (citing *Mathis v. Spears*, 857 F.2d 749, 759 (Fed.Cir.1988) (same)); *cf. Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378-79 (Fed. Cir. 1994) (expert fees not awardable under § 285, but available under the Court's inherent sanctions power in especially egregious cases involving bad faith conduct).

**B.       Application**

   1.       Wahl is Entitled to the Fees Solely or Primarily Related to the Patent Aspects of the Litigation

The Court previously determined that Wahl was entitled to its fees for the patent aspect of the case. Decision Following Bench Trial on Inequitable Conduct, Dkt. 425 at 26-27. Laube now re-argues that point, and urges the Court to consider the "closeness of the case, tactics of counsel, the conduct of the parties and any other factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser." Opp'n, Dkt. 431 at 6 (citing *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1051 (Fed. Cir. 1987)). Those factors favor a fee award to Wahl. The matters presented for trial were issues on which the evidence was clear. Laube lost on infringement, validity, and inequitable conduct, all with respect to a simple mechanical patent. As to tactics of counsel, the Court generally did not find Laube's submissions to be a particularly reliable or informative guide to the facts or law. And, as to the conduct of the parties, in its prior orders, the Court has addressed Mr. Laube's conduct during the prosecution of the patent. Thus, even applying Laube's suggested framework, a fee award is appropriate.

Wahl now argues that it should be awarded all of its fees for the entire litigation. Request, Dkt. 426 at 5 (citing *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 267 F. Supp. 726, 788 (S.D. Cal. 1966) (awarding fees on multiple claims because the patent, misappropriation and other claims were so comingled it is "impossible to separately treat the evidence"); *see also Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1564 (Fed. Cir. 1983) ("Where an action combines both patent and nonpatent claims, the nonpatent issues may in some instances be so intertwined with the patent issues that the evidence would, in large part, be material to both types of issues.").

Wahl argues that Laube's contract and fraud claims were inextricably intertwined with the patent claim because the alleged breach of the Stock Transfer Agreement was premised entirely on Wahl's alleged infringement of the '973 Patent and misappropriation of Wahl's trade secrets. Request, Dkt. 426 at 5-6 (citing SAC, Dkt. 50 ¶ 37 (alleging breach "by way of [Wahl's] infringing activities hereinabove alleged," and alleging similar justification for the fraud claim)). Notwithstanding these imprecise allegations in the SAC, the patent and non-patent claims were reasonably separable in this case, as shown by the fact that the Court issued separate summary judgment decisions on the patent and non-patent claims, and held separate trials -- one bench and one jury -- on the remaining patent and non-patent claims. For these reasons the cases cited by Wahl with respect to "intertwinement," are inapplicable.

Wahl also seeks an award of its fees for the entire litigation by arguing that Laube engaged in vexatious litigation conduct, including: (i) improperly naming an individual defendant who was later dismissed; (ii) refusing to prosecute their case, thereby requiring Wahl to take the lead in drafting every joint

A 234

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | Date | November 6, 2013 |
|----------|-------------------------|------|------------------|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

submission, including advising Laube on compliance with local rules; (iii) refusing to comply with their discovery obligations, resulting in two successful motions to compel and one that Wahl withdrew as moot after the *Markman* hearing; (iv) refusing to dismiss their patent claims after the PTO's rejection of claims 1-5 of the '973 Patent; (v) unsuccessfully moving to resurrect their claim for infringement of a different patent; (vi) unsuccessfully seeking dismissal of Laube's patent claims without prejudice after the *Markman* hearing; (vii) attempting to change the scope of the asserted trade secrets on summary judgment; and (viii) requiring additional legal research in response to Laube's claims of entitlement to millions of dollars in punitive damages. Request, Dkt. 426 at 3-4. Laube's lack of success in this matter speaks for itself. However, the Court does not find that the conduct cited by Wahl justifies an award that extends to the non-patent portions of the case.

In an attempt to limit its responsibility for the patent-related fees incurred after claim construction, Laube argues that it attempted to "essentially confess[] judgment" after the *Markman* hearing. Opp'n, Dkt. 431 at 5. However, what Laube actually sought, long after claim construction, was entry of judgment on very narrow non-infringement grounds, subject to its planned appeal, without a decision on invalidity or inequitable conduct. The Court declined Laube's "invit[ation to] extended relitigation" contrary to "the historic federal policy against piecemeal appeals." Order Granting Patent Portions of Mot. for Summ. J., Dkt. No. 314 (quotation omitted). In other words, Laube did not seek to abandon its patent infringement claim with finality, but rather, sought to continue it in the most advantageous posture it could salvage. Laube's avowed intention to continue its pursuit of that claim necessitated all of the subsequent patent work in the case. For this reason, Laube cannot escape liability for the resulting fees.

       2.    <u>Wahl is Not Entitled to the Claimed Fees Solely or Primarily Related to the Reexamination</u>

The authorities cited by Wahl, which are discussed above, support an award of fees for related reexamination only when a party is compelled to participate in the reexamination or when the reexamination displaces a significant portion of the district court litigation. *PPG Indus.,* 840 F.2d 1565; *Minco,* 903 F. Supp. 1204; *Howes,* 761 F. Supp. 1193. Here, Wahl initiated the reexamination and obtained a stay of the litigation until the examiner's final rejection of the claims. At that time, it successfully requested that the stay be lifted before all appeals from the reexamination were exhausted. Minute Order Granting Defendant's Renewed Motion to Lift Stay, Dkt. 123. The Court then construed the claims and granted Wahl's motion for summary judgment of non-infringement and invalidity. Order Granting Patent Portions of Mot. for Summ. J., Dkt. 314 at 1. As a result, this is not a case in which the reexamination "virtually replaced the district court litigation." *PPG Indus.,* 840 F.2d at 1569. Wahl is, therefore, not entitled to the $168,566.33 in fees attributable solely or primarily to the reexamination.

       3.    <u>The Amount of Reasonable Fees</u>

Wahl submitted a detailed explanation and documentation in support of its request for an award of its fees. Declaration of Joan L. Long in Supp. of Wahl's Application for Fees, Dkt. 427, Exs. H & I. The billing entries related solely to the patent claims total $720,329.50. Dkt. 427 at 7. For billing entries related to both patent and non-patent claims, Wahl contends that $573,397.30 is properly allocated to patent

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | | Date | November 6, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

issues. Wahl's total fee request is the sum of these two figures -- $1,293,726.80. Of that amount, $117,825.50 was billed separately for the reexamination, and an additional $50,740.83 was billed in connection with the litigation file, but is attributed solely or primarily to the reexamination. Thus, Wahl seeks $1,125,160.47 of fees that it claims to have been incurred solely or primarily in connection with the patent aspects of the litigation. Declaration of Joan L. Long in Supp. of Wahl's Reply, Dkt. 434-1 ¶¶ 2, 3, 6, Exs. A, B, and D.

After reviewing Wahl's initial submissions in support of its request for fees, the Court Ordered Wahl to submit a revised billing spreadsheet showing, for each individual attorney, the total number of hours charged in connection with the patent aspect of the case, and the hourly rate(s) charged over the applicable time period. Minute Order re Decl. of Joan Long in Supp. of Application for Attorney Fees, Dkt. 456. Wahl submitted three reorganized billing spreadsheets. The first summarizes the fees incurred in connection with the patent aspects of the litigation file, excluding entries related solely or primarily to the reexamination. The second does the same with respect to the work performed in connection with the reexamination. The third presents the data with respect to the billing entries from the litigation file for time related solely or primarily to the reexamination. Decl. of Joan L. Long in Supp. of Def.'s Submission of Reconfigured Attorney Fee Information, Dkt. 460, Exs. 1-3.

The Court has reviewed the detailed billing spreadsheets. This review led to the conclusion that Wahl's apportionment was careful and reasonable. The rates and total fees sought by Wahl are consistent with or below the corresponding average hourly rates charged for patent litigation in Los Angeles noted in the American Intellectual Property Law Association's ("AIPLA") 2009 and 2011 surveys.[2] Dkts. 427-11, 427-12. In this regard, it is noteworthy that the Barnes & Thornburg rates are on the lower end of the survey, the Mayer Brown Los Angeles rates are at the higher end, and the Mayer Brown Chicago rates are in the middle. The Mayer Brown Los Angeles rates are consistent with those charged by similarly experienced lawyers for litigation of similar commercial importance in the Central District of California, with which the Court is familiar. Further, because Wahl has paid all of the fees at issue, it has shown that it believes them to have been reasonable. Decl. of Michael Fliss in Supp. of Wahl's Request for Attorney Fees, Dkt. 426-1. Notwithstanding these indicia of reasonableness, the Court's review of the evidence presented by Wahl has shown that certain downward adjustments are appropriate. Thus, certain particularized reductions are appropriate in the context of a 35 U.S.C. § 285 fee award. These relate to the change in the law firms that represented Wahl, and to some short-term involvement in the matter by a few attorneys.

---

[2] The AIPLA "publishes an Economic Survey every year listing billing rates for intellectual property attorneys based on their degree of experience." *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 987 (Fed. Cir. 2000) (affirming fee award where district court compared billing rates at issue to those reported in the AIPLA survey). The AIPLA 2009 survey found that in the Los Angeles area, mean and median patent litigation partner rates were $503 and $505, respectively, and mean and median patent litigation associate rates were $349 and $320, respectively. Dkt. 427-11 at I-34, I-52. The AIPLA 2011 survey found that in the Los Angeles area, mean and median patent litigation partner rates were $500 and $475, respectively, and mean and median patent litigation associate rates were $383 and $355, respectively. Dkt. 427-12 at I-34, I-52.

A 236

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV09-00914 JAK (JCx) | Date | November 6, 2013 |
|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

During the time period when Wahl's defense was being handled by the Mayer Brown firm, a two associates based in Chicago -- Michael J. Word and Christopher C. Mackey – spent a substantial amount of time on general work on the matter over a six-month period. Dkt. 460-1 at 1-12. Word's initial hourly rate was $295; it rose to $330. Mackey's initial hourly rate was $330; it rose to $375. All of these hourly rates are within the range of prevailing rates in this community. Subsequently, the representation of Wahl shifted to the Barnes & Thornburg firm. Neither Word nor Mackey moved to that firm when others from Mayer Brown did so. Consequently, the investment in each of them by Wahl was lost, and those who replaced them at Barnes & Thornburg had to invest time to become familiar with the case. To account for this inefficiency, the Court finds it appropriate to award only 50% of the time billed by Word and Mackey. Because their combined billings totaled $59,174.38, the Court awards only $29,587.19 of that amount.

There were several other Mayer Brown lawyers who worked on the case, but did not move to Barnes & Thornburgh. However, some of their work was focused and unique, and did not have to be repeated by the new lawyers from Barnes & Thornburg. For example, Steven E. Rich and Neil Soltman worked largely on a motion to disqualify Plaintiff's counsel, which was heard before the case moved to Barnes & Thornburg. Id. at 16-20. Although Soltman's hourly rate of $750 is well within the upper quartile of Los Angeles patent litigation partner rates reported in the AIPLA survey, in the Court's experience, his rate is consistent with rates charged in Los Angeles for attorneys of similar experience and qualifications. See Soltman Online Biography, Dkt. 427-2. Jamison E. Lynch also worked largely on the motion to disqualify, although he also did work on other issues that required a duplication of effort as a result of the transition. Dkt. 460-1 at 12-16. Consequently, based on a review of the billing statements in light of these factors, it is appropriate to reduce by 15% the requested amount of his billings. Thus, the requested amount of $20,505.63 is reduced by $3,075.84, with a resulting award of $17,429.79.

Another Mayer Brown lawyer, David A. Greenfield, worked on the case for a single day. This was not efficient. Id. at 20. Therefore, the Court has denied the request for an award of the $848.13 in fees arising from this work.

The Court finds appropriate the respective hourly rates for each of the lawyers from Barnes & Thornburg who worked on this matter. These rates are below the mean and median rates reported in the AIPLA survey. Partner Mark A. Hagedorn's hourly rate was between $350 and $395. Id. at 22-63. Associate, then partner, Valerie B. Mullican's hourly rate was between $275 and $305. Id. at 98-119. Partner Levi W. Heath's hourly rate was $445. Id. at 119-132. Associate Lucille J. Shelby's hourly rate was between $240 and $280. Id. at 132-138. Associate Elizabeth A. Peters's hourly rate was $290. Id. at 138-140. The finding that these rates are reasonable is also supported by the Court's observation and consideration of the work that each performed during the litigation. Its quality was consistent with the requested rates. Further, the Court has examined the billing records with respect to the hours spent by each of these attorneys and finds that it was reasonable. Notwithstanding the reasonableness of the hourly rates and time charges of the foregoing Barnes & Thornburg attorneys, several of the billing entries from other lawyers and timekeepers generated fees that the Court does not find to be compensable. Again, there are attorneys who worked on the case for very short amounts of time, which is inefficient. Therefore, the Court denies the request for the fees for the work of Dennis M. McWilliams, Daniel P. Albers, David W. Nelson, Peter A. Clark, Benjamin A. Tull, Erin J. Fox, Timothy S. McFadden, Matthew P. Tyrell, Megan M.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | November 6, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

Pirooz, Kathleen A. Fee, and Rhonda Malinowski, each of whom worked on the case only briefly. *Id.* at 140-143 and 155-157. Their combined billings total $9,911.70.

Finally, the Court has considered the different hourly rates charged by Joan L. Long. Her rate was $610 per hour when she was with Mayer Brown, but dropped to $450 when she moved to Barnes & Thornburg, and later increased to $475. *Id.* at 18-20, 63-98. There is no evidence presented with respect to whether the overall cost of the defense would have been higher or lower had matter been handled exclusively by Mayer Brown, *i.e.,* had Long not changed firms. However, the hourly rates charged by Barnes & Thornburg are substantially lower than those of Mayer brown, and at least on that metric, the change in firms would have resulted in lower hourly costs, which would have provided a benefit to Wahl. For purposes of this motion, this would have provided a corresponding benefit to Laube. Nonetheless, the 26% reduction in Long's hourly rate during the course of litigation is unusual. As a result, it presents the issue whether the $610 rate is reasonable. Wahl explained the change, by pointing out that the billing rates of Barnes & Thornburg

> are lower than most of its competitors and the attorney resources available in its less price-heavy cities, such as Grand Rapids, Michigan, provide an even deeper discount on fees. In addition to its competitive standard rate, B&T offered Wahl a discounted rate. And as the case progressed, B&T agreed to forgo the annual rate increases and freeze Wahl's billing rate at the prior year's discounted rate. As a result, the hourly attorney billing rates for Wahl's patent litigation in Los Angeles ranged from $275/hour to $450/hour for attorney time, far below the fee customarily charged in either Los Angeles or Chicago for a patent infringement action.

Dkt. 426 at 9. This explanation is sufficient to explain the rate change. And, it is not appropriate for the Court to second-guess Wahl's choice of counsel. Indeed, had Wahl not changed firms by following Long, it would have incurred both higher hourly rates and the potential cost of having a replacement for Long get up to speed. However, the work performed by Long at the lower hourly rates of $450 and $475 was of the same quality as the work she performed at the higher hourly rate of $610. It is, therefore, appropriate for the Court to consider the rate change in the overall assessment of reasonableness. For that reason, the Court has applied a 15% discount to the fees charged by Long at the higher rate. Applying that discount to the $10,217.50 that Long billed at the higher rate results in a reduction of $1,532.63.

Wahl also submitted a detailed accounting of the fees it incurred in opposing Laube's recent motion to stay and motion to dismiss. Decl. of Joan L. Long in Supp. of Def.'s Suppl. Submission of Attorney Fees Related to Pl.'s Mot. to Stay and Mot. to Dismiss Patent Claims, Dkt. 459. The fees sought were incurred by lawyers actively involved in the bench and jury trials. The total amount sought, $49,106.73, is reasonable when measured under the standards discussed above.

Laube made only omnibus objections to Wahl's apportionment of fees between patent and non-patent matters. Dkt. 431. Thus, Laube did not submit objections on an entry-by-entry basis. Therefore, to the extent the general objections fail, Laube has, in effect, conceded the propriety of the particular fees submitted. *See Gates v. Rowland*, 39 F.3d 1439, 1449-1451 (9th Cir. 1994) (refusing to reduce fee award

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV09-00914 JAK (JCx) | | Date | November 6, 2013 |
|---|---|---|---|---|
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | | |

where opposing party failed to make "adequate specific objections"); *Cotton v. City of Eureka, Cal.*, 889 F. Supp. 2d 1154, 1176 (N.D. Cal. 2012) ("The party opposing fees must specifically identify defects or deficiencies in the hours requested. Conclusory and unsubstantiated objections are insufficient to warrant a reduction in fees.")

In response to Wahl's reorganized submission, Laube lodged supplemental objections. Dkt. 462. There, Laube argued that Wahl spent too much time responding to Laube's recent motion to dismiss. *Id.* at 2 ("The response was a cut and paste and should not have taken more than a couple of hours at most, assuming that all of the referenced cases and statutes were pulled, read and [S]hephardized once again."). That argument is unpersuasive. Laube's recent motions raised new issues that required new research and consideration, as reflected in Wahl's oppositions and the Court's Orders denying those motions. *See* Dkts. 437, 450, 454, and 457. Laube argues that the apportionment made by Wahl between patent and non-patent issues was not sufficiently precise. But, Laube does not present a specific alternative.[3] Dkt. 462 at 10.

Wahl has established the reasonableness of its fees solely or primarily related to the patent aspect of the litigation in the amount of $1,129,311.71, which reflects a reduction of $44,955.49 applied to the submitted fees in this category of $1,174,267.20.[4]

4.    Wahl is Entitled to the Claimed Expenses

Wahl has demonstrated that the expenses for which it seeks recovery are attributable to the patent aspect of the case. Laube's only specific objection to these expenses is that "Wahl has even included costs associated with the jury trial in this case (see for example apportionment of hotel fees for Wahl's counsel during the jury trial, copies and research all on June 12, 2013 in exhibit J at Dkt. 427-10), incurred during the jury trial in which there were NO patent issues . . . ." Laube's Sur-Reply, Dkt. 442 at 5. First, Laube provides no page citation to a 60-page exhibit, and as best the Court can discern, it appears that the date referred to is the billing date, not the date of the expense. To the extent the Court can locate the entries to which Laube objects, it appears that they were apportioned as low as 4.2% to the patent issues, reflecting an appropriate effort by Wahl to apportion expenses in a manner reasonably related to the

---

[3]  Laube also argued that Wahl's fee submission here suffers from problems identified in *Robert I. Toussie v. County of Suffolk*, Case No. 01-CVC-6716(JS)(ARL) (E.D.N.Y. Sept. 6, 2012), an unpublished decision regarding a motion for attorney fees pursuant to 42 U.S.C. § 1988 in a 42 U.S.C. § 1983 case. Dkt. 462 at 3. In *Toussie*, the court found numerous problems with the motion, including: the plaintiff had achieved only de minimis success; the requested fees were grossly excessive; the request related to issues on which plaintiff did not prevail; the request did not segregate travel time; the request was based on rates that greatly exceed those generally awarded; the request sought fees for redacted portions of bills that plaintiff acknowledged were not related to the claims at issue; and the request sought recovery for fees that another judge already had denied. For these reasons, *Toussie* is not analogous to the present case.

[4]  The $1,174,267.20 is comprised of $1,125,160.47 from Wahl's initial fee request, Dkt. 426, and $49,106.73 from Wahl's supplemental fee request relating to Laube's post-trial motions to stay and dismiss. Dkt. 459

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV09-00914 JAK (JCx) | Date | November 6, 2013 |
| Title | Kim Laube & Company, Inc., et al. v. Wahl Clipper Corporation, et al. | | |

patent claims. Dkt. 427-10 at 53. Although the patent claims were not directly at issue in the jury trial, the testimony given there was not immaterial to the evidence presented at the subsequent bench trial. Thus, Mr. Laube testified at both, and Laube's theories of liability were unclear. Wahl is, therefore, entitled to its claimed $84,689.59 in costs and expenses.


IV.     **CONCLUSION**

For the foregoing reasons, the Motion is GRANTED. Wahl is awarded attorney fees in the amount of $1,129,311.71, and costs and expenses in the amount of $84,689.59.



**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer     ak

A 240

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KIM LAUBE & COMPANY, INC., a California corporation; and KIM LAUBE, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>WAHL CLIPPER CORPORATION, an Illinois corporation, DOES 1-10, Inclusive,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIM | Case No. CV-09-914 JAK (JCx)<br><br>**FINAL JUDGMENT**<br><br>JS-6 |

## **FINAL JUDGMENT**

Pursuant to Fed. R. Civ. P. 58, it is hereby ORDERED and ADJUDGED:

That final judgment is entered in favor of Defendants, Wahl Clipper Corporation ("Wahl") and Does 1 to 10, and against Plaintiffs, Kim Laube & Company ("KLC") and Kim Laube ("Laube"), on all of Plaintiffs' claims.

That final judgment is entered in favor of Counter-Plaintiff Wahl and against Counter-Defendant Laube, declaring that:

- Wahl is found not to infringe U.S. Patent No. 6,473,973 ("the '973 Patent").

- All seven claims of the '973 Patent are found and hereby declared to be invalid.

- The '973 Patent is found to have been procured by Laube through inequitable conduct before the United States Patent and Trademark Office and is thus hereby declared unenforceable.

That final judgment is entered in favor of Counter-Defendants, and against Counter-Plaintiff Wahl, on the other Counterclaims.

That final judgment is entered in favor of Wahl and against Plaintiffs declaring this case 'exceptional' under 35 U.S.C. §285.

That the Court awards $1,129,311.71 in reasonable attorney fees to Wahl and against Plaintiffs, KLC and Laube, joint and several, pursuant to 35 U.S.C. §285.

That the Court awards $84,689.59 in costs and expenses to Wahl and against Plaintiffs, KLC and Laube, joint and several, pursuant to 35 U.S.C. §285.

//
//
//

1

A 242

That the Court awards post-judgment interest to Wahl and against Plaintiffs, KLC and Laube, joint and severally, as provided for in 28 U.S.C. §1961 for any time period between the entry of this Final Judgment and the date upon which the judgment has been fully paid.

**IT IS SO ORDERED and SIGNED this 6th day of November, 2013.**

_____
**John A. Kronstadt**
**UNITED STATES DISTRICT JUDGE**

GRDS01 483106v2

2

A 243

# United States Court of Appeals
## for the Federal Circuit

*Kim Laube & Company, Inc., et al., v. Wahl Clipper Corp., et al.,* 2014-1111

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Kent A. Rowald, Esq., Attorneys for Appellants to print this document. I am an employee of Counsel Press.

On **April 11, 2014,** counsel for Appellants has authorized me to electronically file the foregoing (second) **CORRECTED BRIEF FOR APPELLANTS KIM LAUBE & CO. INC. AND KIM EDWARD LAUBE** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Mark A. Hagedorn, Esq.
Barnes & Thornburg LLP
One North Wacker Drive, Suite 4400
Chicago, IL 6060
Telephone: 312-214-4808
Facsimile: 312-759-5646
mhagedorn@btlaw.com

Levi W. Heath
Barnes & Thornburg, LLP
2029 Century Park East. Suite 300
Los Angeles. CA 90067
Telephone: (310) 284-3880
Facsimile: (310) 284-3894
lheath@btlw.com

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court. The brief was originally filed and served on

January 22, 2014 and corrected and refiled on March 26, 2014 pursuant to the Court's March 13, 2014 order.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

April 11, 2014                                    /s/ John C. Kruesi, Jr.
                                                  Counsel Press

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)(C)

I, Kent A. Rowald, am the attorney for the appellants in this appeal.  I certify that the preceding brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, and the word count certification of Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, because the brief contains 11,632 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), as indicated by the word count of the word-processing system used to prepare the brief.

This brief was printed using a 14 point Times New Roman font.

/s/Kent A. Rowald/s/
Kent A. Rowald
Attorney for Appellants
Kim Laube & Co, Inc.
and Kim Laube